**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOSHUA SHUMAN, a minor by and through his mother and natural guardian, TERESA SHERTZER, and TERESA SHERTZER<br>　　　　　　　　　　　　Plaintiffs,<br>　　v. | CIVIL ACTION<br>No. 02-CV-3594<br><br>(GARDNER) |
| PENN MANOR SCHOOL DISTRICT,<br>PENN MANOR SCHOOL BOARD,<br>GARY B. CAMPBELL, individually and as Superintendent of the Penn Manor School District,<br>AND<br>DONALD STEWART, individually and as Acting Superintendent of the Penn Manor School District,<br>AND<br>JANICE M. MINDISH, individually and as Principal of Penn Manor High School of the Penn Manor School District,<br>AND<br>BRIAN D. BADDICK, individually and as Assistant Principal of Penn Manor High School of the Penn Manor School District,<br>AND<br>PHILIP B. GALE, individually and as Dean of Students of Penn Manor High School of the Penn Manor School District,<br>AND<br>CAROLE FAY, individually and as a teacher and Agriculture Coordinator at Penn Manor High School of the Penn Manor School District,<br>　　　　　　　　　　　　Defendants. | |

**PLAINTIFFS' BRIEF  IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.　STATEMENT OF FACTS

Plaintiff, Teresa Shertzer, is the parent and natural guardian of Plaintiff, Joshua Shuman, a minor, now 17 years of age, on whose behalf she has filed suit.

On December 7, 2001, Plaintiff, Joshua Shuman, was attending school at the Penn Manor High School and was in the 10th grade.  (See, Plaintiffs' Complaint, attached hereto as Exhibit "A", paragraphs 4 and14).  During what is known as "second block," Joshua was in the class known as "Geometry/Algebra," along with other students, including a student named Olivia Becker.  (See, Deposition of Joshua Shuman, attached hereto as Exhibit "B", pages, 47-48, 50-51; See also, Deposition of Olivia Becker, attached hereto as Exhibit "C", page 25, lines 19-25).  Joshua and Ms. Becker were talking in that class that day and then began flirting by nudging each other and giggling.  (See, Exhibit "B", pages 47-49; See also, Exhibit "C", pages 25-27).  Ms. Becker was discussing a country-dance club called Low Places, and inviting Joshua to go.  (See, Exhibit "B", pages 49-50).

The two were then in "third block" together as well, which was a class called Agricultural Science II ("Ag Science II").   (See, Exhibit "B", page 34, line 1, page 51, lines 6-9; See also, Exhibit "C", page 27).  This classroom was one of the agricultural rooms, where there were tables, instead of desks, and there were two or three seats per table.  (See, Exhibit "B", page 53, lines 13-19; See also, Exhibit "C", page 33, lines 15-25 and Becker 1 attached to the deposition).  In this room there were three rows of tables, with three tables across each row.  (See, Exhibit "B", page 53, lines 13-16, and Shuman 1 attached to the deposition; See also, Exhibit "C", page 33, lines 23-25 and Becker 1).  During third block on December 7, 2001, the regular teacher, Ms. Fay, was not present.  (See, Exhibit "B", page 51, lines 6-12; See also, Deposition of Carole Fay, attached hereto as Exhibit "D", page 30, lines 22-25, page 52, lines 4-6).  Instead, there was a substitute teacher, Mrs. Myers, in class that day.  (See, Exhibit "B", page 51, lines 10-14).  The entire class was watching a video and completing a worksheet.  (See, Exhibit "B", page 51, lines 19-24).  Some lights in the class were on and some were off.  (See, Exhibit "B", pages 52-53).  The substitute told the students that they could move around the room wherever they wanted to work with a partner.  (See, Exhibit "B", pages 51-52).  Originally, Joshua was seated more in the front of the room, but then he moved to the back where his friend, Jeremy Apple, was seated.  (See, Exhibit "B", pages 51-52).  Mr. Apple got in trouble midway through the video and was

forced to move to the front of the class.  (See, Exhibit "B", page 52, lines 6-10).  Joshua then turned to his right and asked Ms. Becker if she wanted to work on the worksheet with him.  (See, Exhibit "B", page 52, lines 10-12).  She agreed and they began to work together.  (See, Exhibit "B", page 52, lines 12-19).

The two then began nudging and flirting again like that which had occurred in second block.  (See, Exhibit "B", page 59, lines 7-15, and Shuman 2 attached to the deposition).  Ms. Becker touched Joshua's leg first, and then he touched her leg in the mid-thigh area.  (See, Exhibit "B", page 59, lines 15-17 and Shuman 2).  Then she pulled his hand to her crotch and she reached over and started rubbing his penis over his clothes.  (See, Exhibit "B", page 59, lines 17-19, and Shuman 2).   This touching took place for about five minutes.  (See, Exhibit "B", page 59, lines 20-21, pages 65-66, and Shuman 2).  There was no force involved with this touching, nor any resistance by Ms. Becker.  (See, Exhibit "B", page 59, lines 7-19, and Shuman 2).  In fact, she was laughing about it and engaging in the conduct herself, willingly.  (See, Exhibit "B", pages 59-63 and Shuman 2).  She was even asking Joshua to go to Low Places again.  (See, Exhibit "B", page 60-61).  There was never any complaint by Ms. Becker, she never told him to stop, nor was there any disruption of the class.  (See, Exhibit "B", pages 61-63; See also, Exhibit "C", page 64, lines 12-22).

Two other students in the Ag Science II class that day, Jeremy Fritsch and Jay Shaiebly, witnessed some of the contact between Ms. Becker and Joshua.  (See, Deposition of Jeremy Fritsch, attached hereto as Exhibit "E", pages 12-19; Deposition of Jay Shaiebly, attached hereto as Exhibit "F", pages 20-25).  Mr. Fritsch first noticed Ms. Becker and Joshua talking with each other, generally enjoying each other and laughing.  (See, Exhibit "E", pages 15-16).  He then saw Ms. Becker pulling Joshua's hand to her crotch area.  (See, Exhibit "E", page 17, lines 4-6, and Fritsch 1 attached to the deposition).  He looked away after that, but when he looked back again, he saw Ms. Becker's hand come in under Joshua's arm and begin touch Joshua's crotch area.  (See, Exhibit "E", pages 17-18 and Fritsch 1).  He then looked away again and did not look back at them.  (See, Exhibit "E", pages 18-19).  Mr. Fritsch heard Ms. Becker and Joshua talking

during the contact, but did not hear either of them say stop. (See, Exhibit "E", pages 18-19 and Fritsch 1). He also saw no indication that either one of them wanted the other to stop. (See, Exhibit "E", page 19, lines 7-12).

Mr. Shaiebly could only see Ms. Becker and Joshua above the table, but first was able to see Joshua's arm extended toward Ms. Becker and then was able to see Ms. Becker's arm extended toward Joshua. (See, Exhibit "F", pages 20-24). Mr. Shaiebly confirmed that from what he could see, it was a mutual thing and definitely appeared consensual to him. (See, Exhibit "F", page 22, lines 8-20, pages 24-25). He did not see her push away. (See, Exhibit "F", page 26, lines 19-22). It was the general consensus among the students in the class that both Joshua and Ms. Becker were "messing around" together, and the students were talking about it. (See, Exhibit "F", pages 22-23, page 42, lines 3-11). A couple days later, Mr. Shaiebly approached Ms. Becker and asked her what was going on with her and Joshua. (See, Exhibit "F", pages 25-27). Ms. Becker responded by saying Joshua sexually harassed her, but she acted kind of proud when she said it and said it in a bold tone, like she knew what she was doing getting Joshua kicked out of school. (See, Exhibit "F", pages 25-27). Right when she said it, Mr. Shaiebly did not believe a word she said. (See, Exhibit "F", pages 25-27). Mr. Shaiebly also confirms that Mr. Fritsch saw some of the contact between Ms. Becker and Joshua because Mr. Fritsch came to him the next day or two after December 7. (See, Exhibit "F", pages 31-32).

During lunch on December 7, 2001, which followed third block, Ms. Becker's cousin, John Bachman, approached Joshua and asked him if he had sexually touched Olivia against her will. (See, Exhibit "B", pages 67-68, 71-72, and Shuman 2). He was taken off guard by this statement, said "No" and that he did not know what she means because he thought they were in agreement. (See, Exhibit "B", pages 67-68, 71-72, and Shuman 2). Joshua had heard Ms. Becker talking with her cousin right after class and saying that the touching was unwanted. (See, Exhibit "B", pages 68-69).

On Monday, December 10, 2001, Joshua was confronted by another student named Chad during second block. (See, Exhibit "B", page 74, lines 1-17, and Shuman 2). Chad told Joshua

that Olivia told him that Joshua was raping her on Friday. (See, Exhibit "B", page 75, lines 8-15, and Shuman 2). Chad also told Joshua that Ms. Becker was going to the office and that he would be called down. (See, Exhibit "B", page 75, lines 16-22). Joshua said that he had no idea. (See, Exhibit "B", page 76, lines 3-6).

Apparently, in the morning of December 10, 2001, Olivia Becker went to a guidance counselor, Mr. Wildasin, who then brought her to see Defendant, Philip Gale, an Assistant Principal. (See, Deposition of Philip Gale, attached hereto as Exhibit "G", pages 48-49; See also, Exhibit "C", page 25, lines 7-18, page 47, lines 10-15). She told him that on December 7, the Friday before, during Ag class, she had been unwontedly touched by Joshua. (See, Exhibit "G", page 49, lines 18-20). Ms. Becker apparently provided to Mr. Gale the names of four students she claimed she spoke to after class about the incident. (See, Exhibit "G", pages 51-53). Those students are Dustin Lewis, Shawn Bachman, Jenn Nickle and Jay Shaiebly. (See, Exhibit "G", pages 51-53; See also, Notes of Mr. Gale attached hereto as Exhibit "H"). Mr. Gale claims he took brief notes and only wrote down the student names Ms. Becker provided to him; he claims he took no notes about what Ms. Becker told him about the incident. (See, Exhibit "G", pages 51-53; See also, Notes of Mr. Gale attached hereto as Exhibit "H"). Ms. Becker could not remember what she told Mr. Gale, nor could she remember giving him any names. (See, Exhibit "C", pages 47-48). Mr. Gale alleges that he told Ms. Becker that he would investigate her claim. (See, Exhibit "G", page 54, lines 8-10). This meeting with Ms. Becker took approximately ten to fifteen minutes. (See, Exhibit "G", page 54, lines 17-19).[1]

About a few minutes after Chad confronted Joshua during second block, at approximately 10:15 a.m., Joshua was called to the school office to see Mr. Gale, an Assistant Principal. (See, Exhibit "B", pages 75-77, and Shuman 2; See also, Deposition of Philip Gale, attached hereto as Exhibit "G", pages 12-13). When Joshua arrived in his office, Mr. Gale asked him if he knew why he was there. (See, Exhibit "B", page 78, lines 6-14, and Shuman 2). Joshua told him he did not know. (See, Exhibit "B", page 78, lines 6-14, and Shuman 2). Then Mr. Gale asked about a

---

[1] When Mr. Gale's notes were provided after the discovery deadline in this case, he actually did write down some information besides the four students' names. (See, Exhibit "H").

situation that occurred on December 7 with Olivia Becker.  (See, Exhibit "B", page 81, lines 10-14).  Joshua told him he knew there was something there, but he did not figure it was a "situation."  (See, Exhibit "B", page 81, lines 14-17).  Mr. Gale stated that Ms. Becker was claiming that Joshua physically forced his hand upon her sexually, and that she was very upset about it.  (See, Exhibit "B", page 81, lines 17-20, pages 82-83, and Shuman 2).  Mr. Gale did not provide any more detail about what Ms. Becker claimed Joshua did to her.  (See, Exhibit "B", page 112, lines 2-16; See also, Deposition of Teresa Shertzer, attached hereto as Exhibit "M", page 60, lines 2-10).  Joshua then explained what had actually occurred, that it was consensual, and he was able to fully explain his version of the events.  (See, Exhibit "B", page 81, lines 20-22, page 82, lines 12-22, and Shuman 2).  Mr. Gale informed Joshua that the stories "did not match" and asked if he knew what she was talking about.  (See, Exhibit "B", page 81, lines 23-25, page 82, lines 10-11, page 84, lines 6-11, and Shuman 2; See also, Exhibit "G", page 68, lines 9-12).  Joshua told him he had no idea.  (See, Exhibit "B", pages 81-82).  Mr. Gale said he would have to wait in the office while he called down some witnesses to see if anyone actually witnessed the incident.  (See, Exhibit "B", page 82, lines 1-4, and Shuman 2).  Mr. Gale asked Joshua if he knew anyone who may have witnessed something.  (See, Exhibit "B", page 104, lines 2-3, page 105, lines 15-18).  In response, Joshua told him the names of the students seated in the row in front of him – Ben Railing, Chris Enterline and Jeremy Fritsch.  (See, Exhibit "B", page 103-105).  Joshua did not know whether any of these students saw anything at the time, he just thought they might have.  (See, Exhibit "B", page 104, lines 2-7, pages 105-106).  Mr. Gale told Joshua he was going to look into them.  (See, Exhibit "B", page 104, lines 8-10).  However, Mr. Gale also testified that he did not think it was important to find out if Joshua had any witnesses.  (See, Exhibit "G", pages 71-72).  The initial meeting with Mr. Gale took about ten to fifteen minutes.  (See, Exhibit "B", page 96, lines 7-12). Joshua was then put him in a small conference room in the school office and the door was shut.  (See, Exhibit "B", pages 84-85, and Shuman 2; See also, Exhibit "G", page 61, lines 3-5).  Joshua was in that room until Mr. Gale came to take him to lunch around 11:30 a.m.  (See, Exhibit "B", page 88, lines 1-13, page 89, lines 9-16; See

also, Exhibit "G", page 62, lines 16-18).  Mr. Gale took no notes of this interview with Joshua, or

any subsequent interview with Joshua.  (See, Exhibit "H"; See also, Exhibit "G", pages 107-108).

According to Mr. Gale, he only sometimes takes notes, but usually does so if there are a

lot of students involved or if he is taking direct quotes from that person.  (See, Exhibit "G", pages

21-22).  In most cases, there is supposed to be some sort of written record of what takes place in

an interview of a student.  (See, Exhibit "K", page 47, lines 9-15).  The severity of the issue

would determine whether notes are taken.  (See, Exhibit "L", pages 32-33).  Mr. Gale usually

finds witnesses by asking students or by finding them on his own.  (See, Exhibit "G", page 23,

lines 1-7).  For instance, if something happened in a classroom, he would interview the students in

the class, especially those close in proximity to the incident.  (See, Exhibit "G", page 23, lines 8-

18).  He would also normally talk to the teacher in a class if she was in the room.  (See, Exhibit

"G", page 23, lines 21-24).  Mr. Gale stated that he only detains a student in the office if he has

already made a determination that the student will be disciplined and most likely, that the student

will be suspended.  (See, Exhibit "G", pages 33-35).  The student is not sent home because he has

not yet determined the length of the suspension.  (See, Exhibit "G", page 35, lines 2-7).  However,

a student can be sent home pending an investigation.  (See, Exhibit "K", pages 90-91).  And,

parents are to be notified once an administrator knows there is enough investigation to determine

that there is going to be a suspension.  (See, Exhibit "K", pages 45-46).

After speaking with Joshua, Mr. Gale then claims to have spoken to Ms. Becker again.

(See, Exhibit "G", page 63, lines 1-3).  Ms. Becker apparently became angry and told Mr. Gale

that her named witnesses would be able to confirm that it was not consensual.  (See, Exhibit "G",

pages 63-64).  Ms. Becker did not know whether she spoke to Mr. Gale again that day.  (See,

Exhibit "C", page 49, lines 3-6).  Mr. Gale took no notes from a subsequent interview with Ms.

Becker.  (See, Exhibit "H").

Mr. Gale also claims that he then spoke to three or four students named by Ms. Becker –

Dustin Lewis, Shawn Bachman, Jennifer Nickle and Jay Shaiebly.  (See, Exhibit "G", page 65,

lines 10-13, page 52, lines 18-21; See also, Exhibit "H").  He claims he met each of them

separately and that they each confirmed that Ms. Becker came to them after class and explained to them that Joshua had touched her and forced his hand on her. (See, Exhibit "G", page 65, lines 16-24). However, Mr. Gale again took no notes during any of these supposed interviews. (See, Exhibit "H"). One student, Dustin Lewis, has since died and was not available for this case. (See, Exhibit "C", page 15, line 12).

The remaining three students disagree with Mr. Gale's testimony. Shawn Bachman does not remember Ms. Becker telling him anything about the incident. (See, Deposition of Shawn Bachman, attached hereto as Exhibit "I", pages 16-17). Mr. Bachman also does not recall ever being called to the office or speaking with the administrators about this incident. (See, Exhibit "I", page 11, lines 11-12; pages 18-19). He believes he would have remembered if he had been called down because that would have been unusual. (See, Exhibit "I", page 19, lines 1-7). The third witness, Jenn Nickle, also denies that Ms. Becker ever talked to her about the contact between Ms. Becker and Joshua, as she first learned about it days later from other students. (See, Deposition of Jennifer Nickle, attached hereto as Exhibit "J", page 21, lines 10-25, page 22, lines 17-18). In addition, Ms. Nickle denies ever being called down to the office to speak to any of the administrators. (See, Exhibit "J", page 23, lines 6-11). The fourth witness named by Ms. Becker, Jay Shaiebly, was never called down to the office to speak to any administrator. (See, Exhibit "E", pages 29-30). He was a witness to some of the events as set forth above, but denies speaking with Ms. Becker about the incident on December 7. (See, Exhibit "E", page 29, lines 8-11). Even Mr. Gale states that no other students in the class were interviewed at that time, nor was the substitute teacher ever even contacted. (See, Exhibit "G", pages 73-74).

When Mr. Gale took Joshua to the cafeteria, Mr. Gale told Joshua that there were not any witnesses. (See, Exhibit "B", page 88, lines 11-21). Joshua ate between lunches with no other students, but administrators were present. (See, Exhibit "B", pages 88-89). Present were Principal Janice Mindish, Philip Gale, the other Assistant Principals, Brian Baddick and Mr. Martino, as well as other administrators. (See, Exhibit "B", page 90, lines 4-8). Joshua heard Ms. Mindish, Mr. Gale and Mr. Baddick discussing the incident between him and Ms. Becker. (See,

Exhibit "B", page 90, lines 12-25). This was not the first time they had discussed the matter as Mr. Gale informed Ms. Mindish about it sometime in the morning before lunch. (See, Exhibit "K", page 109). He heard them say they were not coming to any conclusions and that they did not have any information. (See, Exhibit "B", pages 90-91). It is typical at Penn Manor High School for the administrators to meet over the lunches and discuss ongoing discipline matters, especially non-routine matters. (See, Deposition of Janice Mindish, attached hereto as Exhibit "K", pages 18-21, 39-40). Sexual harassment claims are not routine, as there have not been many of them at Penn Manor, so the administrators did discuss this incident over lunch. (See, Exhibit "K", page 50, lines 5-16, page 113, lines 3-16). Specifically, they were discussing suggestions, findings, the situation that had taken place and what to do next, and what type of punishment should be dealt out. (See, Exhibit "G", page 76, lines 15-17, page 78, lines 7-16). No one at this conversation suggested trying to do any further investigation at that point. (See, Exhibit "G", page 78, lines 17-20).

The Superintendent of the School District, Donald Stewart, speaks with Ms. Mindish every day. (See, Exhibit "K", pages 22-23, page 24, lines 13-20). He is the CEO of the Board in terms of district operations, and he oversees all schools and the administrators of all schools. (See, Deposition of Donald Stewart, attached hereto as Exhibit "O", pages 27-28). It is his job as Superintendent to oversee the discipline to make sure that the policies and procedures of the Board are carried out. (See, Exhibit "O", page 57, lines 3-8). Ms. Mindish reports non-routine discipline matters to him during those conversations, or might consult him if it is questionable where their legal bounds are. (See, Exhibit "K", pages 23-24). The Superintendent is always notified when there is a suspension of a student that is three or more days. (See, Exhibit "K", pages 57-59). He can be called at different times, depending on if they need his input, but he is definitely informed on the day of the discipline, once the parents have picked up their child. (See, Exhibit "K", pages 59-60). Under the Penn Manor Policy Manual, Section 248, and pursuant to Penn Manor policies and procedures, the Superintendent shall be immediately notified once there is a complaint of unlawful harassment. (See, pertinent sections of the Penn Manor Policy

Manual, attached hereto as Exhibit "N", Section 248, page 3; See also, Exhibit "K", pages 73-74).

Ms. Mindish testified that she believed that Mr. Stewart was called on December 10, 2001 and

informed about the situation between Joshua and Ms. Becker.  (See, Exhibit "K", page125, lines

1-25).  Mr. Stewart stated that he is always notified of sexual harassment cases, but he may not be

involved in the specifics of the investigation.  (See, Exhibit "O", page 37, lines 8-14).  He was

notified in this matter, but not until after discipline handed down.  (See, Exhibit "O", page 74,

lines 10-14).

          After Joshua ate lunch, he was returned to the small conference room.  (See, Exhibit "B",

pages 91-92).  Eventually, Mr. Gale came in along with Mr. Baddick.  (See, Exhibit "B", page 93,

lines 6-9).  Mr. Gale spoke first and said he was trying to get the story straight and that they still

had not found anyone who witnessed the event.  (See, Exhibit "B", pages 93-94).  He also told

Joshua that the police could have been involved and that they stopped Ms. Becker's father from

pressing charges.  (See, Exhibit "B", pages 94-95).  Joshua felt that both Mr. Baddick and Mr.

Gale were trying to get him to change his story by threatening police involvement.  (See, Exhibit

"B", pages 108-109).  Then Mr. Baddick took over and asked Joshua, "So, did you feel her to get

a rise?"  (See, Exhibit "B", page 93, lines 11-14).  Joshua responded by stating, "What do you

think, I'm a pervert?"  (See, Exhibit "B", page 93, lines 14-15).  Mr. Baddick then said that he

was just trying to get his mind set for the day.  (See, Exhibit "B", page 93, lines 16-17).  Mr.

Baddick denies he ever said such statements.  (See, Deposition of Brian Baddick, attached hereto

as Exhibit "L", pages 76-77).  Mr. Gale also denied Mr. Baddick made those statements.  (See,

Exhibit "G", pages 88-90).  This second meeting lasted about ten to fifteen minutes (See, Exhibit

"B", pages 95-96, page 127, lines 6-10).  Joshua did not explain his version of the events to Mr.

Baddick, as Mr. Baddick was only in the room for this brief exchange.  (See, Exhibit "B", page

126, lines 3-6).  Joshua was scared of him because he was pushy and trying to get Joshua to say

something different than before.  (See, Exhibit "B", pages 110-111).  After Mr. Baddick left,

Joshua asked Mr. Gale if he could speak to Ms. Becker and whether he and Ms. Becker could sit

down and sort out the stories.  (See, Exhibit "B", pages 124-125, page 126, lines 7-10).  Mr. Gale

said that they do not do that.  (See, Exhibit "B", page 125, lines 8-9, page 126, lines 11-12).  Then Mr. Gale left and shut the door behind him, leaving Joshua in the room again.  (See, Exhibit "B", page 96, lines 13-18).

It was typical at this school for an assistant principal to walk in to an interrogation of a student by another assistant principal, as they work in teams.  (See, Exhibit "G", pages 80-81). Mr. Gale testified that it is not proper for him to threaten police involvement if he does not believe they will get involved.  (See, Exhibit "G", pages 31-32).  The Superintendent agrees. (See, Exhibit "O", page 88, lines 18-25).  Nonetheless, Ms. Mindish testified that it has been done.  (See, Exhibit "K", page 92, lines 7-25).

At about 1:15 p.m., Mr. Gale returned to the room alone and informed Joshua that there were still no witnesses, but he was going to be suspended for four days for inappropriate conduct because he admitted touching Ms. Becker.  (See, Exhibit "B", pages 96-97, pages 123-124).  This discipline was reached as a team effort between Mr. Gale, Mr. Baddick and Ms. Mindish, before Josh was actually informed.  (See, Exhibit "K", pages 139-144, 121-122; See also, Exhibit "G", page 78, lines 7-20 and Exhibit "L", pages 49, 61-64).  He also told Joshua that there was no proof that there was force involved.  (See, Exhibit "B", page 124, lines 1-4).  He said he was going to call Joshua's mother, Teresa Shertzer, to come pick him up.  (See, Exhibit "B", page 96, lines 23-24).  Mr. Gale used the term "inappropriate conduct" when describing Joshua's discipline; he never used the term "sexual harassment" to Joshua that day.  (See, Exhibit "B", pages 98-100, page 124, lines 15-17).  This third interview lasted for no more than ten minutes. (See, Exhibit "B", page 127, lines 11-16).  Mr. Gale then left the room and proceeded to his office to call Mrs. Shertzer, leaving the conference room door open this time.  (See, Exhibit "B", page 127, lines 18-25).

Mr. Gale called Mrs. Shertzer at approximately between 1:15 and 1:30 p.m.  (See, Exhibit "M", pages 40-41; See also, Exhibit "B", page 127, lines 7-9).  Joshua could hear him on the telephone.  (See, Exhibit "B", page 128, lines 1-6).  Mr. Gale reached Mrs. Shertzer right away. (See, Exhibit "M", page 41, lines 7-10; See also, Exhibit "B", page 128, lines 17-20).  He

identified himself on the telephone and said he had Joshua in his office.  (See, Exhibit "M", page 41, lines 14-17).  He told Mrs. Shertzer that there was an incident at school on Friday, December 7, and that Joshua was involved in "inappropriate touching."  (See, Exhibit "M", pages 41-43; See also, Exhibit "B", page 129, lines 1-6).  She then asked Mr. Gale to explain to her what he was talking about, what was the inappropriate touching.  (See, Exhibit "M", page 43, lines 9-12).  She got absolutely no explanation from him and was instead told again that Joshua was being suspended for inappropriate touching.  (See, Exhibit "M", page 43, lines 12-16).  She continued to ask throughout the conversation what exactly her son was being accused of.  (See, Exhibit "M", page 43, lines 19-22).  Mr. Gale did not answer her and instead told her more than once that the information was confidential and he could not tell her.  (See, Exhibit "M", page 43, lines 19-25).  He only told her that the stories did not match.  (See, Exhibit "M", page 44, lines 4-7).  Mrs. Shertzer requested the name of the other student involved and Mr. Gale refused to give it to her.  (See, Exhibit "M", page 43, lines 16-19; See also, Exhibit "G", page 93, lines 4-6).  Mr. Gale told her that he had a conversation with the other student's father and convinced him not to press criminal charges.  (See, Exhibit "M", page 44, lines 7-10).  Mrs. Shertzer asked whether there could be further investigation involving the school psychologist since the stories did not match.  (See, Exhibit "M", page 44, lines 10-15).  Mr. Gale told her they do not do that.  (See, Exhibit "M", page 44, lines 15-16).  Mr. Gale then advised her that Joshua would be suspended for four days and that she would receive a letter in the mail.  (See, Exhibit "M", page 44, lines 1-4).  Mr. Gale said that when Joshua returns to school, he would be involved in SAP, Student Assistance Program, where a teacher and a group of students would meet with Joshua to discuss the situation.  (See, Exhibit "M", pages 44-45; See also, Exhibit "G", page 93, lines 1-3).  Mrs. Shertzer questioned whether the teacher was a psychologist and why students were involved and she did not really get much of an explanation, so she declined the offer at that point.  (See, Exhibit "M", page 45, lines 5-10).  Then he told her to pick up Joshua.  (See, Exhibit "M", page 45, lines 18-24).  The entire conversation lasted no more than five or ten minutes.  (See, Exhibit "M", page 47, lines 13-15; See also, Exhibit "B", page 129, lines 7-12).

Mrs. Shertzer arrived at the school at approximately 2:00 p.m. (See, Exhibit "M", page 47, lines 16-17; See also, Exhibit "B", page 129, lines 20-22). Mr. Gale came out to meet her and walked her back to the room where Joshua was sitting. (See, Exhibit "M", page 48, lines 2-5; See also, Exhibit "G", page 99, lines 14-17). She noticed that the room was dark and that Joshua looked awful. (See, Exhibit "M", pages 48-49). He was visibly drained and was holding his head down. (See, Exhibit "M", page 49, lines 9-16). Mr. Gale asked Mrs. Shertzer if she had any questions. (See, Exhibit "M", page 48, lines 5-6; See also, Exhibit "G", page 99, lines 17-18). She did not ask any questions because he had not answered anything she asked him on the telephone. (See, Exhibit "M", page 48, lines 6-13). So, she got her son and left. (See, Exhibit "M", page 48, lines 14-15; See also, Exhibit "G", page 99, lines 18-19). When the two got into the car, they started talking. (See, Exhibit "M", page 49, lines 17-21; See also, Exhibit "B", pages 131-132). Joshua told her his version of what happened and that Joshua felt that he got accused of something he did not do. (See, Exhibit "M", pages 49-51; See also, Exhibit "B", pages 131-132). He told her that he was told there were no witnesses, yet they were punishing him and not Ms. Becker. (See, Exhibit "B", page 132, lines 8-11). Mrs. Shertzer was upset at her son's conduct in class and did punish him at home, but felt it was inappropriate for the school to punish them as they did. (See, Exhibit "M", pages 51-52). Mrs. Shertzer told him that she would call Mr. Gale and see what happened. (See, Exhibit "B", page 132, lines 6-8, 19-22).

Mrs. Shertzer called the school and spoke to Mr. Gale the next day, December 11, 2001. (See, Exhibit "M", page 58, lines 10-12; See also, Exhibit "B", pages 132-133). She asked Mr. Gale again what her son was being accused of. (See, Exhibit "M", page 58, lines 3-12; See also, Exhibit "B", page 133, lines 1-11). She wanted to know what the accuser claimed he did to her and they refused to tell her. (See, Exhibit "M", page 56, lines 21-24, 11-14; See also, Exhibit "B", page 133, lines 1-5).

Mr. Gale sent a letter to Mrs. Shertzer about Joshua's discipline dated December 10, 2001. A true and correct copy of said letter is attached hereto in Exhibit "K", as Mindish 2. (See, Exhibit "B", page 145, lines 8-14; See also, Exhibit "G", pages 114-115 and Exhibit "K", pages

13

138-139).  In that letter, it stated that Joshua would be suspended from school for four days from December 11 through December 14, 2001.  (See, Mindish 2 attached to Exhibit "K"; See also, Exhibit "G", page 115, lines 3-8).  It states that the reason for the suspension is "Sexual harassment" and "[m]ore specifically:  Inappropriate conduct."  (See, Mindish 2 attached to Exhibit "K"; See also, Exhibit "G", page 115, lines 3-8 and Exhibit "B", page 145, lines 15-21).  Mr. Gale chose the words to be used in the letter, but there was a discussion between him, Ms. Mindish and Mr. Baddick as to how to classify the discipline.  (See, Exhibit "G", page 115, lines 9-14; See also, Exhibit "K", pages 138-140).  This letter was the first time Joshua had seen or heard the phrase sexual harassment used with regard to his discipline.  (See, Exhibit "B", pages 145-146).  The letter also asked Mrs. Shertzer to call the office to set up a conference, but had no mention of an informal hearing.  (See, Mindish 2 attached to Exhibit "K").  As a result of this letter, Mrs. Shertzer called the school and scheduled the reinstatement conference for Friday, December 14, 2001 at 2:00 p.m.  (See, Mindish 2 attached to Exhibit "K"; See also, Exhibit "G", page 117, lines 1-14).

While Joshua was out for his suspension, Jeremy Fritsch approached Ms. Fay to talk to her about what he witnessed between Joshua and Ms. Becker.  (See, Exhibit "E", pages 20-21; See also, Exhibit "D", page 58, lines 17-25).  They went out of the room and Mr. Fritsch told Ms. Fay what he witnessed as set forth above.  (See, Exhibit "E", pages 21-22).  Ms. Fay told him that there was nothing she could do about it and said just forget it.  (See, Exhibit "E", pages 22-23).  He did nothing else because he figured it was taken care of.  (See, Exhibit "E", pages 58-61).  Ms. Fay did not tell the administrators about Mr. Fritsch.  (See, Exhibit "K", page 145, lines 15-24, page 204, lines 16-18).  The administrators agree that if a teacher is approached by a witness in a disciplinary matter, the teacher should inform the administration.  (See, Exhibit "G", page 139, lines 3-10; See also, Exhibit "K", pages 144-145).  Ms. Mindish testified that had Mr. Fritsch told Ms. Fay what he saw as set forth in his testimony, it could have made a difference in the discipline handed down from the beginning.  (See, Exhibit "K", pages 204-205).  It could have meant that it was consensual and that both should have been disciplined for less time than Joshua

received.  (See, Exhibit "K", pages 132-135).  In fact, according to the Student Handbook, the punishment for inappropriate conduct is a detention.  (See, Exhibit "B", page 101, lines 6-18).

The reinstatement conference did occur on Friday, December 14, 2001.  (See, Exhibit "B", page 137, lines 11-14; See also, Exhibit "G", pages 118-119 and Exhibit "K", page 153, lines 14-24).  Present at the conference were Joshua, Mrs. Shertzer, Mr. Shertzer (Joshua's step-father), their attorney at the time, Herbert Henderson, II, Esquire, Janice Mindish, and Philip Gale.  (See, Exhibit "B", pages 137-138; See also, Exhibit "K", page 154, lines 16-25).  Mrs. Shertzer felt that if she brought an attorney, the administration might answer her questions, because they had not before.  (See, Exhibit "M", pages 71-72).  Ms. Mindish called the Superintendent once she learned that an attorney would be present.  (See, Exhibit "O", pages 94-95; See also, Exhibit "K", pages 125-126).  The conference occurred in Mr. Gale's office (See, Exhibit "B", page 138, lines 1-2; See also, Exhibit "K", page 154, lines 13-15).  Once Joshua and his group were brought back, Ms. Mindish said that it was a reinstatement conference, not an informal hearing.  (See, Exhibit "B", page 138, lines 4-7; See also, Exhibit "K", pages 156-157).  Then she started talking about what Joshua needed to do to get back into the routine of school.  (See, Exhibit "B", page 138, lines 7-13; See also, Exhibit "K", page 155, lines 12-17).  Mrs. Shertzer tried to ask questions about any new witnesses and asked again about documentation of what Joshua was being accused of, specifically, what Olivia Becker said about what Joshua did to her.  (See, Exhibit "B", page 138, lines 14-16; See also, Exhibit "M", pages 73-74 and Exhibit "K", page 155, lines 9-13).  She also asked about any investigative notes or report.  (See, Exhibit "M", page 73-74; See also, Exhibit "K", pages 157-158).  The administrators would not allow questioning about the event, and told Mrs. Shertzer that the information/documentation was confidential. (See, Exhibit "M", pages 73-74; See also, Exhibit "B", page 138, lines 14-18 and Exhibit "K", pages 157-158).  In addition, at the conference, Mr. Shertzer, Mrs. Shertzer and Joshua each specifically asked Mr. Gale directly whether Mr. Baddick said to Joshua, "So, did you feel her to get a rise?"  (See, Exhibit "M", pages 75-76; See also, Exhibit "B", pages 138-139).  Mr. Gale did not respond to any of them, put his head down and started getting red.  (See, Exhibit "M", pages

75-76; See also, Exhibit "B", pages 138-139).  This statement was offensive to the Shertzers and Joshua.  (See, Exhibit "M", pages 76-77; See also, Exhibit "B", page 141, lines 1-5, 19-23).  Before they got up and left the conference, Mrs. Shertzer asked Mr. Gale if he would take sexual harassment off of Joshua's record and all would continue as normal.  (See, Exhibit "M", page 75, lines 3-10).  He looked at her and said, "No."  (See, Exhibit "M", page 75, lines 10-11).  Then it was Ms. Mindish who declared the conference over.  (See, Exhibit "M", page 100, lines 2-22).  The conference only lasted about fifteen minutes.  (See, Exhibit "K", page 158, lines 13-16).

Joshua returned to school on Monday, December 17, 2001.  (See, Exhibit "B", pages 146-147).  Upon his return, he was provided with a document, signed by Mr. Gale, that there had been a successful parent conference held.  (A true and correct copy of said document is attached hereto as part of Exhibit "K", attached as Mindish 3).  On that day, he was teased and harassed by other students for the discipline.  (See, Exhibit "B", page 147, lines 5-10).  Specifically during breakfast, four students were harassing him about getting kicked out for touching a girl inappropriately.  (See, Exhibit "B", page 147, lines 11-22).  Then, in first block, four students began calling him Chester the Molester and were picking on him and teasing him.  (See, Exhibit "B", page 148, lines 5-23).  The teasing and harassing got so bad that he walked out of school after lunch and walked the six miles all the way home.  (See, Exhibit "B", pages 149-151).  Mrs. Shertzer called Mr. Gale to let him know Joshua was at home because he had walked out of school due to teasing.  (See, Exhibit "M", pages 97-98).  The next day, some friends were asking him about the events, other students were still calling him Chester, and essentially, it was all over the school – everybody was talking about it.  (See, Exhibit "B", pages 152-153).  He could hear people whispering about it when he walked down the hall.  (See, Exhibit "B", page 152, lines 23-25).  About two days after he was back at school, John Bachman and Dustin Lewis threatened Joshua after third block on the way to lunch.  (See, Exhibit "B", page 153, lines 11-25).  They told him they were going to "kick his ass."  (See, Exhibit "B", page 154, lines 1-19).  Joshua kept hearing about it at school until the end of the year.  (See, Exhibit "B", pages 154-155).

As a result of his discipline, Joshua was prohibited from being involved in certain activities. (See, Exhibit "M", pages 124-126). Ms. Fay would not allow him to be in Future Farmers of America and he was not permitted to go on field trips with them. (See, Exhibit "M", pages 124-125). Joshua lives for farming – it is a love of his, so he was devastated by this prohibition. (See, Exhibit "M", page 125, lines 3-11). There are a number of other events that go along with being an agricultural student that Joshua was forced to miss as a result of his discipline – showing livestock at the local fairs and attending the Farm Show. (See, Exhibit "M", pages 125-126).

On January 16, 2002, Mrs. Shertzer went back to the school to review the Penn Manor Policy Manual, and while she was there, she also asked to see her son's discipline record. (See, Exhibit "M", pages 85-86). She called Ms. Mindish two or three days before to schedule a time to view the manual and although Ms. Mindish did get defensive with her, she was permitted to view the manual and get copies of sections she wanted. (See, Exhibit "M", pages 86-88). While she was viewing the manual, she asked the secretary there if she could see Joshua's discipline record. (See, Exhibit "M", page 89, lines 4-10). Eventually, Mr. Gale came out with a manila folder that was empty. (See, Exhibit "M", page 89, lines 12-18). Ms. Mindish came out and Mrs. Shertzer told her that there had to be something in Joshua's discipline record as he was just suspended for four days. (See, Exhibit "M", pages 89-90). When Mrs. Shertzer asked for the record, Ms. Mindish's voice got loud and she got physically close to Mrs. Shertzer. (See, Exhibit "M", page 100, lines 2-10). Mr. Gale told her there were personal notes but Mrs. Shertzer was not allowed to see them. (See, Exhibit "M", pages 89-90). The two administrators left to call the solicitor and then Mr. Gale returned with the letter to Mrs. Shertzer dated December 10, 2001. (See, Exhibit "M", pages 90-91). When Mrs. Shertzer asked about Joshua's prior detention, Mr. Gale then brought her a blue card with the notation on it. (See, Exhibit "M", pages 90-91). She never saw his notes and by the end of the meeting, Mr. Gale was saying that there was no documentation. (See, Exhibit "M", page 90, lines 17-21).

Pursuant to the Penn Manor Policy Manual, Section 248, when a student brings a complaint against another student for unlawful harassment, the Principal shall conduct a thorough investigation and shall prepare a written report summarizing the investigation and recommending disposition of the complaint.  (See, pertinent sections of the Penn Manor Policy Manual, attached hereto as Exhibit "N", Section 248, page 3).  Copies of the report shall be provided to the complainant, the accused, the Superintendent and others directly involved.  (See, Exhibit "N", Section 248, page 3).

Despite the repeated requests previously mentioned, Mrs. Shertzer and Joshua were not provided with any documentation about the incident until after their lawsuit was filed.  (See, Exhibit "M", pages 73-74; See also, Exhibit "K", pages 162-163).  That was when they were provided with a document entitled "Summary of Events in Josh Shuman case."  (See, Exhibit "M", pages 73-74; See also, Exhibit "K", pages 162-163).  Ms. Mindish and Mr. Gale both consider this Summary their investigative reports.  (See, Exhibit "K", pages 127-128; See also, Exhibit "G", page 100, lines 2-24, page 141, lines 19-24).  Mr. Gale admits that he prepared page one of this Summary sometime after Joshua had returned to school and that he was remembering back, not taking the information from any notes he had.  (See, Exhibit "G", pages 107-108).  Ms. Mindish apparently had page two of the Summary typed up from her notes right after her interview with Ms. Becker and then forwarded it to the Superintendent pursuant to his request and direction.  (See, Exhibit "K", pages 175-176).  The practice at Penn Manor is to provide the Superintendent with the notes and/or investigative report, who then, sometimes in consultation with the solicitor, informs Ms. Mindish who should get them.  (See, Exhibit "K", pages 75-78).

Under Section 248 of the Penn Manor Policy Manual, Policy 218, if it is concluded that a student has made false accusations against another, that student shall be subject to disciplinary action.  (See, Exhibit "N", Section 248, page 4).

On or about January 23, 2002, Joshua made a written complaint against Ms. Becker for making false accusations against him under the Unlawful Harassment section of the Penn Manor Policy Manual.  (A true and correct copy of said complaint is attached hereto as part of Exhibit

"K", as Mindish 4). His complaint sets forth what actually occurred on December 7, 2001 and identifies the corroborating witness, Jeremy Fritsch. (See, Mindish 4, attached to Exhibit "K"). Joshua handed this complaint to Ms. Mindish on or about January 25, 2002. (See, Exhibit "K", pages 163-165). According to Ms. Mindish, this was the first time she was made aware of Jeremy Fritsch. (See, Exhibit "K", pages 163-164). Ms. Mindish said upon receiving this complaint/letter from Joshua, she probably called the Superintendent, who is Donald Stewart, discussed the matter with him and they decided to investigate it like any other harassment. (See, Exhibit "K", pages 165-166). Mr. Gale interviewed Mr. Fritsch and Ms. Mindish interviewed Ms. Becker. (See, Exhibit "K", page 166, lines 4-15). Mr. Fritsch remembers speaking to Mr. Gale and telling him what he saw and Mr. Gale taking notes. (See, Exhibit "E", page 23, lines 9-21, and Fritsch 1 attached thereto). However, Mr. Gale claims Mr. Fritsch said he had no recollection of it and that he did not see anything while in class. (See, Exhibit "G", page 133, lines 5-16). Ms. Mindish states that Mr. Gale told her that Mr. Fritsch observed Joshua's and Ms. Becker's hands together, going towards Ms. Becker, but he could not tell who was guiding who. (See, Exhibit "K", pages 193-195). Mr. Fritsch also was not aware of her saying no or pushing him away. (See, Exhibit "K", page 194, lines 2-4, 20-23). When Mr. Gale's notes were provided after the discovery deadline in this case, which are attached in Exhibit "H", they show that Mr. Fritsch told Mr. Gale that he saw Ms. Becker pull Joshua's hand to her crotch and that he told that to Ms. Fay on Monday. (See, Exhibit "H").

Pursuant to Section 248 of the Penn Manor Policy Manual, if an accused is not satisfied with the principal's disciplinary decision, he may file a written appeal to the Superintendent. (See, Exhibit "N", Section 248, page 4). No deadline is stated in the Policy Manual for the filing of this appeal with the Superintendent. (See, Exhibit "N", Section 248, page 4).

On or about January 24, 2002, Plaintiffs, by and through their undersigned counsel, sent a written appeal letter to the Superintendent of Penn Manor Schools, pointing out the failure to hold an informal hearing, the failure to properly investigate the allegations and prepare a written report, and the improper detention and questioning/interrogation of Joshua for approximately four

hours on December 10, 2001.  (See, letter to Superintendent dated January 24, 2002, attached to Exhibit "O" as Stewart 1).  The Acting Superintendent at the time, Donald Stewart, received the letter and he did not believe it was the first time he was presented with the facts of this matter.  (See, Exhibit "O", pages 125-126, 133-134, page 128, lines 13-19).  Mr. Stewart also testified that he has the power to cause an investigation to be reopened, if, for instance, he is presented with evidence that changes the findings.  (See, Exhibit "O", pages 126-128).  The Superintendent, by and through the solicitor for the Penn Manor School District, acting on behalf of the Superintendent, responded by letter on February 12, 2002, by stating that the appeal is untimely and that no further action by the School District is warranted or necessary.  (See, letter from solicitor dated February 12, 2002, attached to Exhibit "O" as Stewart 2).

According to 22 Pa. Code §§ 12.6 and 12.8 and the Penn Manor Policy Manual Section 233, when a suspension is for more than three (3) days, the student shall be entitled to an informal hearing.  According to § 12.8, the following due process requirements are to be observed in regard to the informal hearing:

    a.      Notification of the reasons for the suspension shall be given in writing to the parents or guardian and to the student.
    b.      Sufficient notice of the time and place of the informal hearing shall be given.
    c.      A student has the right to question any witnesses present at the hearing.
    d.      A student has the right to speak and produce witnesses on his own behalf.
    e.      The district shall offer to hold the informal hearing within the first 5 days of the suspension.

According to the Section 233 of the Penn Manor Policy Manual:

The Board recognizes that exclusion from the educational program of the schools, whether by suspension or expulsion, is the most severe sanction that can be imposed on a student in this district and one that cannot be imposed without due process.

No student may be suspended without notice of the reasons for which s/he is suspended and an opportunity to be heard in his/her own behalf…

When the suspension exceeds three (3) school days, the student and parent or guardian will be given the opportunity for an informal hearing with the designated

school official.  Such hearing shall take place as soon as possible after the
suspension, except when extraordinary circumstances involving the health and
safety of the student or others in the school require immediate exclusion, the
hearing may be delayed to such time as circumstances permit.

(See, Exhibit "N", Section 233, page 1).

The administrators of Penn Manor do not agree as to when an informal hearing takes place
so that the due process requirements are satisfied.  Ms. Mindish testified that it occurs when the
parent picks up the child, or at another scheduled time if the parent does not have the time then.
(See, Exhibit K", pages 67-68, 70-71).  She agreed that the policy requires an informal hearing to
take place **after** the suspension, but she understands that to mean after the decision is made to
suspend the student.  (See, Exhibit "K", pages 68-69).  It should not occur during the
investigation process, such as during the interviews, or at the reinstatement conference.  (See,
Exhibit "K", pages 69-70, 62-66).  Ms. Mindish has never been involved in an informal hearing
where witnesses are called, and the student speaks, and can call witnesses on his behalf.  (See,
Exhibit "K", pages 181-182).

Mr. Baddick believes an informal hearing takes place **during** the investigation process,
when meeting with the students and talking about the outcome.  (See, Exhibit "L", pages 34-40).
He considers that there is an informal hearing in any disciplinary matter.  (See, Exhibit "L", page
40, lines 15-18).  When asked whether a student should be entitled to present witnesses on their
behalf at an informal hearing, Mr. Baddick replied, "That has never happened to me in my four
years."  (See, Exhibit "L", page 35, lines 7-12).  Mr. Baddick testified that he has sat down with
both accused student and complaining student "through the process of mediation," so it
apparently can happen, but it is not mandatory.  (See, Exhibit "L", page 42, lines 4-23).

Mr. Gale also believes the informal hearing takes place **during** the investigation process,
as it is an ongoing process, from when he meets the student who is being accused right from the
beginning, when they're in his office.  (See, Exhibit "G", page 24, lines 1-16).  However, in the
Summary of Events he prepared (See, Mindish 1, attached to Exhibit "K"), he stated that the
telephone call with Mrs. Shertzer and the meeting time he had with Joshua was "normally
considered to be the informal hearing."  (Exhibit "G", pages 110-111).  He understood that the

accused is entitled to call witnesses and question the accuser at an informal hearing, yet he considers that a right to make the request, not a right to actually question. (See, Exhibit "G", pages 26-27). If the accuser does not want to be questioned by the accused, he or she does not have to be questioned. (See, Exhibit "G", page 27, lines 1-21). Mr. Gale says he permits the accused to call witnesses at his informal hearing, and also to come back later if, at the time, he does not know of any witnesses, but then stated that he does not tell the accused student that. (See, Exhibit "G", pages 29-30).

   Mr. Stewart believes that an informal hearing is an opportunity for the student and his parents to discuss the circumstances and understand the circumstances of the suspension. (See, Exhibit "O", page 46, lines 1-11). Such a hearing would take place at several opportunities, in his opinion, oftentimes when the parent picks up their child from school, or at a different meeting requested by the parents. (See, Exhibit "O", pages 46-47, page 50, lines 18-25). He agreed that the hearing should take place **after** the suspension. (See, Exhibit "O", page 46, lines 16-20). Mr. Stewart also understood that there needs to be some notice given to the parents of the time and place of the informal hearing, but he did not necessarily agree that they had to be told that "this is your informal hearing," or that it had to be in writing. (See, Exhibit "O", pages 47-49). He recognized that the student has a right to question witnesses at an informal hearing, but when a hearing occurs when the parents pick up their child, he stated that it could only occur if the witnesses were still at school and then agreed to be questioned. (See, Exhibit "O", page 49, lines 4-19). He also was not sure if the parents should be told that they had a right to question witnesses at that time, or a right to call witnesses on their own behalf. (See, Exhibit "O", pages 49-50, 51-52). Nonetheless, it was not the practice in Penn Manor to tell the parents that they are entitled to an informal hearing or that they can call witnesses at such a hearing. (See, Exhibit "O", page 51, lines 19-24). Mr. Stewart did believe that as part of the informal hearing process, the parent and student need to be informed of what the accuser is saying the accused did in detail. (See, Exhibit "O", pages 54-55). In fact he testified that he could not see a circumstance where a

parent would ask to know what the accusations were and would not receive the information. (See, Exhibit "O", page 56, lines 1-10).

The solicitor for Penn Manor is also not clear as to when an informal hearing is to occur. (See, Stewart 2 attached to Exhibit "O").  He claims in his letter on behalf of the Superintendent that the informal hearing can occur **during** the investigation process and also claims that it occurred at the time of the reinstatement conference on December 14, 2001.  (See, Stewart 2 attached to Exhibit "O").

Joshua did finish the tenth grade at Penn Manor High School, but transferred to the 21st Century Cyber School for the eleventh grade.  (See, Exhibit "B", pages 155-157; See also, Exhibit "M", pages 93-94).  It was a joint decision to do it between the Shertzers and Joshua due to the teasing and harassing he was receiving and due to the fact that Mrs. Shertzer believed he was losing respect for the administrative staff and the teachers after the disciplinary action.  (See, Exhibit "B", page 156, lines 8-22; See also, Exhibit "M", pages 93-94).  Based on another joint decision, Joshua returned to Penn Manor High School for his senior year.  (See, Exhibit "M", page 102, lines 19-24).  Joshua wanted to return to be with his friends and graduate with his class. (See, Exhibit "B", page 157, lines 10-15).  He did not do well in the Cyber School, possibly due to the lack of structure and lack of contact with other people and Mrs. Shertzer noticed that he was disconnecting from his family.  (See, Exhibit "M", pages 104-105, 106-107).  He has been better since he has returned to a structured school environment, and, although she has her concerns about his return, Mrs. Shertzer also believes that he has matured since he has been away. (See, Exhibit "M", pages 104-107).

As a result of the actions of the Defendants, Joshua started to treat with his therapist, Hubert Wood, MS, LPC.  (See, Reports and C.V. of Hubert Wood, attached hereto as Exhibit "P").  According to Hubert Wood in his report dated October 13, 2003, when Joshua came to him on December 11, 2001, he was emotionally upset, worried and anxious as a result of what had happened to him on December 10.  (See, Exhibit "P").  Joshua continued to treat until January 23, 2002.  (See, Exhibit "P").  Diagnosis at that time was Adjustment Disorder with Depression and

Joshua continued to show signs of distress and anxiety.  (See, Exhibit "P").  Joshua then began to treat again with Hubert Wood beginning July 9, 2003, because he was re-enrolling at Penn Manor for his senior year.  (See, Exhibit "P").  This treatment continued until September 22, 2003.  (See, Exhibit "P").  Since the incident at Penn Manor in December 2001, Hubert Wood finds that Joshua appears more cautious and less willing to take appropriate risks.  (See, Exhibit "P").  He also finds Joshua less trusting of people in authority, and that he worries in the future, his version of things may not be taken into account as strongly as other people's.  (See, Exhibit "P").  He recognized that Joshua was most distressed from December 11, 2001 through January 23, 2002.  (See, Exhibit "P").  He also finds Joshua as more guarded now and protective of himself.  (See, Exhibit "P").  He finds that Joshua's feelings will continue, but over time, and with further experience, they will become less severe.  (See, Exhibit "P").

In his supplemental report on October 27, 2003, Hubert Wood confirmed that Joshua began treatment another time and continues to see him.  (See, Exhibit "P").  The treatment focused on that fact that the students at Penn Manor have begun to tease him again.  (See, Exhibit "P").  In addition, the supplemental report mentions that another student was teasing Joshua that he had raped a fellow student.  (See, Exhibit "P").   Joshua became angry, upset, hurt, disappointed and sad, about the teasing.  (See, Exhibit "P").

Mrs. Shertzer confirms that Joshua now needs continual positive reinforcement that she and his stepfather believe what he is saying.  (See, Exhibit "M", pages 106-107).  Also as a result of these occurrences, Mrs. Shertzer has suffered out of pocket expenses for medical treatment for her son, education costs, and lost work, as well as pain and suffering to herself in observing her son and his situation and having to take on an additional role as her child's sole support system.  (See, Exhibit "A",  ¶ 50; See also, Exhibit "M", pages 101-102, 110-112).

During this case, Plaintiffs' expert, Dr, Edward Dragan, reviewed the materials and conduct of Defendants and issued opinions criticizing their conduct on many levels.  (See, Expert Reports of Dr. Dragan and his C.V., attached hereto as Exhibit "Q").  Defendants did not hire a liability expert in this case.

II.    **ARGUMENT**

    A.    **Standard of Review**

    A motion for summary judgment may not be granted unless the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56.  The court may grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact.  Fed.R.Civ.P. 56(c).  An issue of fact is " 'genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party."  Childers v. Joseph, 842 F.2d 689, 693-694 (3d Cir. 1988), *citing*, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

    The burden of proving that there is no genuine issue of material fact is initially on the movant.  Forms, Inc. v. American Standard, Inc., 546 F. Supp. 314, 320 (E.D. Pa. 1982), *aff'd mem.*, 725 F.2d 667 (3d Cir. 1983).  Upon such a showing, the burden shifts to the nonmoving party.  Id.  The nonmoving party is required to go beyond the pleadings and by affidavits or by "depositions, answers to interrogatories and admissions on file" designate "specific facts showing that there is a genuine issue for trial."  Fed.R.Civ.P. 56(e).

    In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party.  White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988).  In doing so, the court must accept the nonmovant's allegations as true and resolve any conflicts in his favor.  Id., *quoting*, Gans v. Mundy, 762 F.2d 338, 340 (3d Cir. 1985), *cert. denied*, 474 U.S. 1010 (1985); Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038 (1977).  To show that there is a genuine issue for trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), but "need not match, item for item, each piece of evidence proffered by the movant."  Big Apple BMW, Inc. v. BMW of N. Am., Inc. 974 F.2d 1358, 1363 (3d Cir. 1992).  "In practical terms, if the [nonmovant] has exceeded the 'mere scintilla' threshold and has

offered a genuine issue of material fact," the Court must deny the summary judgment motion." Id., at 1363.

**B.    Claims Brought Under 42 U.S.C. § 1983**

Section 1983 provides a cause of action when two essential elements are established:  (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States.  See, Abbott v. Latshaw, 164 F.3d 141, 145-47 (3d Cir. 1998). Defendants do not dispute that they were acting under color of state law.  It is the second element that Defendants dispute.

The U.S. Supreme Court has rejected the notion that public schools, like private schools, exercise only parental power over their students which is not subject to constitutional constraints. New Jersey v. T.L.O., 469 U.S. 325, 336 (1985).  However, T.L.O. also stated that States are permitted a degree of supervision and control over students in public school that could not be exercised over free adults.  Id. at 339.  "Thus, while children assuredly do not 'shed their constitutional rights…at the schoolhouse gate,' Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 506, 89 S. Ct. 733, 736, 21 L.Ed.2d 731 (1969), the nature of those rights is what is appropriate for children in school."  Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 655-656 (1995).

**1.    First Amendment**

Plaintiffs' First Amendment claim in Counts II and VII of their Complaint concerns the fact that Plaintiffs were not provided access to the information they are entitled to receive. (Exhibit "A", ¶s 89-92).  Specifically, Plaintiffs were entitled to receive information regarding the investigation of Ms. Becker's complaint, as well as the details of what she claimed he did to her.

Precedents from the Supreme Court have focused "not only on the role of the First Amendment in fostering individual self-expression but also on its role in affording the public access to discussion, debate, and the dissemination of information and ideas."  Board of Education, Island Trees Union Free School District No. 26 v. Pico, 457 U.S. 853, 866 (1982),

*citing*, First National Bank of Boston v. Bellotti, 435 U.S. 765, 783 (1978). The Court has held

that in a variety of contexts, "the Constitution protects the right to receive information and ideas."

Board of Education, Island Trees Union Free School District No. 26 v. Pico, 457 U.S. 853, 866

(1982), *citing*, Stanley v. Georgia, 394 U.S. 557, 564 (1969) and Kleindienst v. Mandel, 408 U.S.

753, 762-763 (1972) (*citing cases*). The Court in Kleindienst actually held that "[i]t is now well

established that the Constitution protects the right to receive information and ideas." Kleindienst

v. Mandel, 408 U.S. at 762-763. "Underlying the First Amendment right of access…is a common

understanding that 'a major purpose of that Amendment was to protect the free discussion of

governmental affairs.'" Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501, 517

(1984) (STEVENS, J., concurring), *citing*, Mills v. Alabama, 384 U.S. 214, 218 (1966). That

way, the First Amendment ensures that citizens can effectively participate in and contribute to our

republican form of self-government. Press-Enterprise Co. v. Superior Court of California, 464

U.S. 501, 517 (1984) (STEVENS, J., concurring), *citing*, Globe Newspaper Co. v. Superior Court,

457 U.S. 596, 604 (1982). "Without some protection for the acquisition of information about the

operation of public institutions…by the public at large, the process of self-governance

contemplated by the Framers would be stripped of its substance." Press-Enterprise Co. v.

Superior Court of California, 464 U.S. 501, 517 (1984) (STEVENS, J., concurring), *citing*,

Houchins v. KQED, Inc., 438 U.S. 1, 30, 31-32 (1978) (STEVENS, J., dissenting) (footnotes

omitted). A party relying on the First Amendment as a source of a right of access to government-

held information would normally have to allege and prove that access has traditionally been

afforded to the public and that access "plays a significant positive role in the functioning of the

particular process in question." Capital Cities Media v. Chester, 797 F.2d 1164, 1174 (3d Cir.

1986), *citing*, Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501 (1984).

     In this case, Plaintiffs are not only able to show material facts at issue, but they are also

able to show that they have a right of access to information protected by the First Amendment.

The School District, who is a governmental entity, failed to provide Plaintiffs with their

investigative report or specifically what the accuser, Ms. Becker, claimed Joshua did to her on

December 7, 2001, at least until long after suit was filed.  Under the Penn Manor Policy Manual,

Section 248, when a student brings a complaint against another student for unlawful harassment,

the Principal shall conduct a thorough investigation and shall prepare a written report

summarizing the investigation and recommending disposition of the complaint.  Copies of the

report shall be provided to the complainant, the accused, the Superintendent and others directly

involved.  (Exhibit "N").  Pursuant to this policy, Plaintiffs, as well as any other student and their

parents in such a situation, have a right to receive the investigative report, which was being held

by the School District.

In addition, the Due Process Clause (which will be discussed at length in Section B.3.)

requires, in connection with a suspension of 10 days or less that:

> the student be given oral or written notice of the charges against him and, if he denies
> them, an explanation of the evidence the authorities have and an opportunity to present his
> side of the story.

Goss v. Lopez, 419 U.S. 565, 581 (1975).  Until after this case was filed, Plaintiffs were not

provided information as to specifically what Ms. Becker claimed Joshua did to her.  They were

entitled to receive this information under Goss once Joshua denied that any touching was against

Ms. Becker's will.  At that point, since Joshua's and Olivia's versions "did not match," Mr. Gale

was required to give him an explanation of the evidence the authorities had.  All he told Joshua

was that Ms. Becker claimed that Joshua physically forced his hand upon her sexually, and that

she was very upset about it.  (Exhibit "B", pages 81-83, and Shuman 2).  Mr. Gale refused to tell

Mrs. Shertzer Ms. Becker's name on the telephone and refused to tell her what she claimed

Joshua did to her.  (Exhibit "M", page 43).  Both Mr. Gale and Ms. Mindish refused to provide to

Plaintiffs any notes that were taken during the investigation or any investigative report, as well as

any details about the evidence that they had against Joshua despite repeated requests by Mrs.

Shertzer on the telephone (Exhibit "M", page 56), at the reinstatement conference (Exhibit "M",

pages 73-74), and during the time she visited the school on January 16, 2002 to view the policy

manual (Exhibit "M", pages 89-90).  Mrs. Shertzer, through counsel, even advised the

Superintendent of her right to receive a report and that none was ever received.  (Stewart 1 in

Exhibit "O"). Given this information, Plaintiffs have shown that access to this information has traditionally been afforded to the public, i.e., other students and parents similarly situated.

Plaintiffs are also able to prove the second element - that the access to the information would play a significant positive role in the functioning of the particular process in question. The information that should have been provided to Plaintiffs concerned a public institution, Penn Manor School District, and its operations concerning student discipline. Requiring the administrators to supply this information to the students and parents keeps their discipline in check to ensure that they are following their own policies and procedures and not disciplining students based on false or insufficient evidence. That is exactly what occurred in the instant case. Joshua was disciplined based on both false and insufficient evidence and the Plaintiffs were unable to prove it, outside of their own knowledge of what occurred, until suit was filed and the information was supplied. Furthermore, Plaintiffs' expert, Dr. Edward Dragan found, after reviewing the conduct of Defendants, that it was improper for the information not to be turned over the Plaintiffs. (Exhibit "Q", pages 30-31). Therefore, the Defendants violated Plaintiffs' First Amendment right of access to this information and this claim must not be dismissed.

### a.    Liability of the School District and the Board

In Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978), the United States Supreme Court decided that a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation in question. As such, there is no respondeat superior or vicarious liability for municipalities under § 1983. Id., at 694-695. This rule includes School Districts. See, Glickstein v. Neshaminy School District, 1997 WL 660636 (E.D. Pa.); Smith v. School District of Philadelphia, 112 F.Supp.2d 417 (E.D. Pa. 2000); Pa.R.Civ.P. 76 (defining "political subdivision" to include school districts). Under Monell, the local government can be liable under § 1983 for the execution of a policy or custom that inflicts the injury. Id., at 694-695. The Court pointed out that § 1983 also authorizes suit "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Id., at

690-691.  In other words, the municipalities will be held responsible when their official policies or customs cause their employees to violate another person's constitutional rights.  However, the Court went on to state that they are not addressing what the full contours of local government liability may be under § 1983, and will leave that for further development on another day.  Id. at 695.

The Monell case and those that followed did not change a very basic principle in municipal liability under § 1983 - that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express policy, is "so permanent and well settled as to constitute a 'custom or usage' with the force of law."  Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-168 (1970).  This principle, which was unaffected by Monell, ensures that most deliberate governmental evasions of the Constitution will be sharply limited.  See, City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).  The Court in Praprotnik also recognized that there can be local government liability if there is a practice of the local government that had been in existence for a sufficient length of time, and those individuals with final authority knew or should have known that such a practice had become customary.  Id.  As stated in Black by Black v. Indiana Area School District, 985 F.2d 707 (3d Cir. 1993):

> In order to establish liability a plaintiff must demonstrate both that the defendant's policy, practice, or custom played and affirmative role in bringing about the [harm] and that the defendant acted with deliberate indifference to that [harm].  In order to establish deliberate indifference on the part of the defendant, 'something more culpable [must be shown] than a negligent failure to recognize [a] high risk of harm' to plaintiffs.  Id. at 713 (citations omitted).

The Supreme Court has also held that an unconstitutional policy, practice or custom may be inferred by a single act.  City of St. Louis v. Praprotnik, 485 U.S. at 123.

Since Monell, the courts have gone further and held that a municipality can be liable for inadequate training of its employees.  City of Canton, Ohio v. Harris, 489 U.S. 378 (1989).  As recognized by the Court in Stoneking v. Bradford Area School District, 882 F.2d 720 (3d Cir. 1989), [i]t may seem contrary to common sense to assert that a municipality will actually have a policy of not taking steps to train its employees."  Id., citing, Canton, 109 S.Ct. at 1205.

Nonetheless, if the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, "the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury."  Id., citing, Canton, 109 S.Ct. at 1205.

In the instant case, there is sufficient evidence of a policy, practice or custom in Penn Manor School District of condoning the failure to turn over investigation reports and information to a suspended student and parents.  There is also evidence of a failure to properly train the administrators about the policy to turn over the reports and information.  Penn Manor School District has a written policy in their Policy Manual that, in cases of unlawful harassment, a thorough investigation shall be conducted and a written report shall be prepared summarizing the investigation and recommending disposition of the complaint.  (Exhibit "N", Section 248, page 3).  However, there was a practice that this process was not done.  Ms. Mindish testified that the written notes taken during the investigation constitute the report.  (Exhibit "K", pages 74-75). Then she provides them to the Superintendent.  (Exhibit "K", pages 76-79).  She does not provide them to anyone else unless instructed by the Superintendent or the solicitor.  (Exhibit "K", pages 79-80).  She testified that there was only one other case of harassment in which she was involved and in both cases, she provided the notes/report to the Superintendent and did not provide them to anyone else.  (Exhibit "K", pages 78-80).  Ms. Mindish said the same process was followed in January 2002, after receiving Joshua's complaint against Ms. Becker for bringing a false claim. In that case, her notes were typed and then she provided them to the Superintendent.  (Exhibit "K", pages 81-84).

Mr. Gale only took notes from his initial interview of Ms. Becker on December 10, 2001. (Exhibit "H"; Exhibit "G", page 53).  He would not provide those notes to Mrs. Shertzer, even when she asked for them.  (Exhibit "G", pages 130-131).  He claimed he only had four names written down.  (Exhibit "G", pages 130-131).  He actually prepared the typed version of his report (attached to Exhibit "K" as Mindish 1) around January 30, 2002.  It was done from his memory

since he had no notes of any other interviews.  (Exhibit "G", pages 107-108).   He may have had some things written down as well, but he did that later on, not contemporaneously with December 10.  (Exhibit "G", pages 106-107).  One of the reasons he prepared it was Mrs. Shertzer told him he ought to have documentation of things that had taken place.  (Exhibit "G", page 107).  Mr. Gale also testified that he has read the Policy Manual, but he is not aware, in a case of unlawful harassment, that the Superintendent is to be immediately notified or that he is to prepare an investigative report.  (Exhibit "G", pages 126-127).  In addition, he was unaware that he was to circulate the investigative report to the accused and the complainant.  (Exhibit "G", pages 126-127).

The Superintendent, who is the CEO of the Board, in charge of overseeing all discipline to make sure the policies of the Board are carried out (Exhibit "O", pages 27-28, 57), testified that he does not receive a report every time a student is sexually harassed.  (Exhibit "O", pages 75-76).  He stated that it is the practice in the District that he would be provided a copy of the investigative report in cases of unlawful harassment only if the case elevated to the level of Board action.  (Exhibit "O", page 75).  He also testified that it was not the practice in the District to turn over a written review of the investigation, either a report or the notes, to the complainant and the accused.  (Exhibit "O", pages 146-147).  He claimed that if the parents ask for the notes or the report, the practice would be to turn them over only under the advice of the solicitor.  (Exhibit "O", pages 147-148).

Clearly the above-referenced evidence shows a practice in the District of failing to turn over the information from an investigation of a claim of unlawful harassment.  It also shows a failure to properly train the administrators on how to provide the information in compliance with constitutional requirements.  Since, in addition to this failure, the Plaintiffs were not even verbally informed as to what Ms. Becker claimed Joshua did to her, nor any details of any investigation done, this policy and practice caused plaintiffs' harm.  Plaintiffs were denied access to the information they were entitled to receive.  Since the practice was contrary to the Policy Manual and the law, it shows that they were deliberately indifferent to Plaintiffs' rights to have access to

32

the information and that deliberate indifference caused Plaintiffs' harm.  As such, the District is liable for condoning the aforementioned practices.

## b.    Liability of Individual Defendants[2]

Plaintiffs agree that for an individual government employee to be liable under §1983, he or she must have personal involvement in the constitutional deprivation.  See, Colburn v. Upper Darby Township, 838 F.2d 663, 673 (3d Cir. 1988).  In addition, supervisors can be held liable if they have a practice that communicated condonation or authorization of the offensive behavior. Stoneking v. Bradford Area School District, 882 F.2d at 726.  Then, once liability can be found, the issue of qualified immunity must be decided.

Qualified immunity can shield public officials performing discretionary functions from § 1983 liability, but only if their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); See also, Abbott v. Latshaw, 164 F.3d 141, 148 (3d Cir. 1998).  The Defendants have the burden to establish that they are entitled to qualified immunity.  Stoneking v. Bradford Area School District, 882 F2d at 726, citing, Ryan v. Burlington County, 860 F.2d 1199, 1204 n.9 (3d Cir. 1988).  The Defendants must show that their conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." The inquiry must proceed in two steps.  First, the Court must determine whether the Defendants violated "clearly established" rights or laws.  Second, the Court must decide whether, under the existing law, and the information then available, an individual reasonably could have believed the conduct was permissible.  Reitz v. County of Bucks, 125 F.3d 139, 148 (3d Cir. 1997); Abbott, 164 F.3d at 148; Anderson v. Creighton, 483 U.S. 635, 640-41 (1987).

The first test is purely a legal question. Reitz, 125 F.3d at 148.  The second element "requires application of the law to the particular conduct at issue, an inquiry which may require factual determinations if the nature of the conduct is disputed." Reitz, 125 F.3d at 148.  The goal

---

[2] Plaintiffs concede that all claims against Gary Campbell should be dismissed.  He was the Superintendent at the time of this incident, but he was out sick.  Donald Stewart admits to being the Acting Superintendent at the time and that he took on the Superintendent's duties.  He was made Superintendent in January or February 2002 (Exhibit "O", pages 14-15, 125-126).

is to determine whether the individual's actions were "objectively reasonable" in light of the "clearly established law" and the information in the individual's possession.  Sharrar v. Felsing, 128 F.3d 810, 827-828 (3d Cir. 1997).  If, however, factual disputes exist, the issues should be decided by the jury.  Id., at 828.  Arguments that the defendants desired to handle or subjectively believed that they had handled the incidents properly are irrelevant.  Stoneking v. Bradford Area School District, 882 F.2d at 726, *citing*, Anderson v. Creighton, 483 U.S. 635, 641 (1987).  In the specific context of school discipline, if public school officials knew or reasonably should have known that the action he or she took would violate the constitutional rights of the student affected, or if he or she took the action with the malicious intent to cause a deprivation of constitutional rights or other injury to the student, then there is no qualified immunity.  Wood v. Strickland, 420 U.S. 308, 322 (1975).

The Supreme Court as early as 1982 recognized that First Amendment rights are available to students, including the right to receive and have access to information.  Board of Education, Island Trees Union Free School District v. Pico, 457 U.S. 853, 865-66 (1982).  Therefore, this right is clearly established.

Given that these rights were clearly established at the time of Joshua's discipline, the next step is to determine whether a reasonable person in each of the Defendant's positions would realize that what he or she was doing violated Joshua's First Amendment rights.  It must be pointed out to the Court that due to the many material factual disputes that exist in this case, any decision on qualified immunity is impossible at this stage.

### 1)    Donald Stewart

Although Defendants contend that Mr. Stewart was not personally involved in the violation of Plaintiffs' First Amendment right to access to information, that is simply not the case. Ms. Mindish testified that she provides the Superintendent the investigative notes and report within a day or two of the decision to suspend the student, and then she does not provide them to anyone else unless instructed to do so by the Superintendent.  (Exhibit "K", pages 74-80).  In this

case, since Plaintiffs were not provided the information to which they were entitled, it was due to the conduct of the Superintendent.

In addition, the Superintendent was sent a letter from counsel on behalf of Plaintiffs on January 24, 2002. (attached to Exhibit "O" as Stewart 1). Mr. Stewart testified that he received that letter. (Exhibit "O", page 126). This letter advised him of Plaintiffs' claims that the allegations were not properly investigated and that there was no investigative report prepared and properly disseminated. (Exhibit "O", Stewart 1). Despite this letter, the information was not provided to Plaintiffs until well after this lawsuit was filed. As such, Mr. Stewart was personally involved in the violation of Plaintiffs' right of access to information.

Donald Stewart is also not entitled to qualified immunity. This Defendant has not met his burden of establishing qualified immunity. Furthermore, a reasonable Superintendent would know that Plaintiffs were entitled to the investigative notes and reports pursuant to the requirement in the Penn Manor Policy Manual for unlawful harassment claims and would know that Mrs. Shertzer and Joshua were entitled to receive notice of the charges against them and an explanation of the evidence they had under Goss. A reasonable Superintendent would know that the failure to provide these items violates Plaintiffs' First Amendment right to access to information.

### 2)     Janice Mindish

Ms. Mindish was also personally involved in the violation of Plaintiffs' rights under the First Amendment. Ms. Mindish was made aware of the matter between Ms. Becker and Joshua during the morning of December 10. (Exhibit "K", page 109). It is also the practice at Penn Manor to involve the Principal in non-routine disciplinary matters. (Exhibit "K", pages 20-21). A claim of sexual harassment is not a routine matter. (Exhibit "K", page 50). The administrators also discuss disciplinary matters in detail during lunch (Exhibit "K", pages 39-40), and did so in this case (Exhibit "K", page 113). They discussed suggestions, findings, the situation, what to do next and the type of punishment. (Exhibit "G", pages 76, 78). Since Ms. Mindish was made aware of everything that was going on, she should also be responsible for the failure to provide

the information Plaintiffs were entitled to receive.  Since she was aware of the disciplinary proceedings that day, and chose not to direct that Plaintiffs be provided the information, she was condoning the failure to provide the information and thus, should be liable.

In addition, Mrs. Shertzer specifically asked her at the reinstatement conference about any new witnesses and again about documentation of what Joshua was being accused of, specifically, what Ms. Becker claimed he did to her.  (Exhibit "M", pages 73-74; Exhibit "K", page 155).  She also asked about an investigative report and notes.  (Exhibit "M", pages 73-74; Exhibit "K", pages 157-158).  The administrators there, Mr. Gale and Ms. Mindish, would not allow questioning about the event and told Mrs. Shertzer the information/documentation was confidential.  (Exhibit "M", pages 73-74; Exhibit "K", pages 157-158).  As such, she was personally involved in the failure to provide Plaintiffs access to information and the violation of their First Amendment rights.

Ms. Mindish is also not entitled to qualified immunity.  This Defendant has not met her burden of establishing qualified immunity.  Furthermore, a reasonable high school principal would know that Plaintiffs were entitled to the investigative notes and reports pursuant to the requirement in the Penn Manor Policy Manual for unlawful harassment claims and would know that Mrs. Shertzer and Joshua were entitled to receive notice of the charges against them and an explanation of the evidence they had under Goss.  A reasonable Principal would know that the failure to provide these items violates Plaintiffs' First Amendment right to access to information.

### 3)    Brian Baddick

Plaintiffs concede that there is no evidence Mr. Baddick was personally involved in the violation of their First Amendment right of access to information.

### 4)    Philip Gale

On the other hand, Mr. Gale was personally involved in the violation of Plaintiffs' rights under the First Amendment.  First of all, he was the one who failed to provide Joshua any details about what Ms. Becker claimed he did to her and about any investigation he was conducting, as set forth above.  He also refused to tell Mrs. Shertzer Ms. Becker's name on the telephone and

refused to tell her what she claimed Joshua did to her. (Exhibit "M", page 43). Furthermore, both Mr. Gale and Ms. Mindish refused to provide to Plaintiffs any notes that were taken during the investigation or any investigative report, as well as any details about the evidence that they had against Joshua despite repeated requests by Mrs. Shertzer on the telephone (Exhibit "M", page 56), at the reinstatement conference (Exhibit "M", pages 73-74), and during the time she visited the school on January 16, 2002 to view the policy manual (Exhibit "M", pages 89-90). Therefore, Mr. Gale was definitely personally involved in the failure to provide Plaintiffs access to the information to which they were entitled.

Mr. Gale is also not entitled to qualified immunity. This Defendant has not met his burden of establishing qualified immunity. Furthermore, a reasonable Assistant Principal in charge of disciplining a student would know that Plaintiffs were entitled to the investigative notes and reports pursuant to the requirement in the Penn Manor Policy Manual for unlawful harassment claims and would know that Mrs. Shertzer and Joshua were entitled to receive notice of the charges against them and an explanation of the evidence they had under Goss. A reasonable Assistant Principal in charge of disciplining a student would know that the failure to provide these items violates Plaintiffs' First Amendment right to access to information.

## 2. Fourth Amendment

The Fourth Amendment, made applicable to state officials under the Due Process Clause of the Fourteenth Amendment, protects the right of people to be free from unreasonable searches and seizures. New Jersey v. T.L.O., 469 U.S. at 334. These protections have been extended to students in public schools. Vernonia School Dist. 47J v. Acton, 515 U.S. at 655; New Jersey v. T.L.O., 469 U.S. at 336-337. In most situations, probable cause is the touchstone of reasonableness. Valentino v. School District of Philadelphia, 2003 WL 177210 *5 (E.D. Pa. Jan. 23, 2003). However, in the context of public schools, "reasonableness is determined by balancing the [student's] Fourth Amendment interests, including the expectation of privacy, against legitimate government interests." Id., citing, Vernonia School Dist. 47J v. Acton, 515 U.S. at

656-657 and Gruenke v. Seip, 225 F.3d 290, 301 (3d Cir. 2000).  In addition, the Court is to consider the nature of the intrusion as well.  Gruenke v. Seip, 225 F.3d at 301.

Although there is no Third Circuit case declaring the standard to be applied in determining the reasonableness of a seizure in a public school, the Court in Valentino recognized that several other circuits have held that the Supreme Court's enunciation of the Fourth Amendments reasonableness standard in New Jersey v. T.L.O. applies to seizures in school settings.  Valentino v. School District of Philadelphia, supra, *5 (citations omitted).  The Court in Valentino went on to hold that although the cases of T.L.O., Vernonia and Gottlieb[3] deal with searches in public school, the same principles apply when applying the reasonableness standard to an allegation of an unreasonable seizure in a public school.  Id.  In Vernonia, the Supreme Court reviewed state action under the Fourth Amendment by comparing:  1) the scope of the legitimate expectation of privacy at issue, 2) the character of the intrusion complained of, and 3) the nature and immediacy of the governmental concern at issue and the efficacy of this means for meeting it.  Vernonia School Dist. 47J v. Acton, 515 U.S. at 654-660.

The Vernonia standard should be used in analyzing the instant case and it should be determined after doing that analysis that Plaintiffs are able to prove a violation of Joshua's Fourth Amendment rights.  A public school student has a reasonable expectation of privacy which is decreased, as compared to the public at large, due to the responsibility of the school as custodian and educator.  Vernonia School Dist. 47J v. Acton, 515 U.S. at 655-656; Picarella v. Terrizzi, 893 F. Supp. 1292, 1301 (M.D. Pa. 1995).  Nonetheless, a student retains this privacy interest despite allegations of sexual harassment.  See, Picarella v. Terrizzi, 893 F. Supp. at 1301.

Regarding the governmental interest, the interest must be "important enough to justify the particular [seizure] at hand."  Vernonia School Dist. 47J v. Acton, 515 U.S. at 661.  In this case, the government's interest in maintaining a school free of misconduct is legitimate.  See, New Jersey v. T.L.O., 469 U.S. at 340.

The final consideration is the character of the intrusion complained of.

---

[3] Gottlieb v. Laurel Highlands School District, 272 F.3d 168 (3d Cir. 2001)

> In evaluating the intrusion, the Court must first identify the intrusion.  Second, the Court must determine whether the action was "justified at its inception."  Third, the Court must determine whether, as the intrusion transpired, it was "reasonably related in scope to the circumstances which justified the interference in the first place."

Valentino v. School District of Philadelphia, supra, *6, *citing*, New Jersey v. T.L.O., 469 U.S. at 341.

The instant case involves Joshua's removal from class for an allegation by another student of sexual harassment, his detention and confinement at the school office for about 3 ½ hours, and his three interrogations by school administrators.  Plaintiffs do not challenge whether the intrusion was justified at its inception, which entails the initial removal of Joshua from class or the initial questioning of him by Mr. Gale.  Plaintiffs concede that these initial intrusions were justified due to the allegations of Ms. Becker at the time, even though it is Plaintiffs' position that the allegations were false.  The administrators would have no way to determine that they were false at least until after questioning Joshua the first time.

The problem arises as the intrusion transpired.  During the initial interrogation of Joshua by Mr. Gale, which started around 10:15 a.m. (Exhibit "B", pages 75-77), Mr. Gale was informed that Joshua was claiming the contact with Ms. Becker was consensual and that she was actually engaging in it too.  (Exhibit "B", page 81, and Shuman 2).  Joshua also told him the names of students who were sitting near Ms. Becker and him in class, one of whom as Jeremy Fritsch (Exhibit "B", pages 103-105).  Mr. Gale told Joshua that he would have to wait in the office so that Mr. Gale could determine if there were any witnesses. (Exhibit "B", page 82, and Shuman 2).  He stayed in the conference room for about one hour until he was taken to eat lunch with the administrators, although he did leave briefly to get a drink of water during that time.  (Exhibit "B", pages 86-87, 88-89).  Mr. Gale claims that he interviewed Ms. Becker again and three or four witnesses (Exhibit "G", pages 63-66, 52), but did not claim to interview any other students or the teacher. (Exhibit "G", pages 73-74).  However, the evidence shows that it was questionable whether he spoke to Ms. Becker again, he did not speak to anyone else.  Ms. Becker did not know whether she spoke to him again (Exhibit "C", page 49), and three of the four students who were identified by Ms. Becker - Shawn Bachman, Jennifer Nickle and Jay Shaiebly – either denied or

did not remember being called down to the office at all.  (Exhibits "I", pages 11-12, 18-19; "J", page 23; "F", pages 29-30).  Mr. Gale was even given Mr. Fritsch's name, who turned out to be an actual witness to the events, along with Mr. Shaiebly.  However, Mr. Gale did not speak to them.  If no investigation was taking place, there was no need to detain Joshua in the office for that length of time.

At lunch, the administrators were discussing the matter and what type of punishment should be dealt out.  (Exhibit "G", pages 76, 78).  There was no discussion of doing any further investigation.  (Exhibit "G", page 78).  It appears that a decision had already been made at that point.

After lunch, without doing any further investigation, Mr. Gale and Mr. Baddick interrogated Joshua.  Joshua felt that the two were trying to get him to change his story by threatening police involvement and telling him that they had stopped Mr. Becker from pressing charges on his daughter's behalf.  (Exhibit "B", pages 93-95, 108-109).  Mr. Gale and the Superintendent both agree that it is improper to threaten police involvement if they do not believe they will be involved.  (Exhibits "G", pages 31-32; "O", page 88).  Mr. Gale admitted in his deposition that he did not even speak to Mr. Becker until December 11, the day after Joshua was suspended (Exhibit "G", page 96), so that statement to Joshua was not accurate.  Mr. Baddick could not even state with any clarity in his deposition why he was in the room in the first place.  (Exhibit "L", page 62-65).  Given the fact that Mr. Baddick asked Joshua "So, did you feel her to get a rise?" (Exhibit "B", pages 93) and that he was pushy (Exhibit "B", page 110-111), and only in the room for a brief exchange (Exhibit "B", page 126), his purpose for being in the room along with Mr. Gale was sheer intimidation.  In fact, the entire second interrogation of Joshua was not for the purpose of fact-finding.  No other investigation had taken place since the first interview and the second interrogation was full of threats and tactics of trying to get Joshua to change his story.

The third time Mr. Gale spoke to Joshua, he told Joshua that there were no witnesses and that there was no proof that force was involved.  (Exhibit "B", pages 96-97, 123-124).

Nonetheless, he was going to be suspended for inappropriate conduct. (Exhibit "B", pages 98-100, 124). Joshua remained in the room until about 2:00 p.m., (Exhibit "M", page 47), making the time of his detention over 3 ½ hours. Since no investigation was done since his initial questioning, there was no purpose in keeping him confined and detaining him, nor was there any purpose in continuing to question him. He was actually questioned for about 30 to 40 minutes in total. It was three hours from his initial questioning until the administrators even called Joshua's mother. (Exhibit "M", pages 40-41). When Joshua's mother arrived to pick him up, she said he looked awful and looked drained. (Exhibit "M", pages 48-49). Given the facts that are presented, the Defendants clearly exceeded the scope of a permissible intrusion, improperly confined Joshua and unreasonably restricted his liberty. Dr. Edward Dragan, Plaintiffs' expert, also found, after reviewing the conduct of the Defendants, that Joshua was improperly and unreasonably detained and interrogated. (Exhibit "Q", page 30). Clearly, there are material facts in dispute. Even considering the student's decreased expectation of privacy, and the legitimate governmental interest in maintaining order in the public schools as discussed previously, this intrusion was not reasonable and Plaintiffs' Fourth Amendment claim must not be dismissed.

### a.    Liability of the School District and the Board

There is no written policy in the District about investigations of disciplinary actions and interrogations of students. (Exhibit "O", pages 82-90). There is a widely varied practice due the wide variety of disciplinary actions at school. (Exhibit "O", pages 83-84). However, without any specific guidelines, the administrators do not receive the proper training as to what is constitutionally permissible for detaining a student at school and for interrogating a student. The administrators apparently believed it was okay to detain Joshua for 3 ½ hours at school while they did not conduct any other investigation, and continue to interrogate him in an attempt to intimidate him to change his story. Ms. Mindish testified that there is no limit as to how long they can hold a student. (Exhibit "K", pages 88-90). She also testified that sometimes they do threaten police involvement even when the police will not be involved. (Exhibit "K", page 92). The administrators have this belief because of the failure to properly train them in the proper

procedures of detention and interrogation. Therefore, the District is liable for violating Joshua's Fourth Amendment rights against unreasonable seizure and restraints on his liberty.

**b.**     **Liability of Individual Defendants**

Once it is determined that the individual Defendant can be liable under the Fourth Amendment, then the issue of qualified immunity must be decided. At the time of Joshua's discipline on December 10, 2001, it was clearly established that the Fourth Amendment protection against unreasonable searches and seizures extends to students in public schools. Vernonia School Dist. 47J v. Acton, 515 U.S. at 655. Given that these rights were clearly established at the time of Joshua's discipline, the next step is to determine whether a reasonable person in each of the Defendant's positions would realize that what he or she was doing violated Joshua's Fourth Amendment rights. It must again be pointed out to the Court that due to the many material factual disputes that exist in this case, any decision on qualified immunity is impossible at this stage.

**1)**     **Donald Stewart**

Plaintiffs concede that there is no evidence that Mr. Stewart was personally involved in the violation of Joshua's Fourth Amendment rights.

**2)**     **Janice Mindish**

Ms. Mindish was personally involved in improperly confining Joshua and unreasonably restricting his liberty. She is in charge of the school and her assistant principals. (Exhibit "K", pages 14-15). She was advised of the situation between Joshua and Ms. Becker in the morning of December 10 and discussed it at length with Mr. Gale and Mr. Baddick over lunch. (Exhibit "K", pages 50, 109, 113; Exhibit "G", pages 76, 78). At lunch, before the second interrogation of Joshua occurred, no one suggested doing any further investigation. (Exhibit "G", page 78). However, after lunch Joshua was talked to two more times and detained for about another two hours. She knew what was occurring with Joshua, yet she did nothing to stop the assistants from continuing to hold him and question him for no reason but to try to get him to change his story by intimidation. Ms. Mindish recognized that students can be sent home, rather than detained at

42

school (Exhibit "K", pages 90-91), but that was not done here. Because she was aware what was going on, and was involved in the process of arriving at his discipline, there is sufficient evidence that Ms. Mindish was personally involved in the violation of Joshua's Fourth Amendment rights. In addition, her failure to do anything to stop the assistants from confining Joshua and interrogating him to get him to change his story establishes that she condoned this behavior and thus, should be liable.

Ms. Mindish is also not entitled to qualified immunity on this claim. This Defendant has not met her burden of establishing qualified immunity. Furthermore, a reasonable Principal would know that confining a student for over 3 ½ hours without doing any further investigation and continuing to interrogate him in an attempt to intimidate him into changing his story is not proper. Dr. Dragan, Plaintiffs' expert, found that this conduct was unreasonable. A reasonable Principal would know that this conduct violates Joshua's Fourth Amendment right against unreasonable seizures and restrictions on his liberty.

### 3)       Brian Baddick

Mr. Baddick was also personally involved in violating Joshua's Fourth Amendment rights. He testified that he spoke to Mr. Gale in the morning before lunch about Joshua and Ms. Becker; he stated that Mr. Gale was "looking to consult with" him and to share ideas. (Exhibit "L", page 49, 54). He was also involved in the discussion about the matter over lunch. Therefore, Mr. Baddick was involved in the decision to detain Joshua. Mr. Baddick was also directly involved in continuing to detain Joshua and in interrogating him the second time. Mr. Baddick was pushy and made the comment to Joshua, "So, did you feel her to get a rise?" Joshua believed that Mr. Baddick was trying to get him to change his story. (Exhibit "B", pages 108-109). His sole purpose in the room was intimidation, since no other investigation had taken place since the last time Joshua was spoken to. Therefore, Mr. Baddick was involved in the confinement of Joshua at school for 3 ½ hours and the improper interrogations that occurred during the confinement.

Mr. Baddick is also not entitled to qualified immunity on this claim. This Defendant has not met his burden of establishing qualified immunity. Furthermore, a reasonable assistant

principal would know that confining a student for over 3 ½ hours without doing any further investigation and continuing to interrogate him in an attempt to intimidate him into changing his story is not proper.  Dr. Dragan, Plaintiffs' expert, found that this conduct was unreasonable.  Furthermore, a reasonable assistant principal would know that the comments were offensive and said with intent to injure and insult Joshua.  A reasonable assistant principal would know that this conduct violates Joshua's Fourth Amendment right against unreasonable seizures and restrictions on his liberty.

### 4)    Philip Gale

Clearly, Mr. Gale was directly involved in the violation of Joshua's Fourth Amendment rights.  He was the person in charge of his disciplinary action on December 10, 2001 and was the one who continued to detain him, who failed to conduct any further investigation and then interrogated Joshua for no reason but to get him to change his story as set forth above.  Therefore, he is liable to Joshua.

Mr. Gale, too, is not entitled to qualified immunity on this claim.  This Defendant has not met his burden of establishing qualified immunity.  Furthermore, a reasonable assistant principal would know that confining a student for over 3 ½ hours without doing any further investigation and continuing to interrogate him in an attempt to intimidate him into changing his story is not proper.  Dr. Dragan, Plaintiffs' expert, found that this conduct was unreasonable.  A reasonable assistant principal would know that this conduct violates Joshua's Fourth  Amendment right against unreasonable seizures and restrictions on his liberty.

### 3.    Fourteenth Amendment – Procedural Due Process

The Supreme Court has held that the right to an entitlement to a public education is a property interest which is protected by the Due Process Clause that cannot be taken away "without adherence to the minimal procedures required by that Clause."  Goss v. Lopez, 419 U.S. 565, 574 (1975).  The Court in Goss, went on to state:

> At the very minimum, therefore, students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing.  'Parties whose rights are to be affected are entitled to be

heard; and in order that they may enjoy that right they must first be notified.' Baldwin v. Hale, 1 Wall.223, 233, 17 L.Ed. 531 (1864).

Goss v. Lopez, 419 U.S. at 579. It is now clearly established that students facing temporary suspensions from school have interests qualifying for Due Process Clause protection. Id. at 581. And, in the case of a suspension from school for 10 days or less, due process requires, at a minimum, that "the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Id. The Court rejected trial-type procedures in every brief disciplinary suspension, as it might overwhelm administrative facilities, but:

> On the other hand, requiring effective notice and informal hearing permitting the student to give his version of the events will provide a meaningful hedge against erroneous action. At least the disciplinarian will be alerted to the existence of disputes about facts and arguments about cause and effect. He may then determine himself to summon the accuser, permit cross-examination, and allow the student to present his own witnesses. In more difficult cases, he may permit counsel. In any event, his discretion will be more informed and we think the risk of error substantially reduced.

Id. at 583-584.

Defendants argue in their brief that violations of the Pennsylvania Code and the Penn Manor Policy Manual are not relevant in the determination of a due process violation. (See, Defendants' Brief in Support of Motion for Summary Judgment, page 27, footnote 13). However, the case of Patterson v. Armstrong County Children and Youth Services, 141 F. Supp.2d 512 (W.D. Pa. 2001), does recognize that the Pennsylvania statutes in that case were designed, in part, to protect the persons' constitutional rights to due process of law before permitting state interference with rights. 141 F. Supp.2d at 535. In addition, the Court found that, "[w]hile not dispositive, the statutory schemes adopted by the Pennsylvania legislature…are highly *relevant* to this Court's consideration of" the adequacy of the procedures used in that case. Id. at 538.

Joshua was suspended out of school for four days, so he is entitled to protection under the Due Process Clause. Although Joshua was given an opportunity to present his side of the story, he was not given full notice of the charges against him, nor was he given an explanation of the evidence the School had. Therefore, the Defendants violated his Fourteenth Amendment Due Process rights.

When Joshua arrived in Mr. Gale's office, he did not really know why he was there. (Exhibit "B", page 78 and Shuman 2).  Mr. Gale told him that Ms. Becker claimed that he forced his hand upon her sexually, and that she was very upset about it.  (Exhibit "B", pages 81-83 and Shuman 2).  Mr. Gale did not tell him anything else about what Ms. Becker claimed he did to her. (Exhibit "B", page 112; Exhibit "M", page 60).  And, just before Joshua came to the office, another student named Chad told Joshua that Olivia told him that Joshua was "raping her on Friday."  (Exhibit "B", page 75 and Shuman 2).  As such, Joshua did not know what Ms. Becker claimed he did to her, other than the general concept that she claimed he touched her against her will.  Once he told his version of events and that the touching was consensual and engaged in by both, Mr. Gale then told him that the stories "did not match."  (Exhibit "B", pages 81, 82, 84 and Shuman 2).  It cannot, therefore, be said that Joshua was given full notice of the claims against him.

Once Joshua denied Ms. Becker's claim that the touching was against her will, Joshua was entitled to hear the evidence Mr. Gale and the School had.  The evidence they had was the following:  the details about what Ms. Becker was claiming Joshua did to her and the names of the four people Ms. Becker gave as possible witnesses.  Joshua was told throughout the day on December 10, 2001 that there were no witnesses.  (Exhibit "B", pages 93-94, 96-97, 123-124). The record shows that Mr. Gale did not speak to any of the four witnesses, nor did he speak to any of the other students in the class or the substitute teacher.  Joshua had even given Mr. Gale some names of students sitting near him when the touching occurred, but he did not speak to any of them that day either.  Nonetheless, he just kept telling Joshua that there were no witnesses. Thus, this <u>Goss</u> element also cannot be satisfied.  Although he did believe he relayed to Mr. Gale his complete version of events on December 7, Joshua would not be able to put it in the proper context to satisfy due process when he did not even know the details of what Ms. Becker claimed he did to her.

Furthermore, Joshua was told during the day on December 10, 2001 that he was being punished for inappropriate conduct.  (Exhibit "B", pages 96-97, 123-124).  He was never told that

he was being punished for "sexual harassment." (Exhibit "B", page 112). The first time he heard or saw those words used was in the letter Mr. Gale sent to Mrs. Shertzer dated December 10, 2001 about Joshua's discipline. (Exhibit "B", pages 145-146). As such, he was not informed of what he was actually charged with until after he was out on suspension. Given the evidence in this case, Joshua's due process rights were violated.

Additionally, Pennsylvania law and the Penn Manor Policy Manual each require that a student be entitled to an informal hearing when a suspension is for more than three days. (22 Pa. Code § 12.6; Exhibit "N", Section 233, page 1). Both the law and the policy manual recognize that informal hearings are required to ensure that due process requirements are satisfied before a student is suspended from school. (22 Pa. Code §§ 12.6, 12.8; Exhibit "N", Section 233, page 1). According to § 12.8, the following due process requirements are to be observed in regard to the informal hearing:

a. Notification of the reasons for the suspension shall be given in writing to the parents or guardian and to the student.
b. Sufficient notice of the time and place of the informal hearing shall be given.
c. A student has the right to question any witnesses present at the hearing.
d. A student has the right to speak and produce witnesses on his own behalf.
e. The district shall offer to hold the informal hearing within the first 5 days of the suspension.

Joshua and Mrs. Shertzer did receive notification of the reasons for the suspension when they received the letter from Mr. Gale dated December 10, 2001. However, neither of them was ever notified, orally or in writing of the time and place of an informal hearing, or even that they were entitled to have one. In fact, no informal hearing ever took place where Joshua was permitted to question witnesses, and speak and produce witnesses on his behalf. Joshua requested to speak with Ms. Becker and was told that they "do not do that." (Exhibit "B", pages 124-126). It is likely that none took place because the administrators themselves do not agree as to when they are to occur. Ms. Mindish and Mr. Stewart believe it is to occur after it is determined that the child is suspended and when the parents pick up their child. (Exhibits "K", pages 67-71; "O", pages 46-49). Mr. Baddick and Mr. Gale believe it occurs during the investigation process.

(Exhibits "L", pages 34-40; "G", page 24).  The administrators do not believe that the accused student has a right to question the accused or call witnesses at an informal hearing (Exhibits "G", pages 26-30; "L", pages 35, 42; "K", pages 181-182), nor do they believe that the student and parent need to be told that "this is your informal hearing." (Exhibit "O", pages 47-49).

Plaintiffs concede that a violation of the Pennsylvania Code or of the Penn Manor Policy Manual does not alone establish a violation of Due Process.  However, as set forth in <u>Patterson</u>, supra, they are highly relevant in the determination of the adequacy of the procedures used. Obviously, the laws and the Manual were drafted for the purpose of protecting the constitutional rights to due process of law.  The additional procedural safeguards that the Defendants should have followed in this case are those carefully crafted by the State Agency and by the Penn Manor School Board.  They did so to safeguard the students and their parents by mandating specific procedural requirements.  They must have intended that the appropriate school administrators would carry any burden that would come from having to conduct informal hearings in that fashion.  These are the same issues discussed in the <u>Patterson</u> case.  <u>Patterson v. Armstrong County</u>, 141 F. Supp.2d at 538.  Therefore, the Defendants' failure to follow these procedures must be considered.  Plaintiff's expert, Dr. Dragan, reviewed the conduct of Defendants in detail and found that the District failed to give Joshua the process he was due in violation of District policy and in violation of the standard set forth in <u>Goss</u>.  (Exhibit "Q", pages 29-30).  Given these failures by Defendants, as well as the failure to follow even the most minimal requirements set forth in <u>Goss</u>, and the material facts shown to be in dispute, there is sufficient evidence to prove that Defendants violated Plaintiffs' Fourteenth Amendment Due Process rights and this claim must not be dismissed.

### a.    Liability of the School District and the Board

The Board and District had a written policy that required all students facing suspension of more than three days to be given the opportunity for an informal hearing, which would occur as soon as possible after the suspension.  (Exhibit "N", Section 248, page 1).  The purpose of this policy is so that suspensions cannot be imposed on a student without due process.  (Exhibit "N",

Section 248, page 1).  In Joshua's case, he was entitled to due process, which meant a form of informal hearing under the <u>Goss</u> case.  However, as set forth above, the administrators differ as to when they believe an informal hearing occurs.  Mr. Stewart testified that there is no practice in the District of telling the parents or the student that they are entitled to an informal hearing or that they are even having one when it occurs.  (Exhibit "O", pages 50-51, 47-49).  Since they are inconsistent as to when one occurs and there is a real question as to notice, that is evidence of a widespread District practice of failing to properly conduct informal hearings in accordance with the due process requirements, or at the very least, a failure to properly train the employees as to what process is due to a student facing a suspension of more than three days.

Furthermore, the District has a practice of failing to properly notify the student of the charges against him and of failing to inform the accused student of the evidence the authorities have, once the student denies the claims.  Again, at the very least, the District has failed to properly train the administrators as to these requirements.  Joshua was not notified of the charges against him because he was not told what Ms. Becker claimed he did to her, nor was he accurately informed about what he would be charged with.  He was informed that he was going to be disciplined for inappropriate conduct, not sexual harassment.  His mother was informed of the same thing and when she demanded to know what Ms. Becker claimed Joshua did to her, she was told the information was confidential.  She was told this not only on the day of the discipline (December 10, 2001), but repeatedly on the telephone (December 10 and 11), at the reinstatement conference (December 14), and during the time she was at the office on January 16, 2002.  The Superintendent was notified about the matter on December 10, but was also called before and after the reinstatement conference, and was notified by counsel for Plaintiffs in a letter dated January 24, 2002.  (Exhibit "K", pages 125, 161; Stewart 1 attached to Exhibit "O").  This repeated failure to comply with the due process requirements in <u>Goss</u> shows the failure was so widespread that it has become custom at the District.  Therefore, the District is liable for the violation of Joshua's due process rights.

### b.    Liability of Individual Defendants

Once it is determined that the individual Defendant can be liable for a violation of the Fourteenth Amendment Due Process Clause, then the issue of qualified immunity must be decided.  This case deals with the protection of Joshua's property right to a public education and the right to due process protection of his right to education.  It is well established that a person cannot be deprived of life, liberty or property without due process of law.  The Court in the case of <u>Abbott v. Latshaw</u>, even recognized that the law regarding procedural due process is clearly established.  <u>Abbott v. Latshaw</u>, 164 F.3d at 148.  Furthermore, it was clearly established in 1975 when the Supreme Court decided <u>Goss v. Lopez</u>, 419 U.S. 565 (1975), that students are entitled to due process even if they are suspended from school for 10 days or less. Given that these rights were clearly established at the time of Joshua's discipline, the next step is to determine whether a reasonable person in each of the Defendant's positions would realize that what he or she was doing violated Joshua's Fourteenth Amendment Due Process rights.  It must again be pointed out to the Court that due to the many material factual disputes that exist in this case, any decision on qualified immunity is impossible at this stage.

### 1)    Donald Stewart

Mr. Stewart was personally involved in the violation of Joshua's Due Process rights because he was notified about the matter on December 10, was also called before and after the reinstatement conference, and was notified by counsel for Plaintiffs in a letter dated January 24, 2002.  (Exhibit "K", pages 125, 161; Stewart 1 attached to Exhibit "O).  Despite his knowledge of the events and the appeal letter written to him, no informal hearing was ever held, and Joshua was never given the full notice of the charges against him, or the evidence of what Ms. Becker claimed he did to her.  Therefore, he was involved in causing the violation of Joshua's rights.  In addition, his knowledge of the events, yet his failure to ensure that Joshua had his informal hearing or to ensure that he was properly notified of the charges against him and the evidence the District had against him, shows that he condoned this behavior and should be liable.

Mr. Stewart is also not entitled to qualified immunity on this claim.  This Defendant has not met his burden of establishing qualified immunity.  Furthermore, a reasonable Superintendent would know that a student facing a suspension of more than three days is entitled to notice and an informal hearing, and would know that failing to give such a student full notice of the charges against him, and, once there was a denial, an explanation of the evidence the School had is not proper.  Dr. Dragan, Plaintiffs' expert, found that the conduct of Defendants was unreasonable and in violation of state laws requiring written notice and an informal hearing.  Pursuant to Patterson v., Armstrong County, violations of state law will not deprive an official of immunity, but the explicit mandates of state statutes can serve notice on officials of the requirements they must follow.  141 F. Supp.2d at 540.  The state requirements are clear and they were not followed here, in addition to the requirements set forth in Goss.  A reasonable Superintendent would know that this conduct violates Joshua's Due Process rights.

**2)     Janice Mindish**

Ms. Mindish was also involved.  She was informed of the matter between Joshua and Ms. Becker in the morning, discussed the matter at lunch with Mr. Baddick and Mr. Gale, and was involved in not only the disciplinary process, since it was not a routine matter, but also in the actual discipline Joshua received.  Since Ms. Mindish was made aware of everything that was going on, she should also be responsible for the failure to provide Joshua the due process he was required to receive.  In addition, her knowledge of the events, yet her failure to ensure that Joshua had his informal hearing or to ensure that he was properly notified of the charges against him and the evidence the District had against him, shows that she condoned this behavior of the assistants and should be liable.

In addition, Mrs. Shertzer specifically asked her at the reinstatement conference about any new witnesses and again about what Joshua was being accused of, specifically, what Ms. Becker claimed he did to her.  (Exhibit "M", pages 73-74; Exhibit "K", page 155).  The administrators there, Mr. Gale and Ms. Mindish, would not allow questioning about the event and told Mrs. Shertzer the information/documentation was confidential.  (Exhibit "M", pages 73-74; Exhibit

"K", pages 157-158). As such, she was personally involved in the violation of Joshua's Fourteenth Amendment Due Process rights.

Ms. Mindish is also not entitled to qualified immunity on this claim. This Defendant has not met her burden of establishing qualified immunity. Furthermore, a reasonable Principal would know that a student facing a suspension of more than three days is entitled to notice and an informal hearing, and would know that failing to give such a student full notice of the charges against him, and, once there was a denial, an explanation of the evidence the School had is not proper. Dr. Dragan, Plaintiffs' expert, found that the conduct of Defendants was unreasonable and in violation of state laws requiring written notice and an informal hearing. The state requirements are clear and they were not followed here, in addition to the requirements set forth in Goss. A reasonable Principal would know that this conduct violates Joshua's Due Process rights.

### 3)    Brian Baddick

Mr. Baddick was also involved. He was informed of the matter between Joshua and Ms. Becker in the morning, discussed the matter at lunch with Ms. Mindish and Mr. Gale, and was involved in not only the disciplinary process, but also in the questioning of Joshua and the actual discipline he received. Since Mr. Baddick was made aware of everything that was going on and took part in some of it, he should also be responsible for the failure to provide Joshua the due process he was required to receive.

Mr. Baddick is also not entitled to qualified immunity on this claim. This Defendant has not met his burden of establishing qualified immunity. Furthermore, a reasonable assistant principal would know that a student facing a suspension of more than three days is entitled to notice and an informal hearing, and would know that failing to give such a student full notice of the charges against him, and, once there was a denial, an explanation of the evidence the School had is not proper. Dr. Dragan, Plaintiffs' expert, found that the conduct of Defendants was unreasonable and in violation of state laws requiring written notice and an informal hearing. The state requirements are clear and they were not followed here, in addition to the requirements set

forth in <u>Goss</u>.  A reasonable assistant principal would know that this conduct violates Joshua's Due Process rights.

**4)      Philip Gale**

As set forth above, Mr. Gale was the most directly involved with the violation of Joshua's Due Process rights and therefore, is liable to Joshua for the violations he caused.

Mr. Gale is also not entitled to qualified immunity on this claim.  This Defendant has not met his burden of establishing qualified immunity.  Furthermore, a reasonable assistant principal would know that a student facing a suspension of more than three days is entitled to notice and an informal hearing, and would know that failing to give such a student full notice of the charges against him, and, once there was a denial, an explanation of the evidence the School had is not proper.  Dr. Dragan, Plaintiffs' expert, found that the conduct of Defendants was unreasonable and in violation of state laws requiring written notice and an informal hearing.  The state requirements are clear and they were not followed here, in addition to the requirements set forth in <u>Goss</u>.  A reasonable assistant principal would know that this conduct violates Joshua's Due Process rights.

**4.      Fourteenth Amendment – Equal Protection**

The Fourteenth Amendment of the United States Constitution prohibits any State from "deny[ing] to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.  The essence of the Equal Protection Clause is the requirement that similarly situated people be treated alike.  <u>Jarmon v. Batory</u>, 1994 WL 313063 (E.D. Pa. June 29, 1994), *citing*, <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 10, 112 S.Ct. 2326, 2331 (1992); <u>F.S. Royster Guano Co. v. Virginia</u>, 253 U.S. 412, 415 (1920); <u>Huffaker v. Bucks County Dist. Attorney's Office</u>, 758 F. Supp. 287, 291 (E.D. Pa. 1991).  The Equal Protection Clause forbids only arbitrary classifications.  <u>Student Doe v. Commonwealth of Pennsylvania</u>, 593 F. Supp. 54, 57 (E.D. Pa. 1984).  If the disputed classification affects a fundamental right or is an inherently suspicious classification, like race, the Court is required to strictly scrutinize the classification.  <u>Id.</u>  On the other hand, if no suspect classification is used and no fundamental right is affected, the

53

classification is reviewed under the "rational relationship test." Palmer v. Merluzzi, 868 F.2d 90, 96 (3d Cir. 1989). However, some classifications, like those based on gender or sex, are of such a nature as to require that the state show that the classification must serve important governmental objectives and be substantially related to the achievement of those objectives. Craig v. Boren, 429 U.S. 190, 197 (1976). Although Plaintiffs agree that education is not a fundamental right, but the classification in this case involves gender. Therefore, the substantial relationship test is to be used when reviewing the classification here.

Plaintiffs are not just claiming that Defendants should have believed him over Ms. Becker. They contend that Defendants ignored evidence and chose not to investigate the matter, and simply disciplined Joshua. They also contend that when Defendants were presented with evidence supporting Joshua's version of events, that both students engaged in the touching consensually and willfully, Defendants only disciplined Joshua. Olivia Becker was never disciplined for her conduct on December 7, 2001. (Exhibit "K", page 178).

When Mr. Gale first interviewed Ms. Becker and Joshua, he was made aware of potential witnesses, yet the evidence shows that he did not interview any of them. It is clear from Mr. Gale's notes when he interviewed Ms. Becker, that he wrote down four names – Mr. Lewis, Mr. Bachman, Ms. Nickle, and Mr. Shaiebly. (Exhibit "H"). Joshua identified Ben Railing, Chris Enterline and Jeremy Fritsch as people sitting close to him in class. (Exhibit "B", pages 103-105). Two of those witnesses, Jay Shaiebly and Jeremy Fritsch, actually saw the contact and confirm that it was consensual and engaged in by Ms. Becker herself. (Exhibit "F", pages 20-26; Exhibit "E", pages 12-19). Despite this evidence and contrary to three of the four witnesses[4], Mr. Gale says he spoke to the witnesses and they confirmed Ms. Becker approached them after class and told them what occurred, yet no one was an actual witness to the events. (Exhibit "G", pages 65, 52). The witnesses say they did not speak with any administrator and did not speak to Ms. Becker about the incident after class. (Exhibits "I", pages 11,16-19; "J", pages 21-23; "F", pages 29-30). Mr. Baddick and Ms. Mindish were kept apprised of the matter throughout the day by

---

[4] Dustin Lewis died prior to this case being filed.

Mr. Gale and the three discussed the matter and arrived at a discipline together. (Exhibits "K", page 109, 139-144, 121-122; "G", pages 76-78, 80-81; "L", pages 49, 61-64). No one suggested doing any further investigation. (Exhibit "G", page 78). They simply decided to believe Ms. Becker, without doing any investigation, and tried to get Joshua to change his story by trying to intimidate and threaten him. There was a classroom full of students that day and a substitute teacher. Clearly, they would know that someone might have seen something, yet they made no effort to find out. And to make matters worse, they refused to give any information to Joshua or Mrs. Shertzer about their supposed "investigation" and specifically, as to what Ms. Becker claimed Joshua did to her.

Jeremy Fritsch tried to come forward to a teacher, Ms. Fay, during Joshua's suspension, but Ms. Fay turned him away by telling him to forget it. (Exhibit "E", pages 20-23). In addition, when Jeremy Fritsch was identified by Joshua in January, 2002, and actually told Mr. Gale what he saw, confirming Joshua's version, as evidenced by the notes he took in the interview (Exhibit "H"), the administrators still did not discipline Ms. Becker, or do anything to rectify the discipline given to Joshua. According to the Student Handbook, inappropriate conduct would warrant a detention. (Exhibit "B", page 101). Even Ms. Mindish testified that if it was consensual, they both should have been disciplined and for less discipline than Joshua received. (Exhibit "K", page 133). Both Ms. Mindish and the Superintendent have the power to reopen and investigation, yet they chose not to. (Exhibit "O", pages 126-128; Exhibit "K", pages 205-206). Instead, they have not been entirely truthful as to what Mr. Fritsch reported to them. Mr. Gale claims that Mr. Fritsch told him that he had no recollection of the events and saw nothing in class. (Exhibit G", page 133). However, Ms. Mindish testified that Mr. Gale told her that Mr. Fritsch did see their hands together, but could not tell who was guiding who. (Exhibit "K", pages 193-195).

Defendants were not just mistaken here as they attempt to claim in their Brief. The evidence shows they acted deliberately. Clearly, given this evidence, it cannot be said that the disciplinary actions taken by the Defendants were substantially related to an important governmental interest. The School has a legitimate interest in maintaining a school free of

misconduct.  See, <u>New Jersey v. T.L.O.</u>, 469 U.S. at 340.  However, even if those interests are important, it is clear that the sanctions imposed on Joshua in this case are not substantially designed to serve those interests.  Defendants were shown that Joshua and Ms, Becker were similarly situated, yet they treated them differently, which violates the Equal Protection Clause.  Dr. Dragan again reviewed the conduct of Defendants and found that with the evidence presented to them, the District denied Joshua equal treatment by only disciplining him and by disciplining him so severely.  (Exhibit "Q", page 31).  As such, there is sufficient evidence for Joshua's claim that he was denied equal protection of the laws in violation of the Equal Protection Clause.  There are also material facts in dispute and therefore, Plaintiffs have shown that this claim must not be dismissed.

### a.      Liability of the School District and the Board

There is sufficient evidence to find the District and the Board liable for denying Joshua equal protection of the laws.  At the very least, the evidence is sufficient that the District failed to properly train its employees as to the requirements under the Equal Protection Clause.  Only Joshua was disciplined when it was his word against Ms. Becker's, but no investigation was done, which would have revealed witnesses confirming Joshua's version.  Even when the Superintendent, the CEO of the Board, was presented with the confirming witness evidence, Joshua was still the only one disciplined.  The evidence shows that there was a custom of ignoring evidence and choosing not to investigate properly for both Ms. Becker's complaint and for Joshua's complaint against her.  Therefore, there is sufficient evidence for liability against the District for failing to treat these two similarly situated people alike.

### b.      Liability of Individual Defendants

Once it is determined that the individual Defendant can be liable for a violation of the Fourteenth Amendment Equal Protection Clause, then the issue of qualified immunity must be decided.  It was clearly established by at least 1989 that students were entitled to Equal Protection of the law concerning disciplinary actions taken against them by schools.  See, <u>Palmer v. Merluzzi</u>, 868 F.2d 90 (3d Cir. 1989).  Given that these rights were clearly established at the time

of Joshua's discipline, the next step is to determine whether a reasonable person in each of the Defendant's positions would realize that what he or she was doing violated Joshua's Fourteenth Amendment right to Equal Protection. It must again be pointed out to the Court that due to the many material factual disputes that exist in this case, any decision on qualified immunity is impossible at this stage.

### 1) Donald Stewart

Contrary to what Defendants claim, Mr. Stewart was involved in the violation of Joshua's Equal Protection rights. He was advised of the happenings in the matter on December 10 and then again on December 14, both before and after the reinstatement conference. In addition, he was sent the letter from Plaintiffs' counsel, attaching a copy of Joshua's complaint against Ms. Becker for bringing a false claim, and identifying the witness, Jeremy Fritsch. As a result of that complaint, an investigation was conducted. Mr. Fritsch was interviewed and confirmed Joshua's version, yet Ms. Becker was never disciplined. As such, Mr. Stewart was involved in the decision not to discipline Ms. Becker, despite evidence that she engaged in the touching consensually with Joshua. Therefore, he is liable to Joshua. In addition, his knowledge of the events, yet his failure to rectify Joshua's discipline and to ensure that Ms. Becker was also disciplined for the same conduct, shows that he condoned this behavior and should be liable.

Mr. Stewart is also not entitled to qualified immunity on this claim. This Defendant has not met his burden of establishing qualified immunity. Furthermore, a reasonable Superintendent would know that similarly situated students need to be treated alike and it is not proper to discipline only one student when two students are engaging in the same conduct. A reasonable Superintendent would also know that they should investigate the matter by interviewing all possible witnesses, as well as the teacher in the class, to try to determine which version is more accurate, and the failure to do so would be improper. If a reasonable Superintendent is presented with evidence supporting one student's version of events, that both students engaged in the touching consensually and willfully, and then only disciplined one student, then that reasonable Superintendent would know that that conduct would violate the disciplined student's right to

equal protection of the laws.  Dr. Dragan, Plaintiffs' expert, found that the conduct of Defendants was unreasonable when they only disciplined Joshua and not Ms. Becker.  A reasonable Superintendent would know that this conduct violates Joshua's rights under the Equal Protection Clause.

**2)    Janice Mindish**

Ms. Mindish was again involved in the failure to provide Joshua equal protection of the laws, because she was kept apprised of the matter throughout the day by Mr. Gale.  In addition, she, Mr. Gale and Mr. Baddick discussed the matter and arrived at a discipline for Joshua together, despite the fact that no investigation was done, no witnesses were found and there was no evidence that any force was used.  Furthermore, Joshua handed her his complaint against Ms. Becker and she was the one in charge of that investigation.  Mr. Fritsch confirmed Joshua's version, yet Ms. Becker was never disciplined, causing a violation of Joshua's Equal Protection rights.

Ms. Mindish is also not entitled to qualified immunity on this claim.  This Defendant has not met her burden of establishing qualified immunity.  Furthermore, a reasonable Principal would know that similarly situated students need to be treated alike and it is not proper to discipline only one student when two students are engaging in the same conduct.  A reasonable Principal would also know that they should investigate the matter by interviewing all possible witnesses, as well as the teacher in the class, to try to determine which version is more accurate, and the failure to do so would be improper.  If a reasonable Principal is presented with evidence supporting one student's version of events, that both students engaged in the touching consensually and willfully, and then only disciplined one student, then that reasonable Principal would know that that conduct would violate the disciplined student's right to equal protection of the laws.  Dr. Dragan, Plaintiffs' expert, found that the conduct of Defendants was unreasonable when they only disciplined Joshua and not Ms. Becker.  A reasonable Principal would know that this conduct violates Joshua's rights under the Equal Protection Clause.

### 3)    Brian Baddick

Mr. Baddick was also involved in the failure to provide Joshua equal protection of the laws, because he was kept apprised of the matter throughout the day by Mr. Gale. In addition, he, Ms. Mindish and Mr. Gale discussed the matter and arrived at a discipline for Joshua together, despite the fact that no investigation was done, no witnesses were found and there was no evidence that any force was used. This decision only to discipline Joshua denied him equal protection of the laws in violation of the Equal Protection Clause.

Mr. Baddick is also not entitled to qualified immunity on this claim. This Defendant has not met his burden of establishing qualified immunity. Furthermore, a reasonable assistant principal would know that similarly situated students need to be treated alike and it is not proper to discipline only one student when two students are engaging in the same conduct. A reasonable assistant principal would also know that they should investigate the matter by interviewing all possible witnesses, as well as the teacher in the class, to try to determine which version is more accurate, and the failure to do so would be improper. If a reasonable assistant principal is presented with evidence supporting one student's version of events, that both students engaged in the touching consensually and willfully, and then only disciplined one student, then that reasonable assistant principal would know that that conduct would violate the disciplined student's right to equal protection of the laws. Dr. Dragan, Plaintiffs' expert, found that the conduct of Defendants was unreasonable when they only disciplined Joshua and not Ms. Becker. A reasonable assistant principal would know that this conduct violates Joshua's rights under the Equal Protection Clause.

### 4)    Philip Gale

As set forth above, Mr. Gale was the most directly involved with the violation of Joshua's Equal Protection rights and therefore, is liable to Joshua for the violations he caused.

Mr. Baddick is also not entitled to qualified immunity on this claim. This Defendant has not met his burden of establishing qualified immunity. Furthermore, a reasonable assistant principal would know that similarly situated students need to be treated alike and it is not proper

to discipline only one student when two students are engaging in the same conduct. A reasonable assistant principal would also know that they should investigate the matter by interviewing all possible witnesses, as well as the teacher in the class, to try to determine which version is more accurate, and the failure to do so would be improper. If a reasonable assistant principal is presented with evidence supporting one student's version of events, that both students engaged in the touching consensually and willfully, and then only disciplined one student, then that reasonable assistant principal would know that that conduct would violate the disciplined student's right to equal protection of the laws. Dr. Dragan, Plaintiffs' expert, found that the conduct of Defendants was unreasonable when they only disciplined Joshua and not Ms. Becker. A reasonable assistant principal would know that this conduct violates Joshua's rights under the Equal Protection Clause.

### C.    State Law Claims

#### 1.    Intentional Infliction of Emotional Distress

"The gravamen of the tort of intentional infliction of emotional distress is outrageous conduct on the part of the tortfeasor." McNeal, 598 A.2d at 640, *citing*, Kazatsky v. King David Memorial Park, 515 Pa. 183, 190, 527 A.2d 988, 991 (1987). The outrageous conduct can be either intentional or reckless behavior that causes emotional distress to another. Restatement (Second) of Torts § 46. The elements of a cause of action for intentional infliction of emotional distress are as follows: 1) extreme and outrageous conduct; 2) intentional or reckless conduct; 3) the conduct must cause emotional distress; and 4) the distress must be severe. Kessler v. Monsour, 865 F. Supp. 234, 241 (M.D. Pa. 1994) (citations omitted). Plaintiffs have this claim against Ms. Mindish, Mr. Baddick and Mr. Gale and there is sufficient evidence to prove this claim against each of them.

#### a.    Janice Mindish

There are three instances where Ms. Mindish's conduct towards Joshua and Mrs. Shertzer rises to the level of outrageous. The first instance concerns her conduct during the disciplinary process of Joshua. Essentially, Joshua was detained for over 3 ½ hours and interrogated. She

decided, along with Mr. Baddick and Mr. Gale, to discipline Joshua when no investigation was conducted and no witnesses were interviewed.  Then, she did not provide Joshua with the details of what Ms. Becker claimed he did to her.  When she was actually provided a witnesses confirming Joshua's version, that witness was ignored and the discipline was not rectified. Disciplining Joshua in this setting is purely outrageous conduct that was clearly intentional given the lack of proper investigation and the disregarding of a witness.  As a result, Joshua did suffer severe emotional distress.  He was teased to the point of having to leave school and actually transfer out for one year.  In addition, he was and still is in treatment for the emotional damage he suffered.

The second instance was at the reinstatement conference.  Despite the fact that Mrs. Shertzer tried to ask questions and find out what Joshua was being accused of and specifically, what Ms., Becker claimed he did to her, Ms. Mindish cut her off and told Mrs. Shertzer and Joshua that they were not going to rehash the matter and the information was confidential. (Exhibits "B", page 138; "M", pages 73-74).  And then, Ms. Mindish looked right at Mrs. Shertzer and said, "This is over now."  (Exhibit "M", page 100).  It was Ms. Mindish's decision, not the Shertzers or Joshua. (Exhibit "M", page 100).  This conduct is outrageous in a school setting, considering it is coming from a school principal and directed towards parents and a student.  Mrs. Shertzer was upset by this comment and confirmed that she felt she was treated unprofessionally when this comment was made.  (Exhibit "M", page 100).  She was also upset by the fact that she had asked over and over again for documentation and information concerning what Joshua was being accused of and that they, including Ms. Mindish, kept turning her away

The final instance of outrageous conduct on the part of Ms. Mindish was on January 16, 2002, when Mrs. Shertzer went to view the Policy Manual and her son's disciplinary record. When she asked to see Joshua's record, Mr. Gale brought out an empty folder.  (Exhibit "M", page 89).  Ms. Mindish came out and Mrs. Shertzer told her that there had to be some record since Joshua was just suspended for four days.  (Exhibit "M", pages 89-90).  Ms. Mindish then got physically close to Mrs. Shertzer and she screamed in Mrs. Shertzer's face.  (Exhibit "M", pages

64, 100).  She said she was going to call the solicitor.  (Exhibit "M", page 90).  She was informed that there were personal notes but she was not permitted to see them.  (Exhibit "M", pages 89-90).  Mrs. Shertzer was extremely upset at being treated so unprofessionally at the school.  (Exhibit "M", page 100).

### b.    Brian Baddick

The outrageous conduct of Mr. Baddick came about during the time he interviewed Joshua.  He was trying to get Joshua to change his version by threatening police involvement when it was not going to happen.  (Exhibit "B", pages 108-109).  This in inappropriate behavior when it is intended as a threat.  (Exhibit "G", pages 31-32; Exhibit "O", page 88).  Joshua was scared of him because he was so pushy and trying to intimidate him.  (Exhibit "B", pages 110-111).  In addition, he said the comment to Joshua, "So, did you feel her to get a rise?"  (Exhibit "B", page 93).  This comment was very offensive to the Shertzers and to Joshua and it served no purpose but to insult Joshua.  (Exhibits "B", pages 141-142; "M", pages 76-77).  It was so offensive to Joshua he discussed it with his therapist, Hubert Wood.  (Exhibit "P").  Mr. Baddick denied making this comment at deposition.  (Exhibit "L", page 76-77).  If it was not offensive, there would be no reason to deny it.  As such, there is sufficient evidence to prove a claim of intentional infliction of emotional distress against Mr. Baddick.

### c.    Philip Gale

Since Mr. Gale was the administrator in charge of this matter, his conduct during the entire process, from December 10, 2001 through January 2002 as set forth above, is outrageous.  Joshua was detained for over 3 ½ hours and interrogated even when there had been no investigation.  Mr. Gale threatened police involvement when the police were not going to be involved and then lied to Joshua by telling him he convinced Ms. Becker's father not to press charges.  Mr. Gale was untruthful about interviewing any of the identified witnesses, and it is even unclear whether he interviewed Ms. Becker a second time on December 10, 2001, as she dos not remember it.  The only purpose to the further questioning was to intimidate Joshua and try to make him change his story.  He decided, along with Mr. Baddick and Ms. Mindish, to discipline

Joshua when no investigation was conducted and no witnesses were interviewed. Then, he did not provide Joshua with the details of what Ms. Becker claimed he did to her. He would not provide this information to Mrs. Shertzer either, despite demands in telephone calls, at the reinstatement conference and at the January 16, 2002 meeting for Mrs. Shertzer to view the discipline record and the policy manual. At different times he claimed he had notes, then claimed he did not. Mrs. Shertzer and Joshua were told that the investigative information was confidential at the reinstatement conference and were forbidden to ask questions. When Mr. Gale was asked about Mr. Baddick's comment to Joshua, he would not answer and put his head down. It upset Mrs. Shertzer and Joshua so much that each one of them continued to ask Mr. Gale the same question at the conference. He continued to ignore them and began to turn red.

When he was provided a witnesses confirming Joshua's version, Mr. Gale actually lied about what Mr. Fritsch told him and claimed Mr. Fritsch did not remember anything. Even though Ms. Mindish was told some information from Mr. Gale about Mr. Fritsch, that witness was still ignored and the discipline was not rectified. Disciplining Joshua in this setting is purely outrageous conduct that was clearly intentional given the lack of proper investigation and the disregarding of witnesses. As a result, Joshua and Mrs. Shertzer suffered severe emotional distress. Joshua was teased to the point of having to leave school and actually transfer out for one year. In addition, he was and still is in treatment for the emotional damage he suffered. Therefore, this claim against Mr. Gale must not be dismissed.

### 2.     Negligence

It is true that in order to impose liability on a municipality for state claims, two elements must be proven: (1) a duty owed under common law or statute; and (2) an injury was caused by negligent acts of the local agency, or an employee acting within the scope of his office or duties with respect to one of the enumerated categories of liability. 42 Pa.C.S. § 8542 (a). Subsection (b) lists the many types of categories for which a municipality can be liable under negligence principles. Plaintiffs concede that none of these categories apply in this case. However, § 8550 provides as follows:

> In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of sections 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.

42 Pa.C.S. § 8550. Therefore, if the actions of an employee constitute a crime or willful misconduct, they are not entitled to governmental immunity and remain liable. "Willful misconduct" has been defined as "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." DiSalvio v. Lower Merion School District, 2002 WL 734343, *4 (E.D. Pa. April 25, 2002), citing, King v. Breach, 115 Pa. Cmwlth. 355, 540 A.2d 976, 981 (1988). The DiSalvio Court recognized that willful misconduct can be acts or failure to act. See, DiSalvio v. Lower Merion School District, 2002 WL 734343, *4. Plaintiffs have made this claim against all Mr. Stewart, Ms. Mindish, Mr. Baddick, Mr. Gale and Carole Fay.

### a. Donald Stewart

As set forth above, Mr. Stewart, as Superintendent, who oversees all schools and the school administrators, was made aware of the disciplinary action against Joshua on December 10, and was called two times that week, both before and after the reinstatement conference, to continue to be informed of the status of the matter. Since he was made aware of the occurrences, it can be inferred that he was made aware of the fact that no investigation was done, no witnesses were actually interviewed, and, according to Mr. Gale, there was no proof of any force involved. (Exhibit "B", page 124). Nonetheless, Joshua was disciplined. Clearly, he would know that if he failed to step in and make sure an investigation took place before any discipline was handed down, especially one as severe as sexual harassment, Joshua was likely to be improperly disciplined. Such a discipline would be based on incomplete or false information.

In addition, the evidence shows that Ms. Mindish supplied the notes/investigative reports to the Superintendent within days of the discipline. It was then left to the Superintendent to tell

her who was to get the notes/report.  The Penn Manor policy requires Joshua to be provided with the report, yet it was never provided.  This is further evidence of willful misconduct.

Finally, Mr. Stewart received the letter from Plaintiffs' counsel dated January 24, 2002, as he was the acting Superintendent at the time.  This letter advised him of the violations Joshua suffered and asked him to reopen the investigation.  This letter was sent to him as an "appeal" from Joshua's disciplinary decision pursuant to the Policy Manual.  That Policy did not have a deadline to file the appeal.  (Exhibit "N", Section 248, page 4).  He instructed Ms. Mindish to do some investigation, and even though Mr. Fritsch confirmed Joshua's version of events, Joshua's discipline was never rectified and Ms. Becker was never disciplined.  Mr. Stewart has the power to reopen investigations, yet he chose not to do it in this case.  When he responded to Joshua's letter by a letter from the solicitor, it was stated that the appeal was untimely and that no further action by the District is warranted or necessary.  (Stewart 2 attached to Exhibit "O").  When this letter was sent, Mr. Fritsch had already been interviewed.  Again, this evidence provides sufficient evidence to show willful misconduct on the part of Mr. Stewart, so the negligence claim against him must survive.

In addition, Plaintiffs agree that Pennsylvania recognizes the doctrine of absolute immunity for "high public officials" acting in the course of their official duties and within the scope of their authority.  However, the doctrine of absolute immunity has only been extended to cases where the official is accused of defamation.  See, Lindner v. Mollan, 544 Pa. 487, 67 A.2d 1194 (1996).

The Pennsylvania Supreme Court has not yet decided whether this immunity extends to other intentional torts.  In the case of Smith v. School District of Philadelphia, 112 F.Supp.2d 417 (E.D. Pa. 2000), this Court predicted that the Pennsylvania Supreme Court would hold that absolute immunity extends to claims of intentional infliction of emotional distress and invasion of privacy.  However, that case still involved the issue of defamation and should be distinguished from the instant case.  Specifically, the Board of Education and the Superintendent passed a resolution condemning the plaintiff and calling for his removal as president of the Home and

School Association.  As a result of the resolution, plaintiff in that case was removed from office.
Shortly thereafter, plaintiff filed the lawsuit.  That complaint had seven counts, including
defamation, intentional infliction of emotional distress and invasion of privacy.  The court found
that the Board and the Superintendent had absolute immunity for all of those three counts, but the
holding of the court must not be taken out of context.  That case is really about the allegation of
defamation and what resulted from that speech.

The instant case does not involve defamation, but actions and inactions of the Mr. Stewart
surrounding the improper discipline of Joshua.  As such, absolute immunity should not apply
here.

### b.    Janice Mindish

Based on the aforementioned evidence, clearly there was willful misconduct on the part of
Ms. Mindish throughout the disciplinary process of Joshua from December 10 (confinement and
interrogations, failure to do any investigation, failure to provide information), December 14
(conduct at the reinstatement conference and failure to provide information), the failure to ever
hold an informal hearing, January 16 (the meeting at the school office to review disciplinary
record and policy manual and failure to provide information), January 25 (complaint of Joshua
against Ms. Becker), and through the "investigation" that took place at that time, speaking to Ms.
Becker, and deciding to do nothing about Joshua's discipline and not to discipline Ms. Becker.  It
can be shown by these facts that Ms. Mindish's actions and failure to act caused the improper
discipline of Joshua and therefore, the claim of negligence against her must not be dismissed.

### c.    Brian Baddick

Based on the aforementioned evidence, clearly there was willful misconduct on the part of
Mr. Baddick during the disciplinary process of Joshua on December 10 for his statements to
Joshua and for his attempts at trying to intimidate him into changing his story.  The evidence also
shows that there is willful misconduct on his part when he was involved in the decision to
discipline Joshua after no investigation was done and Joshua was never told what Ms. Becker
claimed he did to her.  No witnesses were interviewed, even though names were provided, and

there were witnesses who did, in fact, witness the events.  As such, the claim of negligence against him must remain.

### d.    Philip Gale

Based on the aforementioned evidence, clearly there was willful misconduct on the part of Mr. Gale throughout the disciplinary process of Joshua from December 10 (confinement and interrogations, failure to do any investigation, failure to provide information, and telephone call with Mrs. Shertzer), December 11 (the telephone call with Mrs. Shertzer), December 14 (conduct at reinstatement conference and failure to provide information), the failure to ever hold an informal hearing, January 16 (the meeting at the school office to review disciplinary record and policy manual and failure to provide information), and through the "investigation" that took place for complaint of Joshua against Ms. Becker, speaking to Mr. Fritsch, and deciding to do nothing about Joshua's discipline and not to discipline Ms. Becker.  It can be shown by these facts that Mr. Gale's actions and failure to act caused the improper discipline of Joshua and therefore, the claim of negligence against him must not be dismissed.

### e.    Carole Fay

Ms. Fay's conduct rises to the level of willful misconduct as well.  While Joshua was out on suspension, Mr. Fritsch approached Ms. Fay to talk to her about what he witnessed between Joshua and Ms. Becker.  (Exhibit "E", pages 20-21; Exhibit "D", page 58).  They went out of the room and Mr. Fritsch told Ms. Fay what he witnessed.  (See, Exhibit "E", pages 21-22).  He told her that he saw Ms. Becker pulling Joshua's hand to her crotch area.  (Exhibit "E", page 17, and Fritsch 1 attached to the deposition).  He looked away after that, but when he looked back again, he saw Ms. Becker's hand come in under Joshua's arm and begin touch Joshua's crotch area. (Exhibit "E", pages 17-18 and Fritsch 1).  He then looked away again and did not look back at them.  (Exhibit "E", pages 18-19).  He neither saw nor heard any indication that either one of them wanted the other to stop.  (Exhibit "E", pages 18-19).  Ms. Fay told him that there was nothing she could do about it and said just forget it.  (Exhibit "E", pages 22-23).  He did nothing

else because he figured it was taken care of. (Exhibit "E", pages 58-61). Ms. Fay did not tell the administrators about Mr. Fritsch. (See, Exhibit "K", pages 145, 204).

The administrators agree that if a teacher is approached by a witness in a disciplinary matter, the teacher should inform the administration. (Exhibit "G", page 13;Exhibit "K", pages 144-145). Ms. Mindish testified that had Mr. Fritsch told Ms. Fay what he saw as set forth in his testimony, it could have made a difference in the discipline handed down from the beginning. (Exhibit "K", pages 204-205). It could have meant that it was consensual and that both should have been disciplined for less time than Joshua received. (Exhibit "K", pages 132-135). In fact, according to the Student Handbook, the punishment for inappropriate conduct is a detention. (Exhibit "B", page 101). Therefore, her willful failure to tell the administrators, knowing that Joshua was currently out on suspension and Ms. Becker was not, caused Joshua improper suspension to continue. No doubt she knew that if she did not come forward with Mr. Fritsch, Joshua's improper discipline would continue. Therefore, the claim against her for negligence must remain.

### 3. Negligent Infliction of Emotional Distress

Plaintiffs withdraw this count from their Complaint.

### D. Punitive Damages

The claim for punitive damages against the Defendants sued in their individual capacity must remain, given the claims against them as set forth above. See, DiSalvio v. Lower Merion School District, 2002 WL 734343 (permitting punitive damages claims against the individual defendants because there were claims against them under § 1983, negligence and intentional infliction of emotional distress and those claims require showings of outrageousness and willful misconduct).

## III. CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request this Honorable Court dismiss the following claims:

1)    all claims against Gary Campbell;

2)      the claim of a violation of the First Amendment against Brian Baddick;

3)      the claim of a violation of the Fourth Amendment against Donald Stewart; and

4)      the claim of Negligent Infliction of Emotional Distress against all Defendants.

In all other respects, Plaintiffs respectfully request that this Court deny Defendants'

Motion for Summary Judgment.

Respectfully submitted,

BY:_____

DEIRDRE A. AGNEW, ESQUIRE
Attorney for Plaintiffs
Goshen Executive Center
Building 400A
1450 East Boot Road
West Chester, PA  19380
(610) 738-4800
FAX (610) 738-4898

## CERTIFICATE OF SERVICE

I, Deirdre A. Agnew, Esquire, hereby certify that on the 9th day of January, 2004, a true and correct copy of Plaintiffs' Response to Defendants' Motion for Summary Judgment, and Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment, were served on Defendants or their counsel via first class, regular mail, postage prepaid, at the following address:

Ellis H. Katz, Esquire
Jason R. Wiley, Esquire
Sweet, Stevens, Tucker & Katz, LLP
331 Butler Avenue
P.O. Box 5069
New Britain, PA  18901


BY:_____
      DEIRDRE A. AGNEW, ESQUIRE