**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOSHUA SHUMAN, a minor by and through his mother and natural guardian, TERESA SHERTZER, and TERESA SHERTZER<br>    Plaintiffs,<br>    v.<br><br>PENN MANOR SCHOOL DISTRICT,<br>PENN MANOR SCHOOL BOARD,<br>GARY B. CAMPBELL, individually and as Superintendent of the Penn Manor School District,<br>AND<br>DONALD STEWART, individually and as Acting Superintendent of the Penn Manor School District,<br>AND<br>JANICE M. MINDISH, individually and as Principal of Penn Manor High School of the Penn Manor School District,<br>AND<br>BRIAN D. BADDICK, individually and as Assistant Principal of Penn Manor High School of the Penn Manor School District,<br>AND<br>PHILIP B. GALE, individually and as Dean of Students of Penn Manor High School of the Penn Manor School District,<br>AND<br>CAROLE FAY, individually and as a teacher and Agriculture Coordinator at Penn Manor High School of the Penn Manor School District,<br>    Defendants. | CIVIL ACTION<br>No. 02-CV-3594<br><br>(GARDNER) |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'**
**STATEMENT OF MATERIAL FACTS**

Plaintiffs, Teresa Shertzer and Joshua Shuman, by and through their undersigned counsel,

present the following Response to Defendants' Statement of Material Facts:

1.   Admitted in part, denied in part.  It is admitted that some allegations arise from the December 7, 2001.  It is denied that all allegations arise from the December 7, 2001 incident. There were subsequent incidents as a result of the December 7 incident from which the allegations arise. (See, Statement of Facts in Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, which is incorporated herein by reference).  Other incidents arise from the manner in which the administration handled the incident on December 10, 2001; the reinstatement conference on December 14, 2001; the January 16, 2002 incident when Mrs. Shertzer went to the school and asked to see the policy manual, Mr.Gale's notes and her son's discipline record; the handling of the written complaint Joshua made on  January 23, 2002 against Ms. Becker for making false accusations against him; and Plaintiffs' written appeal letter sent to the Superintendent of Penn Manor Schools on or about January 24, 2002, followed by the response letter by the solicitor on behalf of the Superintendent on February 12, 2002.  (See, Statement of Facts in Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, which is incorporated herein by reference).

2.   Admitted in part, denied in part.  It is admitted that Ms. Becker went to her guidance counselor, Michael Wildasin.  It is denied as to what Mrs. Becker said or did not say to her guidance counselor given there is no record of it. (See, deposition transcript of Olivia Becker, attached as Exhibit "C", pages 46-47).

3.   Admitted in part, denied in part.  It is admitted that Assistant High School Principal, Philip Gale, was the administrator in charge of investigating the December 7 incident between the minor plaintiff, Joshua Shuman, and another student, Ms. Becker.  It is denied that Mr. Gale "investigated the allegations" because he did not fully investigate the incident.  Ms. Becker apparently provided to Mr. Gale the names of four students she claimed she spoke to after class about the incident.  (See, deposition transcript of Philip Gale Exhibit "G", pages 51-53).  Those students are Dustin Lewis, Shawn Bachman, Jenn Nickle and Jay Shaiebly.  (See, Exhibit "G", pages 51-53; See also, Notes of Mr. Gale attached hereto as Exhibit "H").  Mr. Gale claims he took brief notes and only wrote down the student names Ms. Becker provided to him; he claims

he took no notes about what Ms. Becker told him about the incident. (See, Exhibit "G", pages 51-53; See also, Exhibit "H"). Furthermore, he took no notes from any subsequent interview with Ms. Becker. (See, Exhibit "H"). Ms. Becker does not remember whether she spoke to Mr. Gale more than once. (See, Exhibit "C", page 49, lines 3-6). Mr. Gale asked Joshua if he knew anyone who may have witnessed something. (See, deposition transcript of Joshua Shuman Exhibit "B", page 104, lines 2-3, page 105, lines 15-18). In response, Joshua told him the names of the students seated in the row in front of him – Ben Railing, Chris Enterline and Jeremy Fritsch. (See, Exhibit "B", page 103-105). Mr. Gale took no notes of this interview with Joshua, or any subsequent interview with Joshua. (See, Exhibit "H"; See also, Exhibit "G", pages 107-108). Mr. Gale also claims that he then spoke to three or four students named by Ms. Becker – Dustin Lewis, Shawn Bachman Jennifer Nickle and Jay Shaiebly. (See, Exhibit "G", page 65, lines 10-13, page 52, lines 18-21; Exhibit "H"). He claims he met each of them separately and that they each confirmed that Ms. Becker came to them after class and explained to them that Joshua had touched her and forced his hand on her. (See, Exhibit "G", page 65, lines 16-24). However, Mr. Gale again took no notes during any of these supposed interviews. (See, Exhibit "H"). One student, Dustin Lewis, has since died and was not available for this case. (See, Exhibit "C", page 15, line 12). The remaining three students disagree with Mr. Gale's testimony. Mr. Bachman also does not recall ever being called to the office or speaking with the administrators about this incident. (See, deposition transcript of Shawn Bachman Exhibit "I", page 11, lines 11-12; pages 18-19). He believes he would have remembered if he had been called down because that would have been unusual. (See, Exhibit "I", page 19, lines 1-7). In addition, Ms. Nickle denies ever being called down to the office to speak to any of the administrators. (See, deposition transcript of Jennifer Nickle Exhibit "J", page 23, lines 6-11). The fourth witness named by Ms. Becker, Jay Shaiebly, was never called down to the office to speak to any administrator. (See, Deposition transcript of Jay Shaiebly, Exhibit "F", pages 29-30). Even Mr. Gale states that no other students in the class were interviewed at that time, nor was the substitute teacher ever even contacted. (See, Exhibit "G", pages 73-74). As it turns out,

Jeremy Fritsch, who was identified by Joshua, and Jay Shaiebly, who was identified by Ms. Becker, both saw parts of the contact between Joshua and Ms. Becker and confirm that the contact was consensual. (See, Deposition of Jeremy Fritsch, Exhibit "E", pages 12-19; Exhibit "F", pages 20-25). After Joshua ate lunch, he was returned to the small conference room. (See, Exhibit "B", pages 91-92). Eventually, Mr. Gale came into the room along with Mr. Baddick. (See, Exhibit "B", page 93, lines 6-9). Mr. Gale spoke first and said he was trying to get the story straight and that they still had not found anyone who witnessed the event. (See, Exhibit "B", pages 93-94). When Mr. Gale returned to the room where Joshua was at about 1:15 he also told Joshua that there were still no witnesses and that there was no proof that there was force involved. (See, Exhibit "B", pages 96-97, 123-124).

4. Admitted.

5. Admitted in part, denied in part. It is admitted that Ms. Becker essentially testified that way. It is denied that this is an undisputed fact. Ms. Becker touched Joshua's leg first, and then he touched her leg in the mid-thigh area. (See, Exhibit "B", page 59, lines 15-17 and Shuman 2 attached thereto). Then she pulled his hand to her crotch and she reached over and started rubbing his penis over his clothes. (See, Exhibit "B", page 59, lines 17-19, and Shuman 2). This touching took place for about five minutes. (See, Exhibit "B", page 59, lines 20-21, pages 65-66, and Shuman 2). There was no force involved with this touching, nor any resistance by Ms. Becker. (See, Exhibit "B", page 59, lines 7-19, and Shuman 2). In fact, she was laughing about it and engaging in the conduct herself, willingly. (See, Exhibit "B", pages 59-63 and Shuman 2). Two other students in the Ag Science II class that day, Jeremy Fritsch and Jay Shaiebly, witnessed some of the contact between Ms. Becker and Joshua. (See, Exhibit "E", pages 12-19; and Exhibit "F", pages 20-25). Mr. Fritsch first noticed Ms. Becker and Joshua talking with each other, generally enjoying each other and laughing. (See, Exhibit "E", pages 15-16). He then saw Ms. Becker pulling Joshua's hand to her crotch area. (See, Exhibit "E", page 17, lines 4-6, and Fritsch 1 attached to the deposition). He saw Ms. Becker's hand come in under Joshua's arm and begin touch Joshua's crotch area. (See, Exhibit "E", pages 17-18 and

Fritsch 1). He also saw no indication that either one of them wanted the other to stop. (See, Exhibit "E", page 19, lines 7-12). Mr. Shaiebly could only see Ms. Becker and Joshua above the table, but first was able to see Joshua's arm extended toward Ms. Becker and then was able to see Ms. Becker's arm extended toward Joshua. (See, Exhibit "F", pages 20-24). Mr. Shaiebly confirmed that from what he could see, it was a mutual thing and definitely appeared consensual to him. (See, Exhibit "F", page 22, lines 8-20, pages 24-25). He did not see her push away. (See, Exhibit "F", page 26, lines 19-22).

   6. Denied. Although Ms. Becker may have testified this way, this is not an undisputed fact. This touching took place for about five minutes. (See, Exhibit "B", page 59, lines 20-21, pages 65-66, and Shuman 2). There was no force involved with this touching, nor any resistance by Ms. Becker. (See, Exhibit "B", page 59, lines 7-19, and Shuman 2). In fact, she was laughing about it and engaging in the conduct herself, willingly. (See, Exhibit "B", pages 59-63 and Shuman 2). She was even asking Joshua to go to Low Places again. (See, Exhibit "B", page 60-61). There was never any complaint by Ms. Becker, she never told him to stop, nor was there any disruption of the class. (See, Exhibit "B", pages 61-63; See also, Exhibit "C", page 64, lines 12-22). Mr. Fritsch heard Ms. Becker and Joshua talking during the contact, but did not hear either of them say stop. (See, Exhibit "E", pages 18-19 and Fritsch 1). He also saw no indication that either of them wanted the other to stop. (See, Exhibit "E", page 19, lines 7-12). Mr. Shaiebly confirmed that from what he could see, it was a mutual thing and definitely appeared consensual to him. (See, Exhibit "F", page 22, lines 8-20, pages 24-25). He did not see her push away. (See, Exhibit "F", page 26, lines 19-22).

   7. Admitted. It is admitted that Mr. Gale testified that when Ms. Becker first told him about the incident, on December 10, 2001, that she was upset and crying.

   8. Denied. At approximately 10:15, Joshua was called down to Mr. Gale's office. (See, Exhibit "B", page 76, lines 11-19).

   9. Admitted in part, denied in part. It is admitted that on December 10, 2001 Mr. Gale told Joshua that Ms. Becker was claiming that Joshua physically forced his hand upon her sexually,

and that she was very upset about it.  (See, Exhibit "B", page 81, lines 17-20, pages 82-83, and

Shuman 2).  It is denied that Joshua was fully informed of his charges because Mr. Gale did not

provide any more detail about what Ms. Becker claimed Joshua did to her.  (See, Exhibit "B",

page 112, lines 2-16; See also, Deposition of Teresa Shertzer, attached hereto as Exhibit "M",

page 60, lines 2-10).  Additionally, it is admitted that when Mr. Gale returned to the room where

Joshua was at about 1:15 p.m., he informed Joshua that he was going to be suspended for four

days for "inappropriate conduct" because he admitted touching Ms. Becker.  (See, Exhibit "B",

pages 96-97, pages 123-124).  It is denied that Joshua was ever informed that he was being

disciplined for "sexual harassment."  Mr. Gale used the term "inappropriate conduct" when

describing Joshua's discipline; he never used the term "sexual harassment" to Joshua on

December 10th.  (See, Exhibit "B", pages 98-100, page 124, lines 15-17).   Mr. Gale called Mrs.

Shertzer at approximately between 1:15 and 1:30 p.m.  (See, Exhibit "M", pages 40-41; See also,

Exhibit "B", page 127, lines 7-9).  He told Mrs. Shertzer that there was an incident at school on

Friday, December 7, and that Joshua was involved in "inappropriate touching."  (See, Exhibit

"M", pages 41-43; See also, Exhibit "B", page 129, lines 1-6).  Mr. Gale sent a letter to Mrs.

Shertzer about Joshua's discipline dated December 10, 2001.  A true and correct copy of said

letter is attached in Exhibit "K", as Mindish 2.  (See, Exhibit "B", page 145, lines 8-14; See also,

Exhibit "G", pages 114-115 and Exhibit "K", pages 138-139).  In that letter, it stated that Joshua

would be suspended from school for four days from December 11 through December 14, 2001.

(See, Mindish 2 attached to Exhibit "K"; See also, Exhibit "G", page 115, lines 3-8).  It states

that the reason for the suspension is "Sexual harassment" and "[m]ore specifically:

Inappropriate conduct."  (See, Mindish 2 attached to Exhibit "K"; See also, Exhibit "G", page

115, lines 3-8 and Exhibit "B", page 145, lines 15-21).  Mr. Gale chose the words to be used in

the letter, but there was a discussion between him, Ms. Mindish and Mr. Baddick as to how to

classify the discipline.  (See, Exhibit "G", page 115, lines 9-14; See also, Exhibit "K", pages

138-140).  This letter was the first time Joshua had seen or heard the phrase sexual harassment

used with regard to his discipline.  (See, Exhibit "B", pages 145-146).

10. Admitted in part, denied in part.  It is admitted that Mr. Gale stated that Ms. Becker was claiming that Joshua physically forced his hand upon her sexually, and that she was very upset about it.  It is denied that Joshua testified that he knew why he was being called to the office.  When Joshua arrived in Mr. Gale's office, he asked him if he knew why he was there.  (See, Exhibit "B", page 78, lines 6-14, and Shuman 2).  Joshua told him he did not know.  (See, Exhibit "B", page 78, lines 6-14, and Shuman 2).  Then Mr. Gale asked about a situation that occurred on December 7 with Olivia Becker.  (See, Exhibit "B", page 81, lines 10-14).  Joshua told him he knew there was something there, but he did not figure it was a "situation."  (See, Exhibit "B", page 81, lines 14-17).

11. Admitted in part, denied in part.  It is admitted that Defendant's counsel, Mr. Wiley, asked this question at Joshua's deposition and such answer was provided.  It is denied to the effect that the question and answer were taken out of context.  Prior to this question, Joshua was asked whether he felt he was sufficiently explained the accusations against him in the first or second interview with Mr. Gale.  Joshua's response was that he knew he was being accused of "some kind of force involved with the touching." But he was unaware of a claim for sexual harassment; he was only aware of the claim for inappropriate conduct.  (See, Exhibit "B", page 112, lines 2-11).  It was directly after this question that Joshua was asked whether he was aware that it was Mr. Becker bringing this claim, to which Joshua answered in the affirmative.  (See, Exhibit "B", page 112).

12. Admitted in part; denied in part.  It is admitted that Mr. Gale **claims** that he provided Joshua with notice of the charges pending against him.  It is denied that this is an undisputed fact.  Joshua claims that Mr. Gale only told him that Ms. Becker was claiming that Joshua physically forced his hand upon her sexually, and that she was very upset about it.  (See, Exhibit "B", page 81, lines 17-20, pages 82-83, and Shuman 2).  Mr. Gale did not provide any more detail about what Ms. Becker claimed Joshua did to her.  (See, Exhibit "B", page 112, lines 2-16; See also, Deposition of Teresa Shertzer, attached hereto as Exhibit "M", page 60, lines 2-10).  He merely informed Joshua that the stories "did not match."  (See, Exhibit "B", page 81, lines

23-25, page 82, lines 10-11, page 84, lines 6-11, and Shuman 2; See also, Exhibit "G", page 68, lines 9-12).

13. Admitted in part, denied in part.  It is admitted that Joshua admits that some contact did occur between he and Ms. Becker and that the contact was consensual.  It is denied that Joshua "agreed" that the contact between he and Ms. Becker had occurred because he was never told the details of what Ms. Becker was claiming Joshua did to her.  Joshua claims that Mr. Gale only told him that Ms. Becker was claiming that Joshua physically forced his hand upon her sexually, and that she was very upset about it.  (See, Exhibit "B", page 81, lines 17-20, pages 82-83, and Shuman 2).  Mr. Gale did not provide any more detail about what Ms. Becker claimed Joshua did to her.  (See, Exhibit "B", page 112, lines 2-16; See also, Deposition of Teresa Shertzer, attached hereto as Exhibit "M", page 60, lines 2-10).  He merely informed Joshua that the stories "did not match."  (See, Exhibit "B", page 81, lines 23-25, page 82, lines 10-11, page 84, lines 6-11, and Shuman 2; See also, Exhibit "G", page 68, lines 9-12).

14. Denied.  In Joshua's initial interview with Mr. Gale at about 10:15, Joshua claims that Mr. Gale only told him that Ms. Becker was claiming that Joshua physically forced his hand upon her sexually, and that she was very upset about it.  (See, Exhibit "B", page 81, lines 17-20, pages 82-83, and Shuman 2).  Mr. Gale did not provide any more detail about what Ms. Becker claimed Joshua did to her.  (See, Exhibit "B", page 112, lines 2-16; See also, Deposition of Teresa Shertzer, attached hereto as Exhibit "M", page 60, lines 2-10).  He merely informed Joshua that the stories "did not match."  (See, Exhibit "B", page 81, lines 23-25, page 82, lines 10-11, page 84, lines 6-11, and Shuman 2; See also, Exhibit "G", page 68, lines 9-12).  Joshua told Mr. Gale the names of the students seated in the row in front of him – Ben Railing, Chris Enterline and Jeremy Fritsch.  (See, Exhibit "B", page 103-105).  Joshua did not know whether any of these students saw anything at the time, he just thought they might have.  (See, Exhibit "B", page 104, lines 2-7, pages 105-106).  Mr. Gale told Joshua he was going to look into them. (See, Exhibit "B", page 104, lines 8-10).  However, Mr. Gale also testified that he did not think it was important to find out if Joshua had any witnesses.  (See, Exhibit "G", pages 71-72).  Ms.

Becker also identified four witnesses, who Mr. Gale claims he spoke to.  However, the evidence shows that he did not speak to any of them.  (See, Exhibit "I", pages 16-19; Exhibit "J", pages 21-23; Exhibit "F", pages 29-30).  Mr. Gale admits that he spoke to no other witnesses or event he teacher at the times.  (See, Exhibit "G", pages 73-74).  When Mr. Gale took Joshua to the cafeteria around 11:30, Mr. Gale told Joshua that there were not any witnesses.  (See, Exhibit "B", page 88, lines 11-21).  Joshua ate between lunches with no other students, but administrators were present.  (See, Exhibit "B", pages 88-89).  Joshua heard Ms. Mindish, Mr. Gale and Mr. Baddick discussing the incident between him and Ms. Becker.  He heard them say they were not coming to any conclusions and that they did not have any information.  (See, Exhibit "B", pages 90-91).  After Joshua ate lunch, he was returned to the small conference room.  (See, Exhibit "B", pages 91-92).  Eventually, Mr. Gale came into the room along with Mr. Baddick.  (See, Exhibit "B", page 93, lines 6-9).  Mr. Gale spoke first and said he was trying to get the story straight and that they still had not found anyone who witnessed the event.  (See, Exhibit "B", pages 93-94).  At about 1:15 p.m., Mr. Gale returned to the room alone and informed Joshua that there were still no witnesses, but he was going to be suspended for four days for inappropriate conduct because he admitted touching Ms. Becker.  (See, Exhibit "B", pages 96-97, pages 123-124).   He also told Joshua that there was no proof that there was force involved.  (See, Exhibit "B", page 124, lines 1-4).

    15. Admitted in part, denied in part.  It is admitted that Joshua was advised that there was no other evidence other than the statements of him and Ms. Becker.  It is denied that Joshua was advised of the contents of Ms. Becker's statements. Mr. Gale only told Joshua that Ms. Becker was claiming Joshua physically forced his hand upon her sexually, and that she was very upset about it.  (See, Exhibit "B", page 81, lines 17-20, pages 82-83, and Shuman 2).  Mr. Gale did not provide any more detail about what Ms. Becker claimed Joshua did to her.  (See, Exhibit "B", page 112, lines 2-16; See also, Deposition of Teresa Shertzer, attached hereto as Exhibit "M", page 60, lines 2-10).  He merely informed Joshua that the stories "did not match."  (See, Exhibit "B", page 81, lines 23-25, page 82, lines 10-11, page 84, lines 6-11, and Shuman 2; See also,

Exhibit "G", page 68, lines 9-12). He was told on more than one occasion that there were no witnesses, but he was not told any names. (See, Exhibit "B", pages 88, 93-94, 96-97, 123-124).

16. Admitted in part, denied in part. It is admitted that Mr. Gale informed Joshua that his version of the story and Ms. Becker's version of the story did not match. It is denied that Joshua was ever told any of the details of what Ms. Becker was claiming. Mr. Gale only told Joshua that Ms. Becker was claiming Joshua physically forced his hand upon her sexually, and that she was very upset about it. (See, Exhibit "B", page 81, lines 17-20, pages 82-83, and Shuman 2). Mr. Gale did not provide any more detail about what Ms. Becker claimed Joshua did to her. (See, Exhibit "B", page 112, lines 2-16; See also, Deposition of Teresa Shertzer, attached hereto as Exhibit "M", page 60, lines 2-10).

17. Admitted in part, denied in part. It is admitted that Joshua was given the opportunity to present his side of the story. It is denied to the effect that he was not informed of Ms. Becker's version of the story before explaining his version of the story. Mr. Gale told Joshua that Ms. Becker was claiming he physically forced his hand upon her sexually, and that she was very upset about it. (See, Exhibit "B", page 81, lines 17-20, pages 82-83, and Shuman 2). Mr. Gale did not provide any more detail about what Ms. Becker claimed Joshua did to her. (See, Exhibit "B", page 112, lines 2-16; See also, Deposition of Teresa Shertzer, attached hereto as Exhibit "M", page 60, lines 2-10). Joshua then explained what had actually occurred, that it was consensual, and he was able to fully explain his version of the events. (See, Exhibit "B", page 81, lines 20-22, page 82, lines 12-22, and Shuman 2). Mr. Gale informed Joshua that the stories "did not match" and asked if he knew what she was talking about. (See, Exhibit "B", page 81, lines 23-25, page 82, lines 10-11, page 84, lines 6-11, and Shuman 2; See also, Exhibit "G", page 68, lines 9-12). Joshua told him he had no idea. (See, Exhibit "B", pages 81-82).

18. Admitted in part, denied in part. It is admitted that such questions were asked of Joshua at his deposition and such answers were provided. It is denied to the effect that Joshua was not informed of Ms. Becker's version of the story before explaining his version of the story. Mr. Gale told Joshua that Ms. Becker was claiming he physically forced his hand upon her sexually,

and that she was very upset about it. (See, Exhibit "B", page 81, lines 17-20, pages 82-83, and Shuman 2). Mr. Gale did not provide any more detail about what Ms. Becker claimed Joshua did to her. (See, Exhibit "B", page 112, lines 2-16; See also, Deposition of Teresa Shertzer, attached hereto as Exhibit "M", page 60, lines 2-10). Joshua then explained what had actually occurred, that it was consensual, and he was able to fully explain his version of the events. (See, Exhibit "B", page 81, lines 20-22, page 82, lines 12-22, and Shuman 2). Mr. Gale informed Joshua that the stories "did not match" and asked if he knew what she was talking about. (See, Exhibit "B", page 81, lines 23-25, page 82, lines 10-11, page 84, lines 6-11, and Shuman 2; See also, Exhibit "G", page 68, lines 9-12). Joshua told him he had no idea. (See, Exhibit "B", pages 81-82).

19. Denied. Joshua never told Mr. Gale that that he engaged in "inappropriate conduct." Joshua explained to Mr. Gale what had actually occurred between Ms. Becker and he, that it was consensual, and he was able to fully explain his version of the events (See, Exhibit "B", page 81, lines 20-22, page 82, lines 12-22, and Shuman 2). It is further denied to the effect that Joshua was not informed of Ms. Becker's version of the story before explaining his version of the story. Mr. Gale told Joshua that Ms. Becker was claiming he physically forced his hand upon her sexually, and that she was very upset about it. (See, Exhibit "B", page 81, lines 17-20, pages 82-83, and Shuman 2). Mr. Gale did not provide any more detail about what Ms. Becker claimed Joshua did to her. (See, Exhibit "B", page 112, lines 2-16; See also, Deposition of Teresa Shertzer, attached hereto as Exhibit "M", page 60, lines 2-10).

20. It is admitted that Mr. Gale testified at his deposition that Joshua appeared nervous during his interview.

21. Admitted in part, denied in part. It is admitted that after Mr. Gale's first interview with Joshua that he determined that Joshua would be disciplined, which is why he continued to detain him. (See, Exhibit "G", pages 33-35). It is denied that Mr. Gale made the determination that Joshua would be disciplined for "inappropriate conduct" after his first interview with Joshua. In their initial interview, Mr. Gale stated that Ms. Becker was claiming that Joshua physically forced his hand upon her sexually, and that she was very upset about it. (See, Exhibit "B", page

81, lines 17-20, pages 82-83, and Shuman 2).  Mr. Gale did not provide any more detail about what Ms. Becker claimed Joshua did to her.  (See, Exhibit "B", page 112, lines 2-16; See also, Deposition of Teresa Shertzer, attached hereto as Exhibit "M", page 60, lines 2-10).  Joshua then explained what had actually occurred, that it was consensual, and he was able to fully explain his version of the events.  (See, Exhibit "B", page 81, lines 20-22, page 82, lines 12-22, and Shuman 2).  Mr. Gale informed Joshua that the stories "did not match" and asked if he knew what she was talking about.  (See, Exhibit "B", page 81, lines 23-25, page 82, lines 10-11, page 84, lines 6-11, and Shuman 2; See also, Exhibit "G", page 68, lines 9-12).  Joshua told him he had no idea.  (See, Exhibit "B", pages 81-82).  Mr. Gale said he would have to wait in the office while he called down some witnesses to see if anyone actually witnessed the incident.  (See, Exhibit "B", page 82, lines 1-4, and Shuman 2).  At this point Mr. Gale knew there was discipline pending but had not made a judgment yet.  (See, Exhibit "G", page, 61, lines 4-12).  When Mr. Gale took Joshua to the cafeteria, Mr. Gale told Joshua that there were not any witnesses.  (See, Exhibit "B", page 88, lines 11-21).  Present at the cafeteria were Principal Janice Mindish, Philip Gale, the other Assistant Principals, Brian Baddick and Mr. Martino, as well as other administrators.  (See, Exhibit "B", page 90, lines 4-8).  Joshua heard Ms. Mindish, Mr. Gale and Mr. Baddick discussing the incident between him and Ms. Becker.  (See, Exhibit "B", page 90, lines 12-25).  He heard them say they were not coming to any conclusions and that they did not have any information.  (See, Exhibit "B", pages 90-91).  Specifically, they were discussing suggestions, findings, the situation that had taken place and what to do next, and what type of punishment should be dealt out.  (See, Exhibit "G", page 76, lines 15-17, page 78, lines 7-16).  It was not until the third time Mr. Gale interrogated Joshua, at about 1:15 p.m., that Mr. Gale returned to the room and informed Joshua that there were still no witnesses, but he was going to be suspended for four days for inappropriate conduct because he admitted touching Ms. Becker.  (See, Exhibit "B", pages 96-97, pages 123-124).  This discipline was reached as a team effort between Mr. Gale, Mr. Baddick and Ms. Mindish, before Josh was actually informed.  (See,

Exhibit "K", pages 139-144, 121-122; See also, Exhibit "G", page 78, lines 7-20 and Exhibit
"L", pages 49, 61-64).

22.  Denied as stated.  To the contrary, Joshua never questioned whether the contact between
him and Ms. Becker was consensual; he was certain in relaying his version of the events that the
contact was consensual. (See, Exhibit "B", page 59, lines 7-19, page 63, lines 12-21; see also,
Exhibit "G" page, 59, lines 2-8).

23. Admitted in part, denied in part.  It is admitted that Assistant High School Principal,
Philip Gale, was the administrator in charge of investigating the December 7 incident between
the minor plaintiff, Joshua Shuman, and another student Ms. Becker.  It is denied that Mr. Gale
"investigated the allegations" because he did not fully investigate the incident.  Ms. Becker
apparently provided to Mr. Gale the names of four students she claimed she spoke to after class
about the incident.  (See, deposition transcript of Philip Gale Exhibit "G", pages 51-53).  Those
students are Dustin Lewis, Shawn Bachman, Jenn Nickle and Jay Shaiebly.  (See, Exhibit "G",
pages 51-53; See also, Notes of Mr. Gale attached hereto as Exhibit "H").  Mr. Gale claims he
took brief notes and only wrote down the student names Ms. Becker provided to him; he claims
he took no notes about what Ms. Becker told him about the incident.  (See, Exhibit "G", pages
51-53; See also, Exhibit "H").  Furthermore, he took no notes from a subsequent interview with
Ms. Becker.  (See, Exhibit "H").  Mr. Gale asked Joshua if he knew anyone who may have
witnessed something.  (See, deposition transcript of Joshua Shuman Exhibit "B", page 104, lines
2-3, page 105, lines 15-18).  In response, Joshua told him the names of the students seated in the
row in front of him – Ben Railing, Chris Enterline and Jeremy Fritsch.  (See, Exhibit "B", page
103-105).  Mr. Gale took no notes of this interview with Joshua, or any subsequent interview
with Joshua.  (See, Exhibit "H"; See also, Exhibit "G", pages 107-108).  Mr. Gale also claims
that he then spoke to three students named by Ms. Becker – Dustin Lewis, Shawn Bachman and
Jennifer Nickle.  (See, Exhibit "G", page 65, lines 10-13, page 52, lines 18-21).  He claims he
met each of them separately and that they each confirmed that Ms. Becker came to them after
class and explained to them that Joshua had touched her and forced his hand on her.  (See,

Exhibit "G", page 65, lines 16-24).  However, Mr. Gale again took no notes during any of these

supposed interviews.  (See, Exhibit "H").  One student, Dustin Lewis, has since died and was not

available for this case.  (See, Exhibit "C", page 15, line 12).  The remaining three students

disagree with Mr. Gale's testimony.  Mr. Bachman also does not recall ever being called to the

office or speaking with the administrators about this incident.  (See, deposition transcript of

Shawn Bachman Exhibit "I", page 11, lines 11-12; pages 18-19).  He believes he would have

remembered if he had been called down because that would have been unusual.  (See, Exhibit

"I", page 19, lines 1-7).  In addition, Ms. Nickle denies ever being called down to the office to

speak to any of the administrators.  (See, deposition transcript of Jennifer Nickle Exhibit "J",

page 23, lines 6-11).  The fourth witness named by Ms. Becker, Jay Shaiebly, was never called

down to the office to speak to any administrator.  (See, Exhibit "F", pages 29-30).  Even Mr. Gale

states that no other students in the class were interviewed at that time, nor was the substitute

teacher ever even contacted.  (See, Exhibit "G", pages 73-74).  After Joshua ate lunch, he was

returned to the small conference room.  (See, Exhibit "B", pages 91-92).  Eventually, Mr. Gale

came into the room along with Mr. Baddick.  (See, Exhibit "B", page 93, lines 6-9).  Mr. Gale

spoke first and said he was trying to get the story straight and that they still had not found anyone

who witnessed the event.  (See, Exhibit "B", pages 93-94).  When Mr. Gale returned to the room

where Joshua was at about 1:15, he also told Joshua that there were no witnesses and there was

no proof that there was force involved.  (See, Exhibit "B", pages 96-97, 123-124).

24.  Admitted in part, denied in part.  It is admitted that Joshua stayed in a conference room.

It is denied that Joshua was "asked" to stay in the room during the "second phase of the

investigation."  Mr. Gale told Joshua he would have to wait in the office while he called down

some witnesses to see if anyone actually witnessed the incident.  (See, Exhibit "B", page 82,

lines 1-4, and Shuman 2).  Joshua was then put him in a small conference room in the school

office and the door was shut.  (See, Exhibit "B", pages 84-85, and Shuman 2; See also, Exhibit

"G", page 61, lines 3-5).  It is further denied that Mr. Gale "investigated the allegations" because

he did not fully investigate the incident.  Ms. Becker apparently provided to Mr. Gale the names

of four students she claimed she spoke to after class about the incident. (See, deposition transcript of Philip Gale Exhibit "G", pages 51-53). Those students are Dustin Lewis, Shawn Bachman, Jenn Nickle and Jay Shaiebly. (See, Exhibit "G", pages 51-53; See also, Notes of Mr. Gale attached hereto as Exhibit "H"). Mr. Gale claims he took brief notes and only wrote down the student names Ms. Becker provided to him; he claims he took no notes about what Ms. Becker told him about the incident. (See, Exhibit "G", pages 51-53; See also, Exhibit "H"). Further more he took no notes from a subsequent interview with Ms. Becker. (See, Exhibit "H"). Mr. Gale asked Joshua if he knew anyone who may have witnessed something. (See, deposition transcript of Joshua Shuman Exhibit "B", page 104, lines 2-3, page 105, lines 15-18). In response, Joshua told him the names of the students seated in the row in front of him – Ben Railing, Chris Enterline and Jeremy Fritsch. (See, Exhibit "B", page 103-105). Mr. Gale took no notes of this interview with Joshua, or any subsequent interview with Joshua. (See, Exhibit "H"; See also, Exhibit "G", pages 107-108). Mr. Gale also claims that he then spoke to three students named by Ms. Becker – Dustin Lewis, Shawn Bachman and Jennifer Nickle. (See, Exhibit "G", page 65, lines 10-13, page 52, lines 18-21). He claims he met each of them separately and that they each confirmed that Ms. Becker came to them after class and explained to them that Joshua had touched her and forced his hand on her. (See, Exhibit "G", page 65, lines 16-24). However, Mr. Gale again took no notes during any of these supposed interviews. (See, Exhibit "H"). One student, Dustin Lewis, has since died and was not available for this case. (See, Exhibit "C", page 15, line 12). The remaining three students disagree with Mr. Gale's testimony. Mr. Bachman also does not recall ever being called to the office or speaking with the administrators about this incident. (See, deposition transcript of Shawn Bachman Exhibit "I", page 11, lines 11-12; pages 18-19). He believes he would have remembered if he had been called down because that would have been unusual. (See, Exhibit "I", page 19, lines 1-7). In addition, Ms. Nickle denies ever being called down to the office to speak to any of the administrators. (See, deposition transcript of Jennifer Nickle Exhibit "J", page 23, lines 6-11). The fourth witness named by Ms. Becker, Jay Shaiebly, was never called down to the office to

speak to any administrator. (See, Exhibit "F", pages 29-30). Even Mr. Gale states that no other students in the class were interviewed at that time, nor was the substitute teacher ever even contacted. (See, Exhibit "G", pages 73-74). After Joshua ate lunch, he was returned to the small conference room. (See, Exhibit "B", pages 91-92). Eventually, Mr. Gale came into the room along with Mr. Baddick. (See, Exhibit "B", page 93, lines 6-9). Mr. Gale spoke first and said he was trying to get the story straight and that they still had not found anyone who witnessed the event. (See, Exhibit "B", pages 93-94). When Mr. Gale returned to the room where Joshua was at about 1:15 he also told Joshua that there were no witnesses and that there was no proof that there was force involved. (See, Exhibit "B", pages 96-97, 123-124).

25. Admitted in part, denied in part. It is admitted that while Joshua was in the room the first time, he worked on his Agricultural assignments. It is denied that Joshua worked on any assignment when he returned to the room after lunch. (See Exhibit "B", page 93, 1-5).

26. Admitted in part, denied in part. It is admitted that Joshua went to the cafeteria to eat lunch at approximately 11:30 a.m. It is denied that he was "permitted" to go to the cafeteria to eat lunch because at such time, Joshua was still essentially being detained. Joshua remained in the conference room until Mr. Gale came to take him to lunch around 11:30 a.m. (See, Exhibit "B", page 88, lines 1-13, page 89, lines 9-16; See also, Exhibit "G", page 62, lines 16-18). Mr. Gale then walked with him and "took" him to lunch. (See, Exhibit "B", page 88). Joshua ate lunch by himself with no one else in the cafeteria except for the administrative group. (See, Exhibit "B", page 89, lines 23-25, page 90, lines 1-11).

27. Admitted in part, denied in part. It is admitted that Mr. Gale claims he re-interviewed Ms. Becker. It is denied to the extent that Mr. Gale took no notes from a subsequent interview with Ms. Becker. (See, Exhibit "H"). In fact, it is unclear whether Mr. Gale did re-interview her as she does not remember it. (See, Exhibit "C", page 49, lines 3-6). It is admitted that Mr. Gale was the administrator in charge of investigating the December 7 incident between the minor plaintiff, Joshua Shuman, and another student Ms. Becker and that he claims that he spoke to three or four students named by Ms. Becker – Dustin Lewis, Shawn Bachman Jennifer Nickle

and Jay Shaiebly.  (See, Exhibit "G", page 65, lines 10-13, page 52, lines 18-21; Exhibit "H").  It is denied that this is an undisputed fact because Mr. Gale's notes from that day have four names on it: Lewis, Bachman, Nickle and Shaiebly.  (See, Exhibit "H").  It is also denied because the four students testified Mr. Gale did not interview them with regard to this incident.  One student, Dustin Lewis, has since died and was not available for this case.  (See, Exhibit "C", page 15, line 12).  The remaining three students disagree with Mr. Gale's testimony.  Mr. Bachman also does not recall ever being called to the office or speaking with the administrators about this incident.  (See, deposition transcript of Shawn Bachman Exhibit "I", page 11, lines 11-12; pages 18-19).  He believes he would have remembered if he had been called down because that would have been unusual.  (See, Exhibit "I", page 19, lines 1-7).  In addition, Ms. Nickle denies ever being called down to the office to speak to any of the administrators.  (See, deposition transcript of Jennifer Nickle Exhibit "J", page 23, lines 6-11)  The fourth witness named by Ms. Becker, Jay Shaiebly, was never called down to the office to speak to any administrator.  (See, Exhibit "F", pages 29-30).

28.  It is admitted only that Gale testified that Ms. Becker adamantly denied the contact was consensual.

29.  Admitted in part, denied in part.  It is admitted that after Joshua ate lunch, he was returned to the conference room (See, Exhibit "B", pages 91-92), and eventually Mr. Gale, along with Mr. Baddick, entered the room. Mr. Gale spoke first and said he was trying to get the story straight and that they still had not found anyone who witnessed the event.  (See, Exhibit "B", pages 93-94).  He also told Joshua that the police could have been involved and that they stopped Ms. Becker's father from pressing charges.  (See, Exhibit "B", pages 94-95).  Joshua felt that both Mr. Baddick and Mr. Gale were trying to get him to change his story by threatening police involvement.  (See, Exhibit "B", pages 108-109)   It is denied that Joshua was fully interviewed by Mr. Baddick.  Mr. Baddick asked Joshua, "So, did you feel her to get a rise?"  (See, Exhibit "B", page 93, lines 11-14).  Joshua responded by stating, "What do you think, I'm a pervert?" (See, Exhibit "B", page 93, lines 14-15).  Mr. Baddick then said that he was just trying to get his

mind set for the day.  (See, Exhibit "B", page 93, lines 16-17).  Joshua did not explain his

version of the events to Mr. Baddick, as Mr. Baddick was only in the room for this brief

exchange.  (See, Exhibit "B", page 126, lines 3-6).  Joshua was scared of him because he was

pushy and trying to get Joshua to say something different than before.  (See, Exhibit "B", pages

110-111).

    30. Admitted in part, denied in part.  It is admitted that Joshua was interrogated two times

for periods of 10 to 15 minutes.  However, he was also briefly questioned for a third time.  At

about 1:15 p.m., Mr. Gale returned to the room alone and informed Joshua that there were still

no witnesses, but he was going to be suspended for four days for inappropriate conduct because

he admitted touching Ms. Becker.  (See, Exhibit "B", pages 96-97, pages 123-124).  This

discipline was reached as a team effort between Mr. Gale, Mr. Baddick and Ms. Mindish, before

Josh was actually informed.  (See, Exhibit "K", pages 139-144, 121-122; See also, Exhibit "G",

page 78, lines 7-20 and Exhibit "L", pages 49, 61-64).  He also told Joshua that there was no

proof that there was force involved.  (See, Exhibit "B", page 124, lines 1-4).  He said he was

going to call Joshua's mother, Teresa Shertzer, to come pick him up.  (See, Exhibit "B", page 96,

lines 23-24).  Mr. Gale used the term "inappropriate conduct" when describing Joshua's

discipline; he never used the term "sexual harassment" to Joshua that day.  (See, Exhibit "B",

pages 98-100, page 124, lines 15-17).  This third interview lasted for no more than ten minutes.

(See, Exhibit "B", page 127, lines 11-16).  Mr. Gale then left the room and proceeded to his

office to call Mrs. Shertzer, leaving the conference room door open this time.  (See, Exhibit "B",

page 127, lines 18-25).

    31. Admitted in part, denied in part.  It is admitted that Mr. Gale testified that after re-

interviewing Ms. Becker and the 3 students (witnesses), and **before** he interviewed Joshua for

the second time, Mr. Gale made the judgment that the contact was not consensual.  (See, Exhibit

"G", page 70, lines 12-24).  It is denied that this is an undisputed fact because testimony from

Ms. Becker shows that Mr. Gale never re-interviewed her and testimony from the three students

shows that they were never interviewed.  Ms. Becker did not know whether she spoke to Mr.

Gale a second time on December 10th. (See, Exhibit "C", page 49, lines 3-6). Mr. Gale took no notes from a subsequent interview with Ms. Becker. (See, Exhibit "H"). Mr. Bachman also does not recall ever being called to the office or speaking with the administrators about this incident. (See, deposition transcript of Shawn Bachman Exhibit "I", page 11, lines 11-12; pages 18-19). He believes he would have remembered if he had been called down because that would have been unusual. (See, Exhibit "I", page 19, lines 1-7). In addition, Ms. Nickle denies ever being called down to the office to speak to any of the administrators. (See, deposition transcript of Jennifer Nickle Exhibit "J", page 23, lines 6-11). The third witness named by Ms. Becker, Jay Shaiebly, was never called down to the office to speak to any administrator. (See, Exhibit "E", pages 29-30). Mr. Gale again took no notes during any of these supposed interviews. (See, Exhibit "H"). The fourth student, Dustin Lewis, has since died and was not available for this case. (See, Exhibit "C", page 15, line 12).

    32. Admitted in part, denied in part. It is admitted that Mr. Gale returned to the room alone and informed Joshua that there were still no witnesses, but he was going to be suspended for four days for inappropriate conduct because he admitted touching Ms. Becker. (See, Exhibit "B", pages 96-97, pages 123-124). He also told Joshua that there was no proof that there was force involved. (See, Exhibit "B", page 124, lines 1-4). He said he was going to call Joshua's mother, Teresa Shertzer, to come pick him up. (See, Exhibit "B", page 96, lines 23-24). This third interrogation began about 1:15 p.m. and lasted for no more than 10 minutes. (See, Exhibit "B", page 127, lines 11-16).

    33. Denied. Joshua was called down to the office at approximately 10:15 a.m. and remained in a conference room in the administrative offices until approximately 2:00 p.m., when Mrs. Shertzer arrived at the school to pick up Joshua. (See, Exhibit "B" page 76, lines 11-17 and Exhibit "M", page 47, lines 16-17). At that point, she noticed that the room was dark and that Joshua looked awful. (See, Exhibit "M", pages 48-49). He was visibly drained and was holding his head down. (See, Exhibit "M", page 49, lines 9-16). For part of the first hour that Joshua was in the room he worked on an Agricultural assignment. (See, Exhibit "B", page 86, lines 1-

15).  Joshua was escorted to lunch by Mr. Gale at approximately 11:30 a.m. and returned to the room after he ate lunch.  (See, Exhibit "B", pages 91-92).  At one point during the first hour Joshua did step outside the room and ask a receptionist or secretary for a cup of water.  (See, Exhibit "B" pages 86-87), but he did not leave the room after lunch.  (See, Exhibit "B", pages 97-98).

34.  Admitted.

35.  Admitted.

36.  Admitted in part, denied in part.  It is admitted that Gale testified that he was also involved with another disciplinary matter.  Mr. Baddick and Mr. Martino were the ones in charge of that.  (See, Deposition of Brian Baddick, Exhibit "L", pages 57-58).  It is denied also that Mr. Gale conducted any investigation of the matter between Ms. Becker and Joshua outside of speaking to the two of them.  Testimony from Ms. Becker shows that Mr. Gale never re-interviewed her and testimony from the three students shows that they were never interviewed.  Ms. Becker did not know whether she spoke to Mr. Gale a second time on December 10th.  (See, Exhibit "C", page 49, lines 3-6).  Mr. Gale took no notes from a subsequent interview with Ms. Becker.  (See, Exhibit "H").  Mr. Bachman also does not recall ever being called to the office or speaking with the administrators about this incident.  (See, deposition transcript of Shawn Bachman Exhibit "I", page 11, lines 11-12; pages 18-19).  He believes he would have remembered if he had been called down because that would have been unusual.  (See, Exhibit "I", page 19, lines 1-7). In addition, Ms. Nickle denies ever being called down to the office to speak to any of the administrators.  (See, deposition transcript of Jennifer Nickle Exhibit "J", page 23, lines 6-11).  The third witness named by Ms. Becker, Jay Shaiebly, was never called down to the office to speak to any administrator.  (See, Exhibit "E", pages 29-30).  Mr. Gale again took no notes during any of these supposed interviews.  (See, Exhibit "H").  The fourth student, Dustin Lewis, has since died and was not available for this case.  (See, Exhibit "C", page 15, line 12).  Even Mr. Gale states that no other students in the class were interviewed at that time, nor was the substitute teacher ever even contacted.  (See, Exhibit "G", pages 73-74).

37. This is a conclusion of law, not a statement of material fact.  Nonetheless, although Joshua may not be a member of a suspect class, some classifications, like those based on gender or sex, are of such a nature as to require that the state show that the classification must serve important governmental objectives and be substantially related to the achievement of those objectives. See, Craig v. Boren, 429 U.S. 190,197 (1976).

38. Admitted in part; denied in part.  It is admitted that Joshua and Ms. Becker both engaged in consensual touching which has been defined as inappropriate conduct.  It is denied that he was presented with "conclusive" evidence, as this is not in the record.  The remaining parts of this statement and any inferences thereto are denied as stated.

39. Admitted in part; denied in part.  It is admitted that Joshua testified that his conduct was inappropriate and as a result he deserved to be punished.  It is denied that Joshua thought his punishment was appropriate.  When asked what he thought would be an appropriate punishment for his actions he responded by saying, "detention," because that is what the handbook says the punishment for inappropriate conduct is.  (See, Exhibit "B", page 101, lines 2-18).

40. Admitted in part; denied in part.  It is admitted that Joshua contends that because the conduct was consensual Ms. Becker and he should have been punished equally.  It is denied that just because Joshua reported the conduct was consensual, he should not have been so severely punished.  Joshua contends that had a proper investigation been done, the two witnesses that confirmed Joshua's would have been discovered because Shaiebly's name was given to Mr. Gale by Ms. Becker and Mr. Fritch's name was give to Mr. Gale by Joshua.  (See, Exhibit "B", page 167, lines 24-25, page 168, lines1-5, pages 103-105, Exhibit "H").  Mr. Gale also should have interviewed other students in the class and the teacher, as this was what he normally did.  (See, Exhibit "G", page 23).

41. Admitted in part; denied in part.  It is admitted that upon questioning by Defendants' counsel, Joshua agreed that making a creditability judgment is an appropriate thing to do (See, Exhibit "B", page 168, lines 13-15).  It id denied that Mr. Gale had to make a credibility

judgment based on the conflicting version of event presented to him by Ms. Becker and Joshua, because had he done a proper investigation he would have discovered the two witnesses that confirmed Joshua's version. Mr. Fritsch first noticed Ms. Becker and Joshua talking with each other, generally enjoying each other and laughing. (See, Exhibit "E", pages 15-16). He then saw Ms. Becker pulling Joshua's hand to her crotch area. (See, Exhibit "E", page 17, lines 4-6, and Fritsch 1 attached to the deposition). He saw Ms. Becker's hand come in under Joshua's arm and begin touch Joshua's crotch area. (See, Exhibit "E", pages 17-18 and Fritsch 1). He did not hear either of them say stop. (See, Exhibit "E", pages 18-19 and Fritsch 1). He also saw no indication that either one of them wanted the other to stop. (See, Exhibit "E", page 19, lines 7-12). Mr. Shaiebly could only see Ms. Becker and Joshua above the table, but first was able to see Joshua's arm extended toward Ms. Becker and then was able to see Ms. Becker's arm extended toward Joshua. (See, Exhibit "F", pages 20-24). Mr. Shaiebly confirmed that from what he could see, it was a mutual thing and definitely appeared consensual to him. (See, Exhibit "F", page 22, lines 8-20, pages 24-25). He did not see her push away. (See, Exhibit "F", page 26, lines 19-22).

42. Admitted in part; denied in part. It is admitted that Joshua said when presented with two conflicting stories, and no evidence that confirms either story, it is appropriate to make a credibility judgment. (See, Exhibit "B" pages 166-169). It is denied that Joshua contends that it was appropriate for Mr. Gale to make a credibility judgment in this situation because had there been a proper investigation it would have been discovered that there were two witnesses that confirmed Joshua's version. (See, Exhibit "E", pages 15-19, Shuman 1; Exhibit "F", pages 20-26).

43. It is admitted that neither Joshua nor Mrs. Shertzer suffered physical injury however they did suffer emotional distress as a result of the actions of defendants. As a result of the actions of the Defendants, Joshua started to treat with his therapist, Hubert Wood, MS, LPC. (See, Reports and C.V. of Hubert Wood, attached hereto as Exhibit "P"). According to Hubert Wood in his report dated October 13, 2003, when Joshua came to him on December 11, 2001, he was

emotionally upset, worried and anxious as a result of what had happened to him on December 10. (See, Exhibit "P"). Joshua continued to treat until January 23, 2002. (See, Exhibit "P"). Diagnosis at that time was Adjustment Disorder with Depression and Joshua continued to show signs of distress and anxiety. (See, Exhibit "P"). Joshua then began to treat again with Hubert Wood beginning July 9, 2003, because he was re-enrolling at Penn Manor for his senior year. (See, Exhibit "P"). This treatment continued until September 22, 2003. (See, Exhibit "P"). Since the incident at Penn Manor in December 2001, Hubert Wood finds that Joshua appears more cautious and less willing to take appropriate risks. (See, Exhibit "P"). He also finds Joshua less trusting of people in authority, and that he worries in the future, his version of things may not be taken into account as strongly as other people's. (See, Exhibit "P"). He recognized that Joshua was most distressed from December 11, 2001 through January 23, 2002. (See, Exhibit "P"). He also finds Joshua as more guarded now and protective of himself. (See, Exhibit "P"). He finds that Joshua's feelings will continue, but over time, and with further experience, they will become less severe. (See, Exhibit "P"). In his supplemental report on October 27, 2003, Hubert Wood confirmed that Joshua began treatment another time and continues to see him. (See, Exhibit "P"). The treatment focused on that fact that the students at Penn Manor have begun to tease him again. (See, Exhibit "P"). In addition, the supplemental report mentions that another student was teasing Joshua that he had raped a fellow student. (See, Exhibit "P"). Joshua became angry, upset, hurt, disappointed and sad, about the teasing. (See, Exhibit "P"). Mrs. Shertzer confirms that Joshua now needs continual positive reinforcement that she and his stepfather believe what he is saying. (See, Exhibit "M", pages 106-107). Also as a result of these occurrences, Mrs. Shertzer has suffered out of pocket expenses for medical treatment for her son, education costs, and lost work, as well as pain and suffering to herself in observing her son and his situation and having to take on an additional role as her child's sole support system. (See, Exhibit "A", ¶ 50; See also, Exhibit "M", pages 101-102, 110-112).

44. This is a conclusion of law, not a statement of material fact. Nevertheless, It is admitted that defendants did not engage in conduct that presented an unreasonable risk of bodily harm to

Plaintiffs.  However they did engage in conduct that present a risk of emotional distress towards

Plaintiffs.  See, response to statement 43 for details of emotional harm.

45. Admitted.  It is admitted that Gary Campbell was the superintendent at the time of the

incident however he was out for an illness.  Mr. Stewart has admitted that he was acting

superintendent and took on the duties of superintendent at this time.  He was later made

superintendent in January or February of 2002.  (See, deposition transcript of Mr. Stewart,

Exhibit "O", pages 14-15, 125-126).

46. Denied.  On the contrary, Donald Stewart was involved in this case.  Ms. Mindish

testified that she believed that Mr. Stewart was called on December 10, 2001 and informed about

the situation between Joshua and Ms. Becker.  (See, Exhibit "K", page125, lines 1-25).  Mr.

Stewart stated that he is always notified of sexual harassment cases, but he may not be involved

in the specifics of the investigation.  (See, Exhibit "O", page 37, lines 8-14).  He was notified in

this matter, but not until after discipline handed down.  (See, Exhibit "O", page 74, lines 10-14).

Ms. Mindish apparently had page two of the Summary typed up from her notes right after her

interview with Ms. Becker and then forwarded it to the Superintendent pursuant to his request

and direction.  (See, Exhibit "K", pages 175-176).  The practice at Penn Manor is to provide the

Superintendent with the notes and/or investigative report, who then, sometimes in consultation

with the solicitor, informs Ms. Mindish who should get them.  (See, Exhibit "K", pages 75-78).

On or about January 23, 2002, Joshua made a written complaint against Ms. Becker for making

false accusations against him under the Unlawful Harassment section of the Penn Manor Policy

Manual.  (A true and correct copy of said complaint is attached as part of Exhibit "K", as

Mindish 4).  His complaint sets forth what actually occurred on December 7, 2001 and identifies

the corroborating witness, Jeremy Fritsch.  (See, Mindish 4, attached to Exhibit "K").  Joshua

handed this complaint to Ms. Mindish on or about January 25, 2002.  (See, Exhibit "K", pages

163-165).  Ms. Mindish said upon receiving this complaint/letter from Joshua, she probably

called the Superintendent, who is Donald Stewart, discussed the matter with him and they

decided to investigate it like any other harassment.  (See, Exhibit "K", pages 165-166).  On or

about January 24, 2002, Plaintiffs, by and through their undersigned counsel, sent a written appeal letter to the Superintendent of Penn Manor Schools, pointing out the failure to hold an informal hearing, the failure to properly investigate the allegations and prepare a written report, and the improper detention and questioning/interrogation of Joshua for approximately four hours on December 10, 2001.  (See, letter to Superintendent dated January 24, 2002, attached to Exhibit "O" as Stewart 1).  The Acting Superintendent at the time, Donald Stewart, received the letter and he did not believe it was the first time he was presented with the facts of this matter. (See, Exhibit "O", pages 125-126, 133-134, page 128, lines 13-19).  Mr. Stewart also testified that he has the power to cause an investigation to be reopened, if, for instance, he is presented with evidence that changes the findings.  (See, Exhibit "O", pages 126-128).  The Superintendent, by and through the solicitor for the Penn Manor School District, acting on behalf of the Superintendent, responded by letter on February 12, 2002, by stating that the appeal is untimely and that no further action by the School District is warranted or necessary.  (See, letter from solicitor dated February 12, 2002, attached to Exhibit "O" as Stewart 2).

47. Denied.  Ms. Mindish is the Principal who is the head of the high school.  (See, Exhibit "K", pages 13-14.  She gets involved in all non-routine disciplinary actions and sexual harassment claims are not routine.  (See, Exhibit "K", page 21, pages 50, lines 5-16, page 113, lines 3-16).  Mr. Gale first informed Ms. Mindish of the matter in the morning.  (See, Exhibit "K", page 109).  Joshua ate between lunches with no other students, but administrators were present.  (See, Exhibit "B", pages 88-89).  Present were Principal Janice Mindish, Philip Gale, the other Assistant Principals, Brian Baddick and Mr. Martino, as well as other administrators. (See, Exhibit "B", page 90, lines 4-8).  Joshua heard Ms. Mindish, Mr. Gale and Mr. Baddick discussing the incident between him and Ms. Becker.  (See, Exhibit "B", page 90, lines 12-25). This was not the first time they had discussed the matter as Mr. Gale informed Ms. Mindish about it sometime in the morning before lunch.  (See, Exhibit "K", page 109).  He heard them say they were not coming to any conclusions and that they did not have any information.  (See, Exhibit "B", pages 90-91).  It is typical at Penn Manor High School for the administrators to

meet over the lunches and discuss ongoing discipline matters, especially non-routine matters. (See, Deposition of Janice Mindish, attached hereto as Exhibit "K", pages 18-21, 39-40). Sexual harassment claims are not routine, as there have not been many of them at Penn Manor, so the administrators did discuss this incident over lunch. (See, Exhibit "K", page 50, lines 5-16, page 113, lines 3-16). Specifically, they were discussing suggestions, findings, the situation that had taken place and what to do next, and what type of punishment should be dealt out. (See, Exhibit "G", page 76, lines 15-17, page 78, lines 7-16). No one at this conversation suggested trying to do any further investigation at that point. (See, Exhibit "G", page 78, lines 17-20). At about 1:15 p.m., Mr. Gale returned to the room alone and informed Joshua that there were still no witnesses, but he was going to be suspended for four days for inappropriate conduct because he admitted touching Ms. Becker. (See, Exhibit "B", pages 96-97, pages 123-124). This discipline was reached as a team effort between Mr. Gale, Mr. Baddick and Ms. Mindish, before Josh was actually informed. (See, Exhibit "K", pages 139-144, 121-122; See also, Exhibit "G", page 78, lines 7-20 and Exhibit "L", pages 49, 61-64). Mr. Gale sent a letter to Mrs. Shertzer about Joshua's discipline dated December 10, 2001. A true and correct copy of said letter is attached hereto in Exhibit "K", as Mindish 2. (See, Exhibit "B", page 145, lines 8-14; See also, Exhibit "G", pages 114-115 and Exhibit "K", pages 138-139). In that letter, it stated that Joshua would be suspended from school for four days from December 11 through December 14, 2001. (See, Mindish 2 attached to Exhibit "K"; See also, Exhibit "G", page 115, lines 3-8). It states that the reason for the suspension is "Sexual harassment" and "[m]ore specifically:  Inappropriate conduct." (See, Mindish 2 attached to Exhibit "K"; See also, Exhibit "G", page 115, lines 3-8 and Exhibit "B", page 145, lines 15-21). Mr. Gale chose the words to be used in the letter, but there was a discussion between him, Ms. Mindish and Mr. Baddick as to how to classify the discipline. (See, Exhibit "G", page 115, lines 9-14; See also, Exhibit "K", pages 138-140). The reinstatement conference did occur on Friday, December 14, 2001. (See, Exhibit "B", page 137, lines 11-14; See also, Exhibit "G", pages 118-119 and Exhibit "K", page 153, lines 14-24). Present at the conference were Joshua, Mrs. Shertzer, Mr. Shertzer (Joshua's step-father), their

attorney at the time, Herbert Henderson, II, Esquire, Janice Mindish, and Philip Gale.  (See, Exhibit "B", pages 137-138; See also, Exhibit "K", page 154, lines 16-25).  Mrs. Shertzer felt that if she brought an attorney, the administration might answer her questions, because they had not before.  (See, Exhibit "M", pages 71-72).  Ms. Mindish called the Superintendent once she learned that an attorney would be present.  (See, Exhibit "O", pages 94-95; See also, Exhibit "K", pages 125-126).  The conference occurred in Mr. Gale's office (See, Exhibit "B", page 138, lines 1-2; See also, Exhibit "K", page 154, lines 13-15).  Once Joshua and his group were brought back, Ms. Mindish said that it was a reinstatement conference, not an informal hearing.  (See, Exhibit "B", page 138, lines 4-7; See also, Exhibit "K", pages 156-157).  Then she started talking about what Joshua needed to do to get back into the routine of school.  (See, Exhibit "B", page 138, lines 7-13; See also, Exhibit "K", page 155, lines 12-17).  Mrs. Shertzer tried to ask questions about any new witnesses and asked again about documentation of what Joshua was being accused of, specifically, what Olivia Becker said about what Joshua did to her.  (See, Exhibit "B", page 138, lines 14-16; See also, Exhibit "M", pages 73-74 and Exhibit "K", page 155, lines 9-13).  She also asked about any investigative notes or report.  (See, Exhibit "M", page 73-74; See also, Exhibit "K", pages 157-158).  The administrators would not allow questioning about the event, and told Mrs. Shertzer that the information/documentation was confidential.  (See, Exhibit "M", pages 73-74; See also, Exhibit "B", page 138, lines 14-18 and Exhibit "K", pages 157-158).  In addition, at the conference, Mr. Shertzer, Mrs. Shertzer and Joshua each specifically asked Mr. Gale directly whether Mr. Baddick said to Joshua, "So, did you feel her to get a rise?"  (See, Exhibit "M", pages 75-76; See also, Exhibit "B", pages 138-139).  Mr. Gale did not respond to any of them, put his head down and started getting red.  (See, Exhibit "M", pages 75-76; See also, Exhibit "B", pages 138-139).  This statement was offensive to the Shertzers and Joshua.  (See, Exhibit "M", pages 76-77; See also, Exhibit "B", page 141, lines 1-5, 19-23).  Before they got up and left the conference, Mrs. Shertzer asked Mr. Gale if he would take sexual harassment off of Joshua's record and all would continue as normal.  (See, Exhibit "M", page 75, lines 3-10).  He looked at her and said, "No."  (See, Exhibit "M", page 75, lines

10-11).  Then it was Ms. Mindish who declared the conference over.  (See, Exhibit "M", page

100, lines 2-22).  The conference only lasted about fifteen minutes.  (See, Exhibit "K", page 158,

lines 13-16).  On January 16, 2002, Mrs. Shertzer went back to the school to review the Penn

Manor Policy Manual, and while she was there, she also asked to see her son's discipline record.

(See, Exhibit "M", pages 85-86).  She called Ms. Mindish two or three days before to schedule a

time to view the manual and although Ms. Mindish did get defensive with her, she was permitted

to view the manual and get copies of sections she wanted.  (See, Exhibit "M", pages 86-88).

While she was viewing the manual, she asked the secretary there if she could see Joshua's

discipline record.  (See, Exhibit "M", page 89, lines 4-10).  Eventually, Mr. Gale came out with a

manila folder that was empty.  (See, Exhibit "M", page 89, lines 12-18).  Ms. Mindish came out

and Mrs. Shertzer told her that there had to be something in Joshua's discipline record as he was

just suspended for four days.  (See, Exhibit "M", pages 89-90).  When Mrs. Shertzer asked for

the record, Ms. Mindish's voice got loud and she got physically close to Mrs. Shertzer and

screamed in her face.  (See, Exhibit "M", page 64, page 100, lines 2-10).  Mr. Gale told her there

were personal notes but Mrs. Shertzer was not allowed to see them.  (See, Exhibit "M", pages

89-90).  The two administrators left to call the solicitor and then Mr. Gale returned with the letter

to Mrs. Shertzer dated December 10, 2001.  (See, Exhibit "M", pages 90-91).  On or about

January 23, 2002, Joshua made a written complaint against Ms. Becker for making false

accusations against him under the Unlawful Harassment section of the Penn Manor Policy

Manual.  (A true and correct copy of said complaint is attached hereto as part of Exhibit "K", as

Mindish 4).  His complaint sets forth what actually occurred on December 7, 2001 and identifies

the corroborating witness, Jeremy Fritsch.  (See, Mindish 4, attached to Exhibit "K").  Joshua

handed this complaint to Ms. Mindish on or about January 25, 2002.  (See, Exhibit "K", pages

163-165).  According to Ms. Mindish, this was the first time she was made aware of Jeremy

Fritsch.  (See, Exhibit "K", pages 163-164).  Ms. Mindish said upon receiving this

complaint/letter from Joshua, she probably called the Superintendent, who is Donald Stewart,

discussed the matter with him and they decided to investigate it like any other harassment.  (See,

Exhibit "K", pages 165-166).  Mr. Gale interviewed Mr. Fritsch and Ms. Mindish interviewed Ms. Becker.  (See, Exhibit "K", page 166, lines 4-15).  Mr. Fritsch remembers speaking to Mr. Gale and telling him what he saw and Mr. Gale taking notes.  (See, Exhibit "E", page 23, lines 9-21, and Fritsch 1 attached thereto).  However, Mr. Gale claims Mr. Fritsch said he had no recollection of it and that he did not see anything while in class.  (See, Exhibit "G", page 133, lines 5-16).  Ms. Mindish states that Mr. Gale told her that Mr. Fritsch observed Joshua's and Ms. Becker's hands together, going towards Ms. Becker, but he could not tell who was guiding who.  (See, Exhibit "K", pages 193-195).  Mr. Fritsch also was not aware of her saying no or pushing him away.  (See, Exhibit "K", page 194, lines 2-4, 20-23).  When Mr. Gale's notes were provided after the discovery deadline in this case, which are attached in Exhibit "H", they show that Mr. Fritsch told Mr. Gale that he saw Ms. Becker pull Joshua's hand to her crotch and that he told that to Ms. Fay on Monday.  (See, Exhibit "H").  Ms. Becker was never disciplined and Joshua's discipline was never changed.  (See, Exhibit "K", page 178, lines 21-23).

48.    Admitted in part, denied in part.  It is admitted that Joshua testified as stated. However, Mr. Baddick was somewhat more involved than that.  Mr. Gale first informed Mr. Baddick and told him much detail about the matter in the morning before lunch.  (See, Exhibit "L", pages 48-56).  Joshua ate between lunches with no other students, but administrators were present.  (See, Exhibit "B", pages 88-89).  Present were Principal Janice Mindish, Philip Gale, the other Assistant Principals, Brian Baddick and Mr. Martino, as well as other administrators. (See, Exhibit "B", page 90, lines 4-8).  Joshua heard Ms. Mindish, Mr. Gale and Mr. Baddick discussing the incident between him and Ms. Becker.  (See, Exhibit "B", page 90, lines 12-25). He heard them say they were not coming to any conclusions and that they did not have any information.  (See, Exhibit "B", pages 90-91).  It is typical at Penn Manor High School for the administrators to meet over the lunches and discuss ongoing discipline matters, especially non-routine matters.  (See, Deposition of Janice Mindish, attached hereto as Exhibit "K", pages 18-21, 39-40).  Sexual harassment claims are not routine, as there have not been many of them at Penn Manor, so the administrators did discuss this incident over lunch.  (See, Exhibit "K", page

50, lines 5-16, page 113, lines 3-16).  Specifically, they were discussing suggestions, findings, the situation that had taken place and what to do next, and what type of punishment should be dealt out.  (See, Exhibit "G", page 76, lines 15-17, page 78, lines 7-16).  No one at this conversation suggested trying to do any further investigation at that point.  (See, Exhibit "G", page 78, lines 17-20).  After Joshua ate lunch, he was returned to the small conference room.  (See, Exhibit "B", pages 91-92).  Eventually, Mr. Gale came in along with Mr. Baddick.  (See, Exhibit "B", page 93, lines 6-9).  Mr. Gale spoke first and said he was trying to get the story straight and that they still had not found anyone who witnessed the event.  (See, Exhibit "B", pages 93-94).  He also told Joshua that the police could have been involved and that they stopped Ms. Becker's father from pressing charges.  (See, Exhibit "B", pages 94-95).  Joshua felt that both Mr. Baddick and Mr. Gale were trying to get him to change his story by threatening police involvement.  (See, Exhibit "B", pages 108-109).  Then Mr. Baddick took over and asked Joshua, "So, did you feel her to get a rise?"  (See, Exhibit "B", page 93, lines 11-14).  Joshua responded by stating, "What do you think, I'm a pervert?"  (See, Exhibit "B", page 93, lines 14-15).  Mr. Baddick then said that he was just trying to get his mind set for the day.  (See, Exhibit "B", page 93, lines 16-17).  Mr. Baddick denies he ever said such statements.  (See, Deposition of Brian Baddick, attached hereto as Exhibit "L", pages 76-77).  Mr. Gale also denied Mr. Baddick made those statements.  (See, Exhibit "G", pages 88-90).  This second meeting lasted about ten to fifteen minutes (See, Exhibit "B", pages 95-96, page 127, lines 6-10).  Joshua did not explain his version of the events to Mr. Baddick, as Mr. Baddick was only in the room for this brief exchange.  (See, Exhibit "B", page 126, lines 3-6).  At about 1:15 p.m., Mr. Gale returned to the room alone and informed Joshua that there were still no witnesses, but he was going to be suspended for four days for inappropriate conduct because he admitted touching Ms. Becker.  (See, Exhibit "B", pages 96-97, pages 123-124).  This discipline was reached as a team effort between Mr. Gale, Mr. Baddick and Ms. Mindish, before Josh was actually informed.  (See, Exhibit "K", pages 139-144, 121-122; See also, Exhibit "G", page 78, lines 7-20 and Exhibit "L", pages 49, 61-64).

49.     Admitted in part, denied in part.  It is admitted that Mr. Gale was in charge of investigating the matter between Ms. Becker and Joshua and that Joshua testified in that manner. It is denied that only he made the judgment on his discipline or that Mr. Gale is only sued for that reason.  (See, Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment, which is incorporated herein by reference).  Joshua ate between lunches with no other students, but administrators were present.  (See, Exhibit "B", pages 88-89).  Present were Principal Janice Mindish, Philip Gale, the other Assistant Principals, Brian Baddick and Mr. Martino, as well as other administrators.  (See, Exhibit "B", page 90, lines 4-8).  Joshua heard Ms. Mindish, Mr. Gale and Mr. Baddick discussing the incident between him and Ms. Becker.  (See, Exhibit "B", page 90, lines 12-25).  He heard them say they were not coming to any conclusions and that they did not have any information.  (See, Exhibit "B", pages 90-91).  It is typical at Penn Manor High School for the administrators to meet over the lunches and discuss ongoing discipline matters, especially non-routine matters.  (See, Deposition of Janice Mindish, attached hereto as Exhibit "K", pages 18-21, 39-40).  Sexual harassment claims are not routine, as there have not been many of them at Penn Manor, so the administrators did discuss this incident over lunch.  (See, Exhibit "K", page 50, lines 5-16, page 113, lines 3-16).  Specifically, they were discussing suggestions, findings, the situation that had taken place and what to do next, and what type of punishment should be dealt out.  (See, Exhibit "G", page 76, lines 15-17, page 78, lines 7-16). No one at this conversation suggested trying to do any further investigation at that point.  (See, Exhibit "G", page 78, lines 17-20).  At about 1:15 p.m., Mr. Gale returned to the room alone and informed Joshua that there were still no witnesses, but he was going to be suspended for four days for inappropriate conduct because he admitted touching Ms. Becker.  (See, Exhibit "B", pages 96-97, pages 123-124).  This discipline was reached as a team effort between Mr. Gale, Mr. Baddick and Ms. Mindish, before Josh was actually informed.  (See, Exhibit "K", pages 139-144, 121-122; See also, Exhibit "G", page 78, lines 7-20 and Exhibit "L", pages 49, 61-64).

50.     This statement is a conclusion of law, not a material fact.

51.     This statement is a conclusion of law, not a material fact.  Nonetheless, in the instant case, there is sufficient evidence of a policy, practice or custom in Penn Manor School District of condoning the failure to turn over investigation reports and information to a suspended student and parents.  There is also evidence of a failure to properly train the administrators about the policy to turn over the reports and information.  Penn Manor School District has a written policy in their Policy Manual that, in cases of unlawful harassment, a thorough investigation shall be conducted and a written report shall be prepared summarizing the investigation and recommending disposition of the complaint.  (Exhibit "N", Section 248, page 3).  However, there was a practice that this process was not done.  Ms. Mindish testified that the written notes taken during the investigation constitute the report.  (Exhibit "K", pages 74-75).  Then she provides them to the Superintendent.  (Exhibit "K", pages 76-79).  She does not provide them to anyone else unless instructed by the Superintendent or the solicitor.  (Exhibit "K", pages 79-80).  She testified that there was only one other case of harassment in which she was involved and in both cases, she provided the notes/report to the Superintendent and did not provide them to anyone else.  (Exhibit "K", pages 78-80).  Ms. Mindish said the same process was followed in January 2002, after receiving Joshua's complaint against Ms. Becker for bringing a false claim.  In that case, her notes were typed and then she provided them to the Superintendent.  (Exhibit "K", pages 81-84). Mr. Gale only took notes from his initial interview of Ms. Becker on December 10, 2001.  (Exhibit "H"; Exhibit "G", page 53).  He would not provide those notes to Mrs. Shertzer, even when she asked for them.  (Exhibit "G", pages 130-131).  He claimed he only had four names written down.  (Exhibit "G", pages 130-131).  He actually prepared the typed version of his report (attached to Exhibit "K" as Mindish 1) around January 30, 2002.  It was done from his memory since he had no notes of any other interviews.  (Exhibit "G", pages 107-108).   He may have had some things written down as well, but he did that later on, not contemporaneously with December 10.  (Exhibit "G", pages 106-107).  One of the reasons he prepared it was Mrs. Shertzer told him he ought to have documentation of things that had taken place.  (Exhibit "G", page 107).  Mr. Gale also testified that he has read the Policy

Manual, but he is not aware, in a case of unlawful harassment, that the Superintendent is to be immediately notified or that he is to prepare an investigative report. (Exhibit "G", pages 126-127). In addition, he was unaware that he was to circulate the investigative report to the accused and the complainant. (Exhibit "G", pages 126-127). The Superintendent, who is the CEO of the Board, in charge of overseeing all discipline to make sure the policies of the Board are carried out (Exhibit "O", pages 27-28, 57), testified that he does not receive a report every time a student is sexually harassed. (Exhibit "O", pages 75-76). He stated that it is the practice in the District that he would be provided a copy of the investigative report in cases of unlawful harassment only if the case elevated to the level of Board action. (Exhibit "O", page 75). He also testified that it was not the practice in the District to turn over a written review of the investigation, either a report or the notes, to the complainant and the accused. (Exhibit "O", pages 146-147). He claimed that if the parents ask for the notes or the report, the practice would be to turn them over only under the advice of the solicitor. (Exhibit "O", pages 147-148). Clearly the above-referenced evidence shows a practice in the District of failing to turn over the information from an investigation of a claim of unlawful harassment. It also shows a failure to properly train the administrators on how to provide the information in compliance with constitutional requirements. Since, in addition to this failure, the Plaintiffs were not even verbally informed as to what Ms. Becker claimed Joshua did to her, nor any details of any investigation done, this policy and practice caused plaintiffs' harm. Plaintiffs were denied access to the information they were entitled to receive. Since the practice was contrary to the Policy Manual and the law, it shows that they were deliberately indifferent to Plaintiffs' rights to have access to the information and that deliberate indifference caused Plaintiffs' harm. As such, the District is liable for condoning the aforementioned practices.

      52.    This statement is a conclusion of law, not a material fact. Nonetheless, see answer to statement 51 above.

      53.    This statement is a conclusion of law, not a material fact. Nonetheless, there is no written policy in the District about investigations of disciplinary actions and interrogations of

students.  (Exhibit "O", pages 82-90).  There is a widely varied practice due the wide variety of disciplinary actions at school.  (Exhibit "O", pages 83-84).  However, they can be liable for failure to properly train their employees.  Without any specific guidelines, the administrators do not receive the proper training as to what is constitutionally permissible for detaining a student at school and for interrogating a student.  The administrators apparently believed it was okay to detain Joshua for 3 ½ hours at school while they did not conduct any other investigation, and continue to interrogate him in an attempt to intimidate him to change his story.  Ms. Mindish testified that there is no limit as to how long they can hold a student.  (Exhibit "K", pages 88-90).  She also testified that sometimes they do threaten police involvement even when the police will not be involved.  (Exhibit "K", page 92).  The administrators have this belief because of the failure to properly train them in the proper procedures of detention and interrogation.  Therefore, the District is liable for violating Joshua's Fourth Amendment rights against unreasonable seizure and restraints on his liberty.

54.    This statement is a conclusion of law, not a material fact.  Nonetheless, see answer to statement 53 above.

55.    This statement is a conclusion of law, not a material fact.  Nonetheless, the Board and District had a written policy that required all students facing suspension of more than three days to be given the opportunity for an informal hearing, which would occur as soon as possible after the suspension.  (Exhibit "N", Section 248, page 1).  The purpose of this policy is so that suspensions cannot be imposed on a student without due process.  (Exhibit "N", Section 248, page 1).  In Joshua's case, he was entitled to due process, which meant a form of informal hearing under the Goss case.  However, the administrators differ as to when they believe an informal hearing occurs so that the due process requirements are satisfied.  Ms. Mindish testified that it occurs when the parent picks up the child, or at another scheduled time if the parent does not have the time then.  (See, Exhibit K", pages 67-68, 70-71).  She agreed that the policy requires an informal hearing to take place **after** the suspension, but she understands that to mean after the decision is made to suspend the student.  (See, Exhibit "K", pages 68-69).  It should not

occur during the investigation process, such as during the interviews, or at the reinstatement conference. (See, Exhibit "K", pages 69-70, 62-66). Ms. Mindish has never been involved in an informal hearing where witnesses are called, and the student speaks, and can call witnesses on his behalf. (See, Exhibit "K", pages 181-182). Mr. Baddick believes an informal hearing takes place **during** the investigation process, when meeting with the students and talking about the outcome. (See, Exhibit "L", pages 34-40). He considers that there is an informal hearing in any disciplinary matter. (See, Exhibit "L", page 40, lines 15-18). When asked whether a student should be entitled to present witnesses on their behalf at an informal hearing, Mr. Baddick replied, "That has never happened to me in my four years." (See, Exhibit "L", page 35, lines 7-12). Mr. Baddick testified that he has sat down with both accused student and complaining student "through the process of mediation," so it apparently can happen, but it is not mandatory. (See, Exhibit "L", page 42, lines 4-23). Mr. Gale also believes the informal hearing takes place **during** the investigation process, as it is an ongoing process, from when he meets the student who is being accused right from the beginning, when they're in his office. (See, Exhibit "G", page 24, lines 1-16). However, in the Summary of Events he prepared (See, Mindish 1, attached to Exhibit "K"), he stated that the telephone call with Mrs. Shertzer and the meeting time he had with Joshua was "normally considered to be the informal hearing." (Exhibit "G", pages 110-111). He understood that the accused is entitled to call witnesses and question the accuser at an informal hearing, yet he considers that a right to make the request, not a right to actually question. (See, Exhibit "G", pages 26-27). If the accuser does not want to be questioned by the accused, he or she does not have to be questioned. (See, Exhibit "G", page 27, lines 1-21). Mr. Gale says he permits the accused to call witnesses at his informal hearing, and also to come back later if, at the time, he does not know of any witnesses, but then stated that he does not tell the accused student that. (See, Exhibit "G", pages 29-30). Mr. Stewart believes that an informal hearing is an opportunity for the student and his parents to discuss the circumstances and understand the circumstances of the suspension. (See, Exhibit "O", page 46, lines 1-11). Such a hearing would take place at several opportunities, in his opinion, oftentimes when the parent

picks up their child from school, or at a different meeting requested by the parents.  (See, Exhibit "O", pages 46-47, page 50, lines 18-25).  He agreed that the hearing should take place **after** the suspension.  (See, Exhibit "O", page 46, lines 16-20).  Mr. Stewart also understood that there needs to be some notice given to the parents of the time and place of the informal hearing, but he did not necessarily agree that they had to be told that "this is your informal hearing," or that it had to be in writing. (See, Exhibit "O", pages 47-49).  He recognized that the student has a right to question witnesses at an informal hearing, but when a hearing occurs when the parents pick up their child, he stated that it could only occur if the witnesses were still at school and then agreed to be questioned.  (See, Exhibit "O", page 49, lines 4-19).  He also was not sure if the parents should be told that they had a right to question witnesses at that time, or a right to call witnesses on their own behalf.  (See, Exhibit "O", pages 49-50, 51-52).  Nonetheless, it was not the practice in Penn Manor to tell the parents that they are entitled to an informal hearing or that they can call witnesses at such a hearing.  (See, Exhibit "O", page 51, lines 19-24).  Mr. Stewart did believe that as part of the informal hearing process, the parent and student need to be informed of what the accuser is saying the accused did in detail.  (See, Exhibit "O", pages 54-55).  In fact he testified that he could not see a circumstance where a parent would ask to know what the accusations were and would not receive the information.  (See, Exhibit "O", page 56, lines 1-10).  The solicitor for Penn Manor is also not clear as to when an informal hearing is to occur.  (See, Stewart 2 attached to Exhibit "O").  He claims in his letter on behalf of the Superintendent that the informal hearing can occur **during** the investigation process and also claims that it occurred at the time of the reinstatement conference on December 14, 2001.  (See, Stewart 2 attached to Exhibit "O").   Mr. Stewart testified that there is no practice in the District of telling the parents or the student that they are entitled to an informal hearing or that they are even having one when it occurs.  (Exhibit "O", pages 50-51, 47-49).  Since they are inconsistent as to when one occurs and there is a real question as to notice, that is evidence of a widespread District practice of failing to properly conduct informal hearings in accordance with the due process requirements, or at the very least, a failure to properly train the employees as to what process is due to a student

facing a suspension of more than three days. Furthermore, the District has a practice of failing to

properly notify the student of the charges against him and of failing to inform the accused

student of the evidence the authorities have, once the student denies the claims. Again, at the

very least, the District has failed to properly train the administrators as to these requirements.

Joshua was not notified of the charges against him because he was not told what Ms. Becker

claimed he did to her, nor was he accurately informed about what he would be charged with. He

was informed that he was going to be disciplined for inappropriate conduct, not sexual

harassment. His mother was informed of the same thing and when she demanded to know what

Ms. Becker claimed Joshua did to her, she was told the information was confidential. She was

told this not only on the day of the discipline (December 10, 2001), but repeatedly on the

telephone (December 10 and 11), at the reinstatement conference (December 14), and during the

time she was at the office on January 16, 2002. The Superintendent was notified about the

matter on December 10, but was also called before and after the reinstatement conference, and

was notified by counsel for Plaintiffs in a letter dated January 24, 2002. (Exhibit "K", pages

125, 161; Stewart 1 attached to Exhibit "O"). This repeated failure to comply with the due

process requirements in Goss shows the failure was so widespread that it has become custom at

the District. Therefore, the District is liable for the violation of Joshua's due process rights.

   56.    This statement is a conclusion of law, not a material fact. Nonetheless, there is no

express, written policy of the Board addressing student equal protection rights.

57.    This statement is a conclusion of law, not a material fact. Nonetheless, there is sufficient

evidence to find the District and the Board liable for denying Joshua equal protection of the laws.

At the very least, the evidence is sufficient that the District failed to properly train its employees

as to the requirements under the Equal Protection Clause. Only Joshua was disciplined when it

was his word against Ms. Becker's, but no investigation was done, which would have revealed

witnesses confirming Joshua's version. Even when the Superintendent, the CEO of the Board,

was presented with the confirming witness evidence, Joshua was still the only one disciplined.

The evidence shows that there was a custom of ignoring evidence and choosing not to investigate

properly for both Ms. Becker's complaint and for Joshua's complaint against her.  Therefore, there is sufficient evidence for liability against the District for failing to treat these two similarly situated people alike.

**<u>Conclusion</u>**

Plaintiffs respectfully request that Defendants' Motion for Summary Judgment be denied.


Respectfully submitted,


BY:_____
     DEIRDRE A. AGNEW, ESQUIRE
     Attorney for Plaintiffs
     Goshen Executive Center
     Building 400A
     1450 East Boot Road
     West Chester, PA  19380
     (610) 738-4800

     FAX (610) 738-4898


Date:   January 9, 2004

## <u>CERTIFICATE OF SERVICE</u>

I, Deirdre A. Agnew, Esquire, hereby certify that on the 9th day of January, 2004, a true and correct copy of Plaintiffs' Response to Defendants' Statement of Material Fact, was served on Defendants or their counsel via first class, regular mail, postage prepaid, at the following address:

> Ellis H. Katz, Esquire
> Jason R. Wiley, Esquire
> Sweet, Stevens, Tucker & Katz, LLP
> 331 Butler Avenue
> P.O. Box 5069
> New Britain, PA  18901

BY: _____
      DEIRDRE A. AGNEW, ESQUIRE