| | |
|---|---|
| **TELEPHONE**<br>**(610) 828-2822** | **FAX**<br>**(610) 828-9464** |

**GERALD COOKE, Ph.D. & MARGARET COOKE, Ph.D., P.C.**
**CLINICAL AND FORENSIC PSYCHOLOGY**
**LICENSED PSYCHOLOGISTS**
**4 EAST GERMANTOWN PIKE**
**PLYMOUTH MEETING, PA 19462**

November 21, 2003


Jason R. Wiley, Esq.
331 East Butler Avenue
P.O. Box 5069
New Britain, PA    18901

Dear Mr. Wiley:

    At your request I have conducted a psychological evaluation of Joshua Shuman (DOB 9/17/86, age 17 years 2 months). As you know, Joshua and his family are filing suit against the Penn Manor School District and a number of its employees alleging that the manner in which they handled an incident on 12/7/01 has resulted in psychological damages. The allegation is that there was inappropriate touching between Joshua and another student, Olivia Becker, on 12/7 and that on 12/10 Joshua was called into the school office, confronted with Ms. Becker's allegations that Joshua forced himself on her sexually, resulting in a 4-day suspension of Joshua. Joshua has indicated that he has suffered certain psychological sequelae since that time. The purpose of the present evaluation is to assess whether he has suffered any psychological problems as a result of this incident and the manner in which it was handled, and if so to describe the nature and severity of those problems.

    Joshua was seen in the office on 11/11/03. In addition to a clinical interview and history the following tests were administered:

1. Minnesota Multiphasic Personality Inventory-2: an objective personality test indicating test taking attitude and the nature and degree of psychopathology;

2. Rotter Incomplete Sentences Blank-High School: a projective test providing information on needs, attitudes, values, and the quality of interpersonal relationships;

Shuman Evaluation
page 2 cont.

    3.    Rorschach Inkblot Technique: a projective test revealing unconscious fears, wishes, conflicts, and the degree to which reality is accurately perceived;

    4.    Two Subtests of the Wechsler Adult Intelligence Scale-III/Verbal Subscale: to estimate intellectual functioning.

I also had the opportunity to review the following records:

    1.    Complaint filed in the United States District Court for the Eastern District of Pennsylvania;

    2.    Deposition of Joshua Shuman taken 9/5/03. He indicates that one of the results of these incidents is that he thinks about how others view him and what they are saying and thinking about him. Contrary to what his mother had said in her deposition about changes in behavior, Joshua indicated that he still enjoys mechanics, hunting, fishing, and boating. He also says it was for about 2 months after the incident that he didn't hang out with friends. He also states he does not believe he was depressed;

    3.    Deposition of Joshua's mother, Teresa Shertzer, taken 9/5/03. When asked about personality changes she indicates he has become untrusting and feels that others think he is lying. He withdrew to his room after his parents made the decision that he was going to go back to Penn Manor. He showed a loss of interest in hunting and fishing for about a year after. (The question of whether or not such changes are reflected in psychological testing will be discussed in the body of this report);

    4.    School records from the Penn Manor School District. These are important in two respects. First, they show that in the 8th grade (school year 1999-2000) Joshua finished the year with 4 A's, 8 B's, and 2 C's. In the 9th grade (school

Shuman Evaluation
page 3 cont.

       year 2000-2001) his grades were 2 A's, 6 B's, and 1 C. In the first marking period of the 10th grade (school year 2001-2002) which is the year in which the incident happened in December (placing it a couple weeks before the Christmas break and the end of the second marking period), Joshua had 2 B's and 2 C's. Thus, there was a significant decline in his academic performance predating the incident. (This is different from Joshua's representation to this examiner that he was an A-B Honor Student in the first marking period, though he "might have had a C" and that his grades declined markedly "to C's" after the incident). The second point is that there was some additional decline, however, associated with the incident. In two courses in which Olivia was not in the class Joshua had gotten a C in the first marking period and got C's in the second marking period as well. However, in the two classes that Olivia was also in Joshua went from B to C, thus showing a decline. Joshua indicated in our interview (to be discussed further below) that those were the classes in which he received more taunting and teasing from classmates, because Olivia was in those classes, than other classes. It should also be noted that he had different classes in the third marking period and got C's in all four of them. However, by the fourth marking period he had gone from C to B in three of the four classes, a slightly stronger academic performance than in the first marking period before the incident occurred, thus indicating that there was no lasting impact on his academic achievement due to the incident;

5. Records of Hubert R. Wood, M.S., of Life Span Psychological Services. These records indicate that he first met with Joshua on 12/19/00, approximately one year prior to the incident in question. Apparently his mother initiated this treatment out of concern about his lack of emotion related to some things that were going on in his family. Mr. Wood's diagnosis at the end of that session was Adjustment Disorder with

Shuman Evaluation
page 4 cont.

Depression. He saw Joshua again on 1/13/01, 1/17/01, and 2/14/01, when that series of sessions ended. In the letter dated 10/13/03 Mr. Wood indicates that therapy was discontinued by mutual agreement. Such a statement indicates that both Joshua and the therapist felt there was no need for continued treatment. In fact the Client Discharge Form indicates that the patient completed treatment with moderate improvement.

The next series of sessions began on 12/11/01, immediately following the incidents in question and dealt with that. A note of that date indicates the diagnosis "Continues to be Adjustment Disorder with Depression." This time there were five sessions on 12/11/01, 12/12/01, 12/20/01, 1/2/02, and 1/23/02. That is, therapy was terminated by mutual agreement after only 6 weeks and with Joshua being described as having experienced moderate improvement. While the notes are difficult to read, it appears that Joshua and his mother were seen together in all those sessions rather than Joshua being seen individually. The notes indicate that "Mom is very upset," but no similar statement is made about Joshua. On the Client Discharge Form for this series the diagnosis was slightly different: Adjustment Disorder with Anxiety/Depression. However, again it indicated that he completed treatment with moderate improvement. In Mr. Wood's letter of 10/13/03 he indicates that this series of sessions focused on the social difficulties at school because of being teased and harassed by other students and his difficulty handling that. Mr. Wood's letter indicates that again therapy was discontinued by mutual agreement as Joshua was managing his feelings and emotions in a positive and productive way.

There was then no further therapy from 1/23/02 until 7/9/03, a period of approximately 1 1/2 years. At that point there were four sessions between 7/9/03 and 9/22/03 in anticipation of Joshua returning to Penn Manor for his senior

Shuman Evaluation
page 5 cont.

> year after having gone to Cyber School for the
> 11th grade. Again it appears from the notes that
> all these sessions were with his mother rather
> than individual sessions. The note of 9/22/03
> indicates that "School is going well. He likes
> his classes and is having no social problems."
> However, the note of 10/15/03 indicates that he
> is angry and upset with students that had been
> teasing him. While it is difficult to read the
> note of 10/29/03 it appears that this then
> stopped. That is the last note, though it
> indicates the next appointment is scheduled for
> 11/20, thus Joshua is continuing to see Mr. Wood
> in therapy.

Joshua was brought to the evaluation by his stepfather. While it was clear that neither of them was particularly happy with having to come to the evaluation, which apparently involved an almost 2-hour drive, Joshua was cooperative with examination process. There was no clinical evidence of anxiety, depression, thought disorder, or psychosis.

The history was obtained from Joshua and the above mentioned records. Joshua indicates he is the younger of two children with a sister who is 6 years older than he is. He has not seen his father, who is in jail, since age 10. He indicates that his father was not a good person as he was into drugs and alcohol and belonged to the Pagans. They have talked on the phone but they have no real relationship. Joshua seems quite mature in speaking about the fact that when his father is released in about 3 years he will give his father a chance, feeling that in that much time somebody can change. However, he says the first time he finds out that his father is involved in drugs or criminal activity he won't have anything to do with him. He indicates that his stepfather has been in his life since age 11. He indicates that his stepfather does care about him a lot, but he perceives his stepfather as bossy and therefore they don't get along that well. He describes his mother in positive terms and indicates that they have a good relationship. He indicates that what he remembers of his childhood was good, except for the times his father wasn't there for special occasions such as Christmas.

Shuman Evaluation
page 6 cont.


Joshua indicates he is currently in his senior year at school and plans to graduate in 2004. Regarding his work history, he indicates that he has worked as a laborer at four different places. The first of these was from 1999 to 2001, the second was from February 2001 to May of 2003, the third was from May of 2001 to October of 2003 (overlapping in part with the other job). He just began a new job on 11/10/03 as a laborer at Flyway Excavating Inc. and he is looking forward to being able to obtain a certificate as a heavy equipment operator after a year of on-the-job training.

Regarding his social history, Joshua has never been married and has no children. He lives with his parents. He currently has a girlfriend who he has been seeing for three weeks. He has had several other girlfriends in the past. The longest relationship was 10 months. It appears that he has had a normal social life.

Joshua indicates he has never used alcohol or illicit drugs and is against the use of both. He is not on any medication and has never been on any medication for his nerves. He has no significant medical history. The only treatment he has had has been the treatment with Mr. Wood as discussed in the record review section.

This examiner asked Joshua about his reaction to the situation at school. He indicates he went to therapy following that because his mother wanted him to because she was worried, though he didn't feel he needed it. They talked about the situation and Mr. Wood told him that kids would pick on him and he should try to ignore it. He indicates for the most part he has followed that advice and he had no confrontations for the rest of that year. When asked why he stopped seeing Mr. Wood after that series of sessions he indicates it is because Mr. Wood said there wasn't any reason he needed to see Josh. When asked why he began therapy again in July of 2003 after 18 months he indicates, again, that his mother was worried how he felt about important issues. He says he doesn't talk to his parents about it so it enables him to talk to Mr. Wood about it. He has seen Mr. Wood once every two weeks since then and he indicates that he would like to continue to see him.

Shuman Evaluation
page 7 cont.

    This examiner asked Joshua if he felt he was depressed currently. His response was that when he hears comments made about him that depresses him and "It will ruin my day." When asked how long this lasts, based on that comment, he indicates it takes about a week to put it out of his mind. When asked if during that time he has any difficulty sleeping as a result of the thoughts he has he indicates he does not. When asked if it interferes with him going to school or to work he indicates that it does not, though it does bother him that he will have to go to class seeing the same kid who said that to him. When asked if he was depressed after it happened he indicated that he was. When asked how long that lasted he states it was 6 months. When asked why the depression lasted that long he indicates it was because he was going to be pulled out of Penn Manor and, because of the sanctions against him, would not be able to go to the Farm Show with the rest of his class or to other FFA events. He also felt his reputation had been ruined. (Joshua's report that his depression lasted 6 months is inconsistent with the therapy records that would suggest more of a duration of 6 weeks). At this point Josh contradicted himself somewhat saying that he didn't feel like going to work during that six months and did miss several times because he didn't feel like doing anything. When asked how his school work was effected he indicates that "I went from A-B Honor Roll to C's," though he then acknowledged he might have had a C. We then went over the school transcript showing that that was not the case and it was in that context that he pointed out that the two courses in which he went from a B to a C were the ones in which Olivia was in the class. He did not like going to Cyber School for the 11th grade because he was "stuck in my room all the time." He indicates that when he went back to Penn Manor for his senior year there were a couple of comments but it was not like in the 10th grade and was much better. He indicates there are about 6 people who cause problems but he also indicates that he has 4 to 5 friends who are very supportive. He indicates he was always into hunting, fishing, and boating and he does not believe there was any interference with that and he is still interested in it.

    Testing of intellectual functioning reveals a prorated Verbal IQ of 93, which is in the Average Range and at the

Shuman Evaluation
page 8 cont.

32nd percentile of the population. Social judgment is higher than that score but attention and concentration is somewhat lower and he may have some mild deficits in that area.

    Joshua approached the testing in a candid and straightforward manner with no evidence that he was trying to be defensive or guarded on the one hand, or that he was trying to exaggerate or malinger regarding mental or emotional problems on the other hand. He is not particularly introspective nor psychologically minded. This is probably responsible for some inconsistent, contradictory responding on the MMPI, but this does not invalidate the profile. The testing indicates that he does not have a particularly good self-image and this may date back to his early childhood experiences with his biological father. However, he has an extremely low tension level and is very easy going. His level of social extroversion is within the Average Range. He is lower than average on all measures of anxiety and depression. He is within the Average Range on scales that measure trust in others. Testing further indicates that he perceives himself as getting along with most people, and never has problems meeting new people or keeping friends. He believes the quality of his relationships are good. He has a traditional masculine attitude value and interest pattern and those are the more positive aspects of his self-image. He enjoys the outdoors and takes pride in his hunting, fishing, and his anticipated career as a heavy equipment operator. He is currently disgusted over the court case being dragged out so long and it bothers him that his mother and stepfather are unhappy about the situation. He still does worry about what people in school think about him. He gets angry when people make comments based on misinformation. He indicated he had just had an incident about two weeks prior with one kid but that the teacher intervened. He believes that Olivia still has it in for him and she says she is going to "take me down." He indicates it was she who initiated the touching. When asked why he feels she then reported him, he indicates two Possibilities. One is that he indicates she found out that he had a girlfriend and that he didn't really want anything to do with Olivia so she got mad. He says the other is that perhaps her friends found out about the touching and

Shuman Evaluation
page 9 cont.

she tried to cover up her own role in it by blaming him. Projective testing indicates that there is some degree of superficiality in interpersonal relationships, associated with his lack of insight and psychological mindedness. He is likely to base his relationship around activities and tasks. There is some underlying anxiety and anger in relationships with women but it is not disruptive of perception, judgment, or control.

In summary, while the present testing shows some residual feelings and thoughts about the incidents upon which the complaint is based, it is important to make a distinction between that and a diagnosable disorder. There is nothing in the present testing that indicates any diagnosable disorder involving anxiety or depression. In addition, while he may have feelings specific to this incident and the particular people who say something about him, there is also no indication from the testing that he is distrustful in interpersonal relationships in general. On the contrary, he feels he gets along with most people and does not have problems meeting new people or keeping friends. Thus it is my opinion that Joshua does not have any current mental or emotional problems and the only diagnosis would be No Mental Illness.

The question then arises regarding whether he did have a diagnosable reaction to this incident at some time in the past, and if so how long that lasted. It is noteworthy in this regard that the initiative for all the treatment came from his mother and the notes would suggest that she was apparently more upset than he was. The course of treatment with Mr. Wood after the incident was approximately six weeks, and then there was a hiatus of 18 months. Termination was by mutual agreement with moderate improvement. This time period is fairly consistent with Joshua's statements in his deposition that there was about a 2-month period after the incident that he didn't hang out with friends. Based on those considerations this examiner holds the opinion that Joshua had a mild Adjustment Disorder with Depression and Anxiety that lasted approximately 6 to 8 weeks and was in reaction to the incident. However, it is my opinion that after that time, while he still might have had some feelings and thoughts about the incident, those did not rise to the level of a

Shuman Evaluation
page 10 cont.

diagnosable disorder. Nor did they interfere with his functioning to a degree necessary to reach a diagnosable level.

Joshua returned to treatment in July of 2003, again on the initiative of his mother, and around issues of the upcoming court proceedings. It is my opinion that were it not for the court proceedings he would have been unlikely to return. I also see no reason from the present evaluation why he would need to continue in therapy.

All the opinions in this report are held to a reasonable degree of psychological certainly.

Thank you for the opportunity to evaluate Joshua. Please contact me if you have any further questions.

Very truly yours,


Gerald Cooke, Ph.D.

GC/nr