# In the Matter of
# Shuman and Shertzer
# v.
# Penn Manor School District, et al.

In the United States District Court
For the Eastern District of
Pennsylvania

Civil Action No. 02-CV-3594

Case Review
and
Consultant Report

Submitted to:
Deirdre A. Agnew, Esq.
Law Offices of Deirdre A. Agnew
1450 East Boot Rd.
West Chester, PA 19380

Completed by:
Edward F. Dragan, Ed.D.
Education Management Consulting, LLC
24 Arnett Ave., Suite 102
Lambertville, NJ 08530

October 30, 2003

| Shertzer and Shuman |
| :---: |
| v. |
| Penn Manor School District, et al. |

## GOAL OF THE ASSIGNMENT

The goal of the assignment is to render an opinion as to whether the Penn Manor School District (District), through its employees, acted within the standard of professional care in the field of education and education administration and supervision regarding Joshua Shuman, a student enrolled in the Penn Manor High School, during the 2001-2002 school year.

The opinions expressed in this report are within a reasonable degree of probability in the fields of education and education administration and supervision. The opinions are based upon standards articulated by the State of Pennsylvania and the District as well as common and accepted practices in these disciplines and my experience and training as a teacher, school administrator, and adjunct professor of educational administration.

## QUALIFICATIONS OF CONSULTING EXPERT

My education includes a master's degree in special education, with a focus on administration, a doctoral degree in education administration and supervision, with a focus on staff supervision and policy development and implementation, and a master's degree in education law. I also have an extended background in the education field. My experience includes school board superintendent, where I was responsible for the development of policies governing student discipline, student supervision, and harassment. It also includes principal, where I was responsible for the development of procedures governing student discipline, student supervision, harassment, and staff supervision. In this position, I trained teachers and other staff members on topics that included the supervision and discipline of students, what constitutes harassment, and what steps to take upon a report of harassment. In this

2

position, I also had the responsibility to investigate issues of student behavior and make determinations regarding appropriate discipline, including suspension. My opinions are based upon my years of experience as a state education administrator where I supervised and evaluated public and private school programs, services, and policies and procedures. The responsibilities of this position included, but were not limited to, providing consultation to schools regarding the supervision and discipline of students, including policies and procedures governing student harassment and discipline.    As an adjunct professor of Educational Administration, I provide information and instruction to school district personnel enrolled in graduate level classes on issues concerning student discipline, student supervision, sexual harassment, and staff supervision.

I am court-qualified as an education, education administration and supervision, special education, special education administration and supervision, student supervision and liability expert in numerous federal, state, and administrative courts around the country.

## CONSULTANT'S METHODOLOGY

Before preparing this report, I reviewed the following documents:

1.   Complaint;
2.   Plaintiff's Response to Motion to Dismiss Portions of Complaint;
3.   Hearing transcript and ruling by Court on Motion to Dismiss Portions of Complaint;
4.   Penn Manor High School Policy Manual;
5.   Penn Manor High School Administrative Handbook;
6.   Student File on Joshua Shuman;
7.   Student File on Olivia Becker;
8.   Personnel file and discovery responses of Janice Mindish;
9.   Personnel file and discovery responses of Philip Gale;
10.  Personnel file and discovery responses of Brian Baddick;
11.  Personnel file of Carole Fay;

12. Joshua's school re-enrollment forms for this year (now in 12th Grade);

13. Summary of incident written by Joshua Shuman;

14. Diagram of classroom drawn by Joshua Shuman;

15. Joshua Shuman's discipline record for 10th grade;

16. Olivia Becker's discipline record for 11th grade;

17. Letter from High School to Teresa Shertzer dated December 10, 2001;

18. Joshua Shuman's reinstatement of suspended student form;

19. List of students in classroom provided by high school, including disciplinary actions taken that resulted in at least 4-day suspension of student for school years 2000-2001 and 2001-2002;

20. Letter providing address of another student in class left off above list;

21. Statement written by student witness Jeremy Fritsch;

22. Complaint Joshua Shuman submitted to school claiming Olivia Becker made false accusations against him;

23. Letter and memo from Attorney Henderson summarizing events at and leading up to Reinstatement Conference on December 14, 2001;

24. Letter Attorney Deirdre Agnew sent to Superintendent dated January 24, 2002;

25. Response from School Solicitor dated February 12, 2002;

26. Defendant's Summary of Events;

27. Rule 26 Disclosures from both sides;

28. Interrogatories directed to Defendants;

29. Defendants' Initial Responses to Discovery;

30. Defendants' Three (3) Supplemental Responses to Interrogatories;

31. Trial Orders in the case;

32. Orders ruling on Motion to Dismiss Portions of Complaint;

33. Joshua Shuman's psychotherapy records and report;

4

34.    Copies of School Code:

        a.  22 Pa. Code § 12.1 through §12.14

        b.  22 Pa. Code § 161.3

35.    Confidential communications statute – 42 Pa. C.S.A. § 5945;

36.    Copies of Local Agency Law;

37.    Penn Manor High School Student Handbook for the 2001/2002 school year;

38.    Penn Manor High School Student Handbook for the 2003/2004 school year;

39.    US Supreme Court Decision: Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975);

40.    Deposition transcript of Philip B. Gale and exhibits;

41.    Deposition transcript of Janice Mindish and exhibits;

42.    Deposition transcript of Brian D. Baddick and exhibits;

43.    Deposition transcript of Donald Stewart and exhibits;

44.    Deposition transcript of Joshua Shuman and exhibits;

45.    Deposition transcript of Teresa Shertzer and exhibits;

46.    Deposition transcript of Carole Fay and exhibits;

47.    Deposition transcript of Jeremy Fritsch and exhibits;

48.    Deposition transcript of Olivia Becker and exhibits;

49.    Deposition transcript of Jay Shaiebly and exhibits;

50.    Deposition transcript of Jennifer Nickle and exhibits; and

51.    Deposition transcript of Shawn Bachman.

## SUMMARY OF OPINIONS

It is my opinion, based upon a reasonable degree of probability in the fields of education and education administration and supervision and student supervision that the District failed to act within the standard of professional care.

It is my opinion that the District, through its employees, breached the standard in the field of education and that breach subjected Joshua to unfair and

mistaken exclusion from the educational process. My review and analysis of the data indicates that the District's decision, through its employees, to suspend Joshua in this circumstance was not supported by the evidence. The substantial rights of Joshua may have been prejudiced because the District's findings, inferences, and conclusions were unsupported by substantial evidence in view of the entire record that I reviewed. A reasonable administrator faced with the same or similar circumstance would not consider the collected evidence to support a decision to suspend Joshua for four (4) days. The District, through its employees, breached its duty to thoroughly investigate the complaint against Joshua and to provide an opportunity for a factual hearing before excluding him from the educational process for four (4) days. This process would not have cost the District anything and it would not have interfered with the total educational process of the District.

I base this opinion on the following:

1.  There is a lack of substantial evidence which a reasonable administrator in the same or similar situation would regard as adequately supporting the conclusion that Joshua sexually harassed Olivia Becker;

2.  The decision to suspend Joshua for four (4) days was not supported by the evidence, was arbitrary and capricious, and an abuse of discretion on the part of the staff;

3.  District policy specifically provided for a factual hearing at which Joshua could contest the suspension, confront, and cross-examine witnesses who supported the charge, or call witnesses to verify his version of the incident. The District, through its employees breached this standard when they suspended Joshua for four (4) days and failed to appropriately provide such a hearing;

4.  According to the Penn Manor Policy Manual, Section 248, when a student brings a complaint against another student for unlawful harassment, the Principal shall conduct a thorough investigation

6

and shall prepare a written report summarizing the investigation and recommending disposition of the complaint. Copies of the report "shall" be given to the complainant, the accused, the Superintendent, and others directly involved. The District, through its employees, breached this standard by failing to conduct a thorough investigation of the allegations. The District, through its employees, breached this standard by failing to prepare a written report summarizing the investigation and recommending disposition of the complaint. The District, through its employees, breached this standard by failing to provide copies of the report to the complainant, the accused, the Superintendent and others directly involved;

5. The District, through its employees, breached its standard of investigating allegations of harassment by failing to notify the Superintendent of the allegations, failing to conduct an impartial investigation, failing to conduct a thorough investigation, and failing to prepare a written report in a timely manner that summarized the investigation and recommended disposition of the complaint. The investigation that the Board conducted through its employees was not able to substantiate the charge of harassment. Even so, disciplinary action was arbitrarily taken against Joshua and he was denied access to his education as a result of being suspended;

6. The District, through its employees, and in particular Mr. Gale and Mr. Baddick, acted unreasonably when Joshua was detained and interrogated for a period of three to four hours and threatened with police action;

7. Mr. Philip B. Gale, Assistant Principal, failed to conduct an adequate investigation of the charges against Joshua before making a determination to suspend him for four (4) days. In the course of this failure he did not interview students in the class that

Joshua and Olivia were attending nor did he interview the teacher and;

8. The District, through its employees, breached the standard in the field of education and education administration and student supervision when Mr. Gale failed to inform Joshua that since a suspension for more than three (3) days was being considered, Joshua had the right to talk with and question Olivia;

9. The District policy, articulated by Mr. Gale, is that inappropriate conduct, in the context of student discipline, is the same as sexual misconduct and that sexual misconduct is consensual. The eyewitnesses to the activity between Joshua and Olivia state, except for Olivia, that the conduct was consensual. Therefore, in this case, the District, through its employees, failed to afford Joshua equal treatment by not disciplining Olivia under the same standard;

10. The District, through its employees, did not reasonably consider the fact that Mr. Gale may have accepted fact statements from three students who did not witness the activities in the class. Olivia told these students, according to Mr. Gale, her version of the occurrences of the day. However, two of the three students testified that they do not recall talking with anyone in the administration or ever talking with Olivia about the incident. The third student has died. Mr. Gale failed to conduct an adequate investigation into these statements and used this alleged student information to help make the decision to discipline Joshua by suspending him for four (4) days, denying him access to his education;

11. The District, through its employees, breached the standard articulated by the Pennsylvania Department of Education Code regarding the exclusion of students from school. Even though Joshua's suspension exceeded three school days, the District, through its employees, failed to provide Joshua and his parent the

8

opportunity for an informal hearing consistent with state requirements;

12.     The District, through its employees, breached the standard articulated by the Pennsylvania Department of Education Code and its own standard regarding hearings and the proper elements of due process. There was no informal hearing provided for Joshua, although the suspension exceeded three school days. The District, through its employees, failed to provide Joshua's parents notice of the time and place of an informal hearing. The District, through its employees, failed to provide Joshua with the right to question any witnesses at a hearing. The District, through its employees, failed to provide for Joshua to exercise his right to speak and produce witnesses on his behalf. The District failed to offer to hold the informal hearing within the first five days of the suspension;

13.     The District, through its employees, breached the standard pursuant to the United States Supreme Court decision in Goss v. Lopez when it failed to provide Joshua, who was facing temporary suspension, with an explanation of the evidence that the school administrators claimed that they had;

14.     The District, through its employees, breached the standard when it failed to provide Joshua and his mother with access to the details of the claim that Olivia was making and failed to supply Ms. Shertzer with even Olivia's name;

15.     The District, through its employees, breached its standard regarding unlawful harassment. There is no indication in the record that the building principal immediately, upon the allegation of Olivia, notified the superintendent or other designated administrator. The record indicates that Mr. Gale failed to conduct an impartial and thorough investigation of the alleged harassment since no potential witnesses were interviewed, including students who were in the class with Joshua and Olivia, as well as the teacher who was in

charge of the class.  There is no evidence in the record that the building principal prepared a written report summarizing the investigation and recommending disposition of the complaint, and that copies of the report were provided to the complainant, the accused, the superintendent and others directly involved;

16.    The District, through its employees, breached their standard when the Superintendent/Acting Superintendent was presented with evidence of potential problems regarding the discipline of Joshua and failed to appropriately act.

## DISCUSSION

The discussion section of this report presents in detail the information upon which the above opinion is based.  The discussion begins with a review of the pertinent section of Goss v. Lopez as it relates to the standard of care in the field of education administration and student supervision.  Next it will address the education code of the State of Pennsylvania.  It continues with a review of the policies of the Board of Education of the District.  Next, the discussion section will present a description of the incident that occurred on December 7, 2001.  Finally, the section will present a description of the response to the incident by the school and district officials, and whether the response was within the standard of professional care in the field of education and education administration and supervision.

**Goss v. Lopez.**

Due process requires that every individual have an opportunity to know the evidence against him or her.  The general rule requiring evidence be released to the accused is directly in keeping with the due process standard of Goss v. Lopez.  Administratively, the standard of Goss v. Lopez requires that for students facing temporary suspension that the student be given oral or written

notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.

**Pennsylvania Education Code.**

The State of Pennsylvania specifies administrative code, which sets the standard of professional care in the field of education and education administration and supervision in the public schools in the state. Pennsylvania Code Chapter 22 Section 12.6 is entitled "Exclusions from School." This standard indicates that the board of school directors shall define and publish the types of offenses that would lead to exclusion from school. Exclusion from school may take the form of suspension or expulsion. Suspension is exclusion from school for a period of from one to 10 consecutive school days. According to the standard, no student shall be suspended until the student has been informed of the reasons for the suspension and given an opportunity to respond. Prior notice of the intended suspension need not be given when it is clear that the health, safety, or welfare of the school community is threatened. The standard requires that the parents and the superintendent of the district shall be notified immediately in writing when the student is suspended. When the suspension exceeds three school days, the student and parent shall be given the opportunity for an informal hearing consistent with the requirements set forth in Section 12.8 (relating to hearings).

Pennsylvania Code Chapter 22 Section 12.8 is entitled "Hearings." This section of the education code specifies that education is a statutory right, and students must be afforded all appropriate elements of due process if they are to be excluded from school. The code provides for an informal hearing. The purpose of the informal hearing is to enable the student to meet with the appropriate school official to explain the circumstances surrounding the event for which the student is subject to suspension or to show why the student should not be suspended. The informal hearing is meant to encourage the student's parents or guardian to meet with the principal to discuss ways by which future

11

offenses can be avoided.  The following due process requirements are to be observed concerning the informal hearing:

1.   Notification of the reasons for the suspension shall be given in writing to the parents or guardian and to the student;

2.   Sufficient notice of the time and place of the informal hearing shall be given;

3.   A student has the right to question any witnesses present at the hearing;

4.   A student has the right to speak and produce witnesses on his own behalf; and

5.   The district shall offer to hold the informal hearing within the first five days of the suspension.

**Penn Manor School District Policies.**

The Penn Manor School District has the authority to adopt policies for the guidance of the Superintendent in the operation of the school district.  The policies shall be consistent with law, have a rational and substantial relationship to a legitimate purpose of the Board, and be directed towards the maintenance and support of a thorough and efficient system of public education in the district. (Board Policy Number 002.)

Mr. Philip B. Gale, Assistant Principal in August of 2000 (Gale 12:5) indicated that there are specific policies that he has to follow during the discipline process. (Gale 19:18)  The school district policy manual (Gale 19:21) contains them and there is information in the student handbook (Gale 19:24) and the high school administrative handbook. (Gale 20:2)  In explaining the District policy concerning discipline of students, Mr. Gale indicated that if there is a student-to-student complaint he interviews the accused. (Gale 21:1)  He also indicated that he interviews witnesses. (Gale 22:25)  According to Mr. Gale, if something happened in a classroom he would interview the students in that classroom (Gale 23:12) and he would talk to the teacher if the teacher were in the room. (Gale

12

23:23)  According to Mr. Gale, there is an informal hearing for suspensions longer than three (3) days. (Gale 25:14)  Ms. Mindish is not normally directly involved in routine discipline matters but is involved through discussions with administrators. Mr. Gale stated that the student accused of something can request to talk with the accuser (Gale 26:7) but he does not tell them that. (Gale 26:10)  Additionally, Mr. Gale indicated that if there are witnesses the accused student is given the opportunity to come back at a later time after doing his own investigation (Gale 30:4) but he does not tell the student that. (Gale 30:6)  Ms. Mindish indicated that parents are to be notified once there is a decision to suspend a student. (Mindish 46)  Mr. Gale indicated that the District detains a student only once there has been a decision to discipline, which is likely to result in exclusion from school such as a suspension. (Gale 34, 35)

There is much conflict in the record regarding the District's policy concerning informal hearings when a student is considered for suspension for more than three days. Mr. Gale indicates that an informal hearing is held during the time of the investigation. Mr. Baddick also indicates that the informal hearing is held during the investigation.  However Ms. Mindish indicates that the informal hearing is held when the parent picks up a child who has been suspended which is after the investigation.  The District solicitor, Mr. Robert M. Frankhouser, indicates that the informal hearing is held during a student reinstatement conference, which is after the suspension is served.

The Board developed a policy entitled "Student Discipline."  That policy indicates that the Board shall require each student to adhere to the rules and regulations promulgated by the administration and to submit to disciplinary measures appropriately assigned for infraction of those rules.  The policy states that any student disciplined by a district employee shall have the right to notice of the infraction and a hearing before the building principal prior to being disciplined, and may appeal the discipline determination to the superintendent. (Board Policy Number 218.)

The Board developed a policy entitled "Suspension and Expulsion." That policy indicates that the Board recognizes that exclusion from the educational program of the schools, whether by suspension or expulsion, is the most severe sanction that can be imposed on a student in the district and one that cannot be imposed without due process. The Board may suspend, after a proper hearing, a student for such time, as it deems necessary or may permanently expel him or her. The policy states that no student may be suspended without notice of the reasons for which he is suspended and an opportunity to be heard in his own behalf before the school official who holds the authority to reinstate him. The parents shall be notified immediately in writing when a student is suspended. When the suspension exceeds three (3) school days, the student and parent or guardian will be given the opportunity for an informal hearing with the designated school official. The hearing shall take place as soon as possible after the suspension, except when extraordinary circumstances involving the health and safety of the student or others in the school require immediate exclusion, the hearing may be delayed to such time as circumstances permit. (Board Policy Number 233.)

The Board developed a policy entitled "Student Rights." The policy indicates that no student shall be deprived of equal treatment and equal access to the educational program, due process, a presumption of innocence, and free expression and association, in accordance with Board policy. (Board Policy Number 235.)

The Board developed a policy entitled "Unlawful Harassment." The policy indicates that the Board prohibits all forms of unlawful harassment of students and encourages students who have been harassed to promptly report such incidents to the designated employees. The policy further states that the Board directs that complaints of harassment shall be investigated promptly and corrective action shall be taken when allegations are verified. The policy defines

14

the term harassment, in part, as unwelcome and offensive physical conduct relating to sex, which creates an intimidating hostile or offensive educational environment.  When a student believes that he or she is being harassed, the student should immediately inform the harasser that his or her behavior is unwelcome, offensive, or inappropriate.  If the unwelcome, offensive, or inappropriate behavior continues, the student shall follow the established complaint procedure.  The complaint procedure includes the following:

1.    A student shall report a complaint of harassment, orally or in writing, to the building principal or a designated employee, who shall inform the student of his or her rights and of the complaint process.

2.    The building principal immediately shall notify the Superintendent or other designated administrator and shall conduct an impartial, thorough, and confidential investigation of the alleged harassment. In determining whether alleged conduct constitutes harassment, the totality of the circumstances, nature of the conduct and context in which the alleged conduct occurred shall be investigated.

3.    The building principal shall prepare a written report summarizing the investigation and recommending disposition of the complaint. Copies of the report shall be provided to the complainant, the accused, the Superintendent and others directly involved, as appropriate;

4.    If the investigation results in a substantiated charge of harassment, the district shall take prompt corrective action to ensure the harassment ceases and will not recur. (Board Policy Number 248.)

Mr. Donald Stewart, Superintendent, indicated that he was not notified before the discipline decision was dispensed. (Stewart 74:14)  The District standard requires that a report be prepared for the Superintendent, recommending disposition of the complaint.  Mr. Gale indicated that he was not aware that the superintendent is required to be called in a claim of unlawful

harassment. (Gale 126:23) Mr. Gale was also not aware that he was supposed to circulate the investigation report to the accused and the complainant. (Gale 127:6) Mr. Gale breached his duty to notify the superintendent, to prepare an investigative report, and circulate that report to the appropriate individuals. A summary was prepared about January 30, 2002 (Gale 131:7), which was approximately seven weeks after the suspension.

**Penn Manor High School Administrative Handbook.**

The Penn Manor High School publishes an administrative handbook that contains policies and procedures concerning the effective operation of the school. The handbook includes a section entitled "Sexual Harassment." This section describes examples of sexual harassment and the procedure for registering a sexual harassment complaint. The section is specifically written for employee misconduct and not student misconduct.

**Penn Manor High School Student Handbook.**

The Penn Manor High School publishes a student handbook, which is distributed to each student. According to the principal's message, the handbook is designed to inform the student body of policies and procedures established at Penn Manor High School. The policies are designed to ensure a productive educational environment. Students, according to the principal's message, are required to have a student handbook with them through the school day.

One section of the student handbook describes the peer mediation program. The program helps students resolve their conflicts peacefully. Students trained as peer mediators conduct mediation sessions. Students in conflict are given the chance to explain their side of the story without interruption. Then they are given the chance to respond and clarify what the other person has reported.

Consequences for inappropriate behavior are defined in the student handbook.  One section describes the consequence of inappropriate public display of affection, indicating that the first offense is addressed with a written warning.  The second offense will require a one-hour detention and the third offense a two-hour detention.

Consequences for harassment of students are defined in the student handbook.  The first step is to conduct a conference with both sides.  Detention or immediate suspension, peer mediation, or a letter sent to parents may result.  The second step includes detention or suspension, a parental conference and required additional counseling, and possibly police involvement.

The student handbook for the 2003/2004 school year contains a section entitled "Out of School Suspension."  This section indicates that out of school suspension is reserved for severe discipline, failure to serve detentions or repetitive disciplinary problems.  A parent conference is required for reinstatement.  It states in this handbook "an informal hearing with the administrator will occur for student suspensions beyond the third day."  This did not exist during the 2001/2002 school year.

**School Records Pertaining to Joshua Shuman.**

Joshua was born on September 17, 1986 and was attending grade ten during the 2001-2002 school year at Penn Manor High School.  Penn Manor High School is a school in the Penn Manor School District, Millersville, Pennsylvania.  A review of Joshua's school records indicates that he achieved grades of mostly B's during the ninth grade and mostly C's during tenth grade.  Standardized test scores revealed a student of average to above average achievement in most academic subject matter.  Mr. Gale indicated that Joshua was not a problem student (Gale 46:16) and he was not aware of any discipline issues. (Gale 46:21)  Ms. Janice Mindish, Principal of Penn Manor High School,

indicated that Joshua was not a problem student (Mindish 90:25) and had no discipline to speak of, of which she was aware. (Mindish 98:3)

When Joshua was attending the first grade, he was referred for a consultation due to below academic performance compared with his peers. The team recommended a check on his reading progress mid-year. There is no other information in the record indicating that special education was provided for Joshua. His progress report for third grade indicates that he demonstrated capable progress, met expectations with guidance and support, and worked satisfactorily and appropriately in most areas. Joshua's report card for grade six indicates that he demonstrated significant progress, met expectations successfully with minimal support and worked confidently and competently in most academic areas. Indications of character development were rated by his teacher as progressing successfully in most areas.

Overall, a review of the record indicates that Joshua was a typical student with average ability who progressed through the school system without academic or behavior concerns.

**School Records Pertaining to Olivia Becker.**

Olivia was born on February 24, 1986. She attended parochial school through her elementary grades. A review of her record indicates that she performed academically and behaviorally within the average range. She attended the Lamperter-Strasburg School District before transferring to Penn Manor School District where she started grade ten in the 2001-2002 school year.

During the latter half of the eleventh grade, her father, who expressed concern that she may have a learning disability, referred Olivia for a multidisciplinary evaluation. Achievement testing found Olivia's reading skills to be significantly below grade and age expectations. Her math skills were found to be another area of learning deficiency. School Psychologist, Dr. Robert Hoeppel,

18

in his May 13, 2003 report indicated that Olivia described school as being a highly stressful environment and she has experienced what she described as panic attacks since eighth grade. She reported being symptom-free during tenth grade. Dr. Hoeppel concluded that Olivia could be described as having low average, to average cognitive ability. Olivia also exhibited a history of emotional distress that further interfered with her availability to learn. As part of the evaluation process Olivia's father, Mr. Thomas T. Becker, completed a form describing current or past problems in behavior areas. Mr. Becker indicated, among other issues, that Olivia blames others for her own mistakes, engages in physically dangerous activities, lies, and has rapid mood swings. Dr. Hoeppel recommended that the school consider Olivia eligible for specially designed instruction as a student with a learning disability and emotional concerns. The multidisciplinary evaluation team concluded that Olivia is a student with a disability and classified her as emotionally disturbed with a secondary disability category of specific learning disability. The determination of the District was that she was in need of specially designed instruction including social skills and support in the content areas of reading and math.

**Description of the Incident and Follow-up by School Personnel.**

On December 7, 2001, Joshua was attending school at the Penn Manor High School. He and other students, including Olivia Becker, Jeremy Fritsch, Jennifer Nickle, and Jay Shaiebly were attending class in the agriculture room of the school during the second and third block of the day. A substitute teacher, Ms. Myers, was in charge of the class on that day since the regular teacher, Ms. Carole Fay, was not present.

On December 10, 2001, Mr. Gale indicated, he first learned of Olivia's claim, after she went to one of the guidance counselors, Mr. Wildasin. (Gale 48:10) Mr. Wildasin brought Olivia to him (Gale 49:7) and she said that she needed to talk about some things that had occurred on the Friday before. (Gale 49:10) Olivia told Mr. Gale that prior to the class in question she and Joshua

were flirting back and forth which entailed talking and joking around. (Gale 50:11, 50:19)  Olivia told Mr. Gale that during the agriculture class, while they were watching a video, Joshua had his hand on top of her hand and she went along with it because he had a hold of her hand. (Gale 51:14)  Mr. Gale indicated that Olivia alleged Joshua forced himself on her sexually.  Mr. Gale told Olivia that he would investigate (Gale 54:10) and he sent her back to class. (Gale 54:12)  Olivia identified three students, according to Mr. Gale, and he wrote their names down. There were no notes of Mr. Gale's alleged investigation provided by the District.

At approximately 10:15 AM on December 10, 2001, Joshua was called to the school office to meet with Mr. Gale.  Mr. Gale stated that he informed Joshua that he was being accused of inappropriately touching a young lady in his classroom. (Gale 55:23)  According to Joshua, Mr. Gale told him that Olivia was claiming that he physically forced his hand upon her and that she was very upset about it. (Shuman 81:8)  According to Joshua there was no force involved and the two of them were touching each other over their clothing and that that Olivia physically held his hand.  Mr. Gale informed Joshua that the stories did not match and immediately put Joshua in another room in the school.  According to Mr. Gale while Joshua was in the room Olivia was called down a second time and denied that the actions were consensual and became angry. (Gale 63:6; 64:3)

Joshua was in a separate room for three to four hours.  During the time that Joshua was interrogated by Mr. Gale and Mr. Baddick it was mentioned that the police could become involved. (Shuman108:8)  According to Joshua, he took this as a threat. (Shuman 108:13)  If the administrators said this during the time that they were questioning Joshua it was and inappropriate comment and the type of behavior that is not acceptable for administrators in a school setting.  Also during the questioning Mr. Baddick asked Joshua "did you feel her to get a rise." (Shuman 93:11)  If Mr. Baddick said this during the questioning of Joshua it was an inappropriate comment and the type of statement that is not acceptable for an

20

administrator in a school setting. The administrators claimed that another investigation was taking place on another matter, which distracted them from only dealing with Joshua in a timely manner. Even if this other investigation was taking place, the time of Joshua's detention was unreasonable.

According to Joshua, after the administrators talked him with, Mr. Gale indicated that there were no witnesses and that he was suspended for four (4) days because of inappropriate conduct. During these meeting Joshua was never told that he was disciplined for sexual harassment. (Shuman 112:6) After Joshua found out his punishment, Mr. Gale called his mother. Neither Joshua nor his mother was ever told that he was being disciplined for sexual harassment.

In a handwritten letter, Joshua indicated that Olivia and he were flirting with each other in class on Friday. In the third block, Ms. Myers said it was okay for him to move to the back of the room to talk to Jeremy Appel. Then he and Olivia started to flirt again; she nudged his leg and he touched her leg. Then he touched her crouch and she proceeded to rub his penis. He stated that there was no resistance or force involved and she was laughing about it. On the following Monday, Joshua wrote, Mr. Gale told him that Olivia said he had sexually forced himself on her.

Jeremy Fritsch, a student in the class, indicated that he saw Joshua and Olivia touching each other and he saw Olivia pull Joshua's hand down to her crotch. He did not hear either of them say no or anything. (Fritsch 12:6) He indicated that he saw Olivia pulling Joshua's hand down to her crotch and that she was not trying to push him away. (Fritsch 17:4) Jeremy reported that he heard laughing between both Joshua and Olivia. (Fritsch 16:15) He indicated that he thought he was sitting right in front of Joshua and Olivia. (Fritsch 13:24) In a handwritten report, Jeremy indicated that Mr. Gale called him to the office and interviewed him about what he saw between Joshua and Olivia. Jeremy

21

stated that he told Mr. Gale what he saw and Mr. Gale wrote it down. Copies of notes were never provided.

In Answers to Interrogatories prepared by Mr. Baddick, Ms. Mindish and Mr. Gale, they indicated that Mr. Gale interviewed students Dusty Lewis, Shawn Bachman, and Jennifer Nickle on December 10, 2001. Ms. Mindish also indicated that these were the three students interviewed and they were friends of Olivia. (Mindish 119:8, 119:15)  However, Ms. Nickle indicated that she did not think that Mr. Gale called her down on December 10, 2001 to talk with her. (Nickle 23:12)  She stated that she would remember because it was a "pretty big deal." (Nickle 23:17)  Ms. Nickle indicated that Olivia did not talk with her about any contact between her and Joshua. (Nickle 21:10)  Shawn Bachman indicated that he did not remember anything that went on in the class and did not remember talking to any administrator or to Olivia about the incident. (Bachman 11:10; 16:14; 18:7)  Mr. Bachman indicated that he did not witness any contact between Joshua and Olivia in the class. (Bachman 18:4)  Ms. Mindish indicated that these three witnesses did not see anything. (Mindish 140:21)  These students were not witnesses to the activities that occurred in the class.  If they represented what Olivia told them from her perspective, the administrators were relying on incomplete information at best.  As set forth above, the testimony from two of the three students indicates that neither remembers being called to the office, speaking with an administrator or ever speaking with Olivia about the incident.  (It is my understanding that Dusty Lewis is deceased.)

The assumption that Olivia accurately told students what had happened is not reliable evidence from which a reasonable school administrator should make a determination about circumstances that could deny a student of educational opportunity by virtue of a long-term suspension of four (4) days. Ms. Mindish indicated that discipline actions that involve suspensions of four (4) days or more are not routine. (Mindish 180:14)  Mr. Gale indicated that none of the students he interviewed saw anything. (Gale 67:21)  The students he interviewed were, he

22

thought, friends of Olivia, who she claimed to have told of the incident, after the fact, and who in fact did not witness anything. Ms. Mindish indicated that the administrator would often say to a student, "who saw what happened...? And then we will call those students in and talk to them." (Mindish 46:23) Ms. Mindish indicated that she believed she was told that, even Olivia's witnesses did not see anything, and that no one on either side saw anything one way or the other. (Mindish 117:15)

Ms. Mindish indicated that the District policy regarding unlawful harassment requires that the administrator must conduct an impartial, thorough, and confidential investigation of the alleged harassment. (Mindish 73:24) There is no information in the record, and no report, that indicates that the District, through its employees, conducted an investigation in a meaningful way. Mr. Baddick, Mr. Gale and Ms. Mindish all indicated that the only documentation of the interviews of students is a document entitled "Summary of Events in Josh Shuman Case." Mr. Gale indicated in his answers to interrogatories that there were no known witnesses to the situation other than Joshua and Olivia. However, he failed to investigate to the point of reasonably determining whether in fact there were any witnesses. Ms. Mindish stated that normally (in a situation like this) one would interview the classroom teacher. (Mindish 118:24) Even though Ms. Mindish indicated that attempting to contact the substitute teacher was certainly something that could be done (Mindish 118:16), Mr. Gale did not attempt to contact her for information. Even though the substitute teacher was in charge of the class that day, Mr. Gale claims to have listened to the accounts of three students. They did not witness anything in the class. Mr. Gale indicated that he did not think that he asked Joshua if he knew of any witnesses. (Gale 71:21) He indicated that he did not think it was important to know if Joshua had any witnesses because if they had been that important he felt that Joshua would have offered them to tell his side. (Gale 72:8) Since he was the administrator investigating the allegation against Joshua, Mr. Gale had an obligation to conduct a fair and thorough investigation of the charges. As such, Mr. Gale should have

23

indicated to Joshua that he could have named witnesses to verify his description of what occurred, but he failed to do so.  Mr. Gale indicated that he was trying to do a fair investigation (Gale 72:14) and he agreed that he was trying to find every person who had knowledge or could assist with the determination of who was telling the truth. (Gale 72:21)  However, he only claims to have interviewed students identified by Olivia. (Gale 73:2)  In this situation, Mr. Gale failed in his duty since he only listened to Joshua, to Olivia, and, he claims, to the three students Olivia identified.  He failed to interview any independent witnesses from the class.  Mr. Gale stated that he made no attempt to contact the substitute teacher (Gale 74:17) and made no effort at that point to find other witnesses. (Gale 74:21)  Mr. Gale breached the District standard as articulated by Ms. Mindish.  Even with the lack of information from all potential eyewitnesses, i.e., all the students in the class and the teacher, Mr. Gale stated that he formed a judgment after talking to Olivia a second time, and talking to the three students to whom she allegedly relayed her story. (Gale 71:14)  Two of the three witnesses did not remember talking with Mr. Gale or even Olivia.  This calls into question whether Mr. Gale ever spoke with any of these witnesses.

Mr. Gale informed Joshua that he was suspended for four (4) days.  A review of the record indicates that Joshua was suspended for inappropriate conduct.  Mr. Gale indicated that inappropriate conduct is the same as sexual misconduct. (Gale 37:9) and that sexual misconduct is consensual. (Gale 36:18, 37:1, 37:3)  Ms. Mindish indicated that if the touching were consensual they would both have a suspension for inappropriate conduct. (Mindish 133:12)  Ms. Mindish indicated that it does make a difference if the touching is consensual, because that means they both behaved inappropriately. (Mindish 134:4)  Mr. Gale indicated that sexual harassment is not consensual. (Gale 37:3)  Ms. Mindish indicated that in a different situation, where two students were both acting inappropriately, these students both were suspended for three days. (Mindish 134:25)  Ms. Mindish stated that she is not aware of any situation that was classified as consensual conduct, that was inappropriate, and only one

24

student was disciplined. (Mindish 137:2) Therefore, if Joshua was charged with inappropriate conduct, i.e., sexual misconduct, which is consensual by District standard, then the District, through its employees breached his right to equal treatment by failing to discipline Olivia under the same standard.

Ms. Teresa Shertzer, Joshua's mother, was contacted approximately three to four hours after Joshua was originally detained and questioned by school staff, and was told to come to the school to pick up her son. According to Ms. Shertzer there was a short telephone conversation with Mr. Gale. Ms. Shertzer indicated that Mr. Gale told her that Joshua was being suspended for inappropriate touching but would not tell her Olivia's name or what Joshua was being accused of. He told her it was confidential. (Shertzer 43:9) Ms. Shertzer should have been called right away, as soon as Joshua was called to the office. It was inappropriate for Mr. Gale to wait for three to four hours to call Ms. Shertzer.

Mr. Gale indicated that whether a student is detained in a separate room or office after initial questioning depends on whether the administrator decided that disciplinary action is warranted (Gale 33:10); otherwise the student returns to class. (Gale 33:14) Mr. Gale indicated that Joshua was in the conference room about two and one-half to three hours. (Gale 116:14) Since Joshua was being detained, Mr. Gale had exercised the District policy following a determination that Joshua would be disciplined and likely suspended. Joshua was suspended from December 11 through December 14, 2001. Because of the disciplinary action taken against Joshua, he was prohibited from attending the Pennsylvania Farm Show.

Ms. Mindish stated that whenever there is a suspension of more than three (3) days, an informal hearing is required. (Mindish 72:12) There is no indication in the record that the District, through its employees, provided for an informal hearing to take place, either when Joshua's mother came to the school to pick him up, or at any time at all. Ms. Mindish indicated that Ms. Shertzer was

probably not advised that when she picked Joshua up from school, that was the informal hearing, (Mindish 147:20), a time, according to Ms. Mindish, during which Joshua and Ms. Shertzer could seek and obtain additional information that could potentially clarify and resolve some or all outstanding issues. Donald Stewart, the acting superintendent at the time, indicated that an informal hearing is "...an opportunity for the youngster and his parents to have an opportunity to discuss the circumstances and understand the circumstances of the suspension." (46-5) He further indicated that the parent and student needs to be informed of what the accuser said and what the accused did. (55:5) Upon questioning, the school administrator should provide detail to the parents the reasons for suspension (55:11). Mr. Stewart stated that the informal hearing frequently occurs when the parent comes to pick up the child. (46:24) He further indicated that, while he is familiar with the education code which specifies that a parent is to be notified about a time and place for the informal hearing (47-24), he doesn't know what words the parents are to be told to inform them it is the informal hearing. (48-5) From Ms. Mindish's conversations with Mr. Gale or Mr. Baddick, she does not know if Ms. Shertzer, at minimum, was given the complainant's name (Mindish 149:2) and/or whether she was told what Olivia claimed Joshua did to her. (Mindish 149:6) Ms. Shertzer indicated that she was never told these things from the administration. Even if school officials considered this an informal hearing, it breached the applicable administrative standard for this context. As stated previously, the administrators do not seem to agree on the timing of an informal hearing. No matter when they claim they say it is supposed to occur, Joshua and his mother were never informed that any meeting or conversation was an informal hearing.

When Jeremy learned of Joshua's suspension, he approached his teacher, Ms. Fay, and told her what he witnessed in the classroom on December 7, 2001. He stated that he saw Olivia and Joshua touching each other. He also saw that Olivia was a willing participant, that she engaged in touching Joshua and encouraging him to touch her, and at no time did she tell Joshua to stop. In

26

response to Jeremy's statements, Ms. Fay told him that there was nothing she could do and to forget it. (Fritsch 22:14) Jeremy indicated that because Ms. Fay told him to forget about it he did not go to see Mr. Gale or any other administrators about what he had observed. (Fritsch 42:1) A handwritten report developed by Jeremy indicates that he saw Joshua and Olivia touching each other. He saw Olivia grab Joshua's hand and pull it to her crotch. He also indicated that he saw Olivia touching Joshua and did not hear Olivia or Joshua tell each other to stop. Jeremy went to Ms. Fay during the time that Joshua was on suspension. It was inappropriate action on Ms. Fay's part that she failed to go to the administration with this information.

Ms. Mindish stated that she asked Mr. Gale why he did not give her Jeremy's name before and he said he did not realize this student saw anything, and the student came to him after Joshua returned from suspension. Thus, he was not aware of the student at the time he investigated. (Mindish 143:24) Ms. Mindish indicated that if Jeremy had been interviewed at the beginning about what he saw it could have changed the discipline. (Mindish 205:3) If Mr. Gale appropriately followed the standard, he would have conducted a thorough investigation prior to the determination of the suspension. This investigation would have included interviewing the students and teacher who were in the class during the incident. If he had completed such an investigation, then it is likely that Jeremy's information, concerning his witnessing of the events, would have been uncovered and considered, and likely could have modified the decision to suspend Joshua and prevent the issue pertaining to his equal treatment.

Ms. Shertzer received a letter from the district on or about December 13, 2001, stating that the reason for Joshua's suspension was "Sexual Harassment. More specifically: Inappropriate conduct." This is the first time that these terms were used and Joshua and Ms. Shertzer saw them. The letter advised Ms. Shertzer to call the school office to schedule a reinstatement conference. The letter did not mention an informal hearing.

A reinstatement conference was conducted at the school on December 14, 2001. Ms. Janice M. Mindish, Principal, and Mr. Gale, indicated to Ms. Shertzer and others present that they were not at the conference to discuss the incident; that the conference was a reinstatement conference not an informal hearing. No other conferences or hearings were held or scheduled. According to Answers to Interrogatories prepared by school officials, Joshua did not deny the inappropriate contact with Olivia. At the meeting, questions were asked about the incident (Gale 119:24), but the family and Joshua's attorney at the time, were told by Ms. Mindish (Gale 120:8) that it was not an informal hearing but rather, a reinstatement conference. (Gale 120:4) Mr. Stewart indicated that he thought a reinstatement conference might not have to be "exclusively" for that purpose (99-13) and that, "it could be, yes," if a parent with a disciplined student started to ask questions during the reinstatement conference, and wanted there to be a hearing, there could be. (100-1) When Joshua returned to school on or about December 17, 2001, he was provided a document that stated that he was reinstated to school as of December 17, after a successful parent conference was held. Mr. Stewart indicated that a suspended student returns to school the day of the reinstatement conference but Joshua returned, not on Friday December 14, 2001, the day of his reinstatement conference, but on Monday December 17, 2001. (137-16). Record documents, as well as Mr. Stewart's deposition testimony (137-20), indicate that Mr. Bob Frankenhouser, District attorney, wrote a letter explaining that the December 14, 2001 meeting was Joshua's informal hearing. This indicates that a contradiction concerning the understanding of the administrators as to when an informal hearing is to take place. Clearly from the record the reinstatement conference was not an informal hearing.

On or about January 23, 2002, Joshua made a written complaint against Ms. Becker, in accordance with Penn Manor District Policy 218, Section 248. That policy states that, if it is concluded that a student has made false

28

accusations against another, that student shall be subject to disciplinary action. There is no documentation in the record that indicates that the District, through its employees, followed its own standard and conducted an investigation of the complaint.    Joshua and his mother were not advised that any investigation occurred at this time.    However, in interrogatories prepared by school officials and the depositions of Ms. Mindish and Mr. Gale it is indicated that an investigation was made relating to a follow-up on January 25, 2002.    In that apparent second investigation, according to the summary of events prepared by Mr. Mindish, Olivia identified a fourth witness, Jay Shaiebly.  He apparently was an actual witness.  However, he indicated that he never spoke with Olivia or an administrator about the incident.

On or about January 24, 2002, Joshua, through his counsel, in accordance with Penn Manor District Policy 218, Section 248, sent a written appeal letter to the Superintendent. The letter pointed out the failure to hold an informal hearing, the failure to properly investigate the allegations and prepare a written report, and the improper detention and questioning/interrogation of Joshua for approximately 4 hours on December 10, 2001.    The District responded that the appeal was untimely and that no further action was warranted or necessary.    Donald Stewart, serving as Superintendent at the time of this incident indicated that there is no time limit of which he is aware in which to bring an appeal of a disciplinary matter that involves unlawful harassment (78-24) and that he has the authority to reopen an investigation. (128-11).

**Conclusion.**

The District, through its employees, breached the standard in the field of education and education administration and supervision, which resulted in Joshua's unfair and mistaken exclusion from the educational process.    The District's decision, through its employees, to suspend Joshua for four (4) days was not supported by substantial evidence. The District, through its employees, breached its standard regarding unlawful harassment.

The District, through its employees, breached its duty to thoroughly investigate the complaint against Joshua, to inform him that he had the right to speak to, and question his accuser, and to provide an opportunity for an informal hearing, before excluding him for four (4) days from the educational process, or within five (5) days of his suspension.  District policy specifically provided for a factual hearing at which Joshua could contest the suspension, confront the accuser's witnesses and cross-examine them, or call witnesses to verify his version of the incident. The reviewed record fails to indicate that such process took place.  Even under the standard of Goss v. Lopez Joshua was never provided an explanation of the evidence the authorities had.  The District, through its employees breached its standard by failing to prepare a written report summarizing the investigation and recommending disposition of the complaint, and as a result, it failed to uphold District policy to provide copies to the complainant, the accused, the Superintendent and others directly involved. The District, through its employees, breached its standard of investigating allegations of harassment by failing to conduct an impartial investigation. In the course of his investigation, Mr. Gale did not interview students in Joshua and Olivia's class and did not interview the teacher. He dispensed Joshua's discipline based on inferences made because of information provided by witnesses named only by Olivia Becker.

The District policy specifies that inappropriate conduct, in the context of student discipline, is the same as sexual misconduct, which is considered consensual.   Evidence was presented to the District that the conduct was consensual and they should have disciplined both students.  Failing to do so is where they breached their own standard.

The District, through its employees, improperly and unreasonably detained and interrogated Joshua.

30

The District failed to provide Joshua and his mother with the information regarding Olivia's name and what she claimed he did to her.

Some discipline was warranted to both Joshua and Olivia because of their behavior. That discipline would more appropriately have been detention for both of them rather than suspension for only Joshua for four days. The District, through its employees, failed to uphold its standard and denied Joshua equal treatment under this standard by suspending him for inappropriate conduct but not assigning any disciplinary consequences to Olivia for participation in the same conduct.

As a result of the arbitrary manner in which discipline was assigned to Joshua, he was denied access to his education and sustained prejudice to his substantial rights.

## STATEMENT OF CONFIDENTIALITY.

I have read the statement of confidentiality in this matter and agree to abide by its provisions.

## ATTORNEY INFORMATION

Deirdre A. Agnew, Esq.
Law Offices of Deirdre A. Agnew
1450 East Boot Rd.
West Chester, PA 19380
610-738-4800

31

**NOTICE**

As a consulting expert on this case, I reserve the right to modify or supplement this report, and the opinions herein contained, as additional information is made available or as additional tasks are assigned. Such tasks may include, but are not limited to, review of additional records and/or transcripts of depositions, interviews, and research.

EDWARD F. DRAGAN, ED.D., MEd, CMC

32

*Appendix*

A.    Consultant Resume

B.    Consultant Testimony Record

# EDWARD F. DRAGAN
## Ed.D, MEL, CMC, CPM

**CERTIFIED AND COURT QUALIFIED**
**CONSULTANT TO SCHOOLS and LAWYERS**

**Education Management Consulting, LLC**
24 Arnett Ave., Suite 102
Lambertville, NJ 08530

609-397-8989
edragan@edmgt.com
www.edmgt.com

- Court Qualified Education Administration, School Liability, Education, Education Supervision, and Special Education Expert.
  - Certified School Administrator.
    - Certified Special Educator.
      - Certified Teacher.
  - Certified Management Consultant.
    - Certified Public Manager.
  - Doctorate in Education Administration and Supervision – Rutgers University.
    - Masters in Special Education – The College of New Jersey.
    - Masters in Education Law – Franklin Pierce Law Center.
    - Post-graduate study in College Pupil Personnel Services.
  - Post-graduate study at New York University, Ithaca Collage, Ohio University and Ohio State University in Administration, Education and Student Supervision
    - Distinguished Education Expert – National Forensic Center.
  - Diplomate – American Academy of Certified Consultants and Experts.
    - Member – American Association of School Administrators.
  - Member – American College of Forensic Examiners International.
  - Member – International Association of School Safety Professionals.

## PROFESSIONAL HISTORY

1993-Present

EDUCATION MANAGEMENT CONSULTING, LLC, Lambertville, NJ
**Founder and Principal Consultant.**

*Develop and implement comprehensive system-wide organizational, management and program designs and audits for education and client-centered agencies on a worldwide basis.* Specialties include liability risk management, restructuring of administrative roles and functions, review and evaluation of policies, procedures and practices, special education programs and services, assessment of multi-team effectiveness, charter schools and international schools. Additional services include the development and evaluation of alternative schools, dispute resolution, on-site management and consultation for school superintendents and boards of education in the development, implementation and evaluation of education programs and services and school management and consultation for university and college administrators on issues concerning student safety and meeting the needs of students with disabilities.

*Provide expert consultation services for schools, agencies, and lawyers.* Services provided for plaintiff, defendant, and insurance carriers in areas including negligence, student supervision, employee dismissal, special education, school evaluation, harassment, and civil rights issues. Recent cases included sexual abuse, student peer harassment, serious sports injury, murder, rape, wrongful death, least restrictive placement, parent visitation rights, school reviews in matrimonial cases, student supervision, negligent hiring, supervision and retention and other high profile cases. Service providers include public and private schools, charter schools, camps and institutions of higher education. Services have been provided to law firms in twenty different states across the country.

*Evaluate the efficiency and effectiveness of service delivery and administrative models in education and client centered settings.* Review the management of programs and services, evaluate the adequacy of supervision, assess pupil and client outcomes and program integrity. Develop comprehensive reports with recommendations based upon on-site observations, staff, student and parent interviews and record reviews.

*Engage in management consulting with a variety of clients* including the National network on Disabilities, The Autistic Children's Project of California, National Hewitt Wallice Reader's Digest Grant recipients in education, public schools, private schools, charter and international schools as well as other agencies concerning all issues of education management and law.

## CONSULTATION TO SCHOOLS AND AGENCIES

**A sample of recent consultation to schools and agencies include:**

*Saddle River Board of Education* – Reviewed and assessed programs and services for students with disabilities including resource programs and related service options.

*Lincoln School, San Jose, Costa Rica* – Designed and conducted a staff training seminar and management consultation in the areas of disabilities education and school organizational analysis.

*South Hunterdon Regional High School Board of Education* – Developed and implemented staff training and consultation in the area of the management and law of disabilities education issues. Provided management consultation in the area of organizational analysis and development focused on staff accountability and liability risk management.

*Emerson Board of Education* – Designed and conducted a comprehensive review and analysis of education programs and services. Reviewed policies and procedures related to student learning, organization structure and staff accountability.

*Little Ferry Board of Education* – Reviewed and analyzed the organization structure and systems of accountability focused on student learning. Revised job functions and job descriptions established accountability systems and recommended major policy and procedural modification.

*Ridgewood Board of Education* – Provided consultation for the redesign of all major instructional and management systems related to at-risk students and students with disabilities to comply with the IDEA Amendments of 1997 and new state regulations. Recommended policy and procedural modifications and staff development programs. Conducted staff and parent training in the area of instructional organization and laws related to the education of students with disabilities.

*Lakewood Board of Education* – Reviewed and analyzed the programs and services provided by the district for students with disabilities in preschool and early childhood programs. This review included curriculum, program options, organization structure and delivery of services according to standards in the field of education and special education.

*University of Zurich* – Provided consultation to a government project group focused on restructuring special education in Switzerland.

2

*Alpine Board of Education* – Reviewed and analyzed the management structure, staffing accountability, curriculum delivery systems and programs as they related to cost and comparison with other similar districts. Presented recommendations in each area to develop enhanced management systems, improve student performance and reduce costs and risk of litigation.

*The Walworth Barbour American International School, Israel* – Consulted with the superintendent and staff regarding the development of programs and services for exceptional students including those with learning and behavior problems and those who are gifted. Presented a graduate level course in teaching and supervising students with special needs.

*West Orange Board of Education* – Developed and implemented a comprehensive plan to review finance and budget related to the administrative organization and the provision of programs and services for pupils with disabilities. Conducted a review and analysis of the management of the delivery of programs and services including cost effectiveness and quality of services. Completed a functional assessment of staff responsibilities and presented recommendations for improvements.

*Asbury Park Board of Education* – Conducted a comprehensive organizational review and analysis of the department of special education. Assessed the effectiveness of the administrative model, the child study team process, student programs and other support services. Developed and presented a comprehensive plan of improvement that included the restructuring of administration resulting in savings of a significant amount of the budget.

*International School of Aleppo, Syria* – Consulted wit the superintendent, administrator and staff regarding the development of programs and services for students with learning and behavior problems and those who are at risk of school failure. Evaluated the school's capacity for program development and recommended unique programs to meet student and teacher needs.

*Bloomingdale Board of Education* – Developed and implemented a comprehensive review and analysis of the quality and efficiency of the student and teacher support system. Evaluated the management, structure and procedures for instructional programs and implementation of legal education requirements. Developed and presented a comprehensive evaluation report with recommendations for quality improvement and cost reduction.

*Dunellen Board of Education* – Conducted a management review and analysis of the superintendent and director of special education roles. Evaluated programs and services for the at risk population and pupils with disabilities. Conducted a management review of the division of special services. Assessed the quality of student and teacher support services. Determined the quality of relationships between staff and service providers. Reviewed program cost and litigation risk factors. Developed and presented a comprehensive evaluation report with recommendations for program and management improvement.

*Ramapo Indian Hills Board of Education* – Reviewed and analyzed the administrative structure. Developed and implemented a comprehensive management plan and provided on-site management of special education services. The provision of services brought the district into full legal compliance in their mandated program area.

*Keyport Township Board of Education* – Designed and conducted a comprehensive review and analysis of the administration of the district. Evaluated programs and services for the at risk population and students with disabilities. Interviewed regular and special education staff, administrators, students and parents. Reviewed curricula and support services and observed programs and staff meetings. Developed and presented a comprehensive evaluation report with recommendations for management improvement.

*Marlboro Township Board of Education* – Evaluated programs and services and conducted a management review of the division of special services. Reviewed pupil records, district policies and procedures, interviewed staff, students and parents. Observed programs and staff meetings. Developed and presented a comprehensive evaluation report with recommendations for program and management improvement.

3

*Lawrence Township Board of Education* – Developed a comprehensive strategic plan for system change in order to include and support pupils with disabilities in general education programs. Provided staff training, materials and direction.

## CONSULTATION TO LAWYERS

**Recent consultation to lawyers:**

Consultation has been provided to more than 200 lawyers working on cases involving schools and education issues. Expert reports have been completed on more than 125 cases and expert testimony has been provided at 26 depositions and trials around the country.

Consultation to lawyers has included: review and analysis of case records; development of cause of action; identification of documents and information for discovery; assistance with the development of interrogatories; assistance with the development of questions for depositions; on-site observations and review; research; report writing; and court testimony.

Recent cases have included liability for student injury, including supervision of students, murder, wrongful death, sexual molestation, harassment, staff hiring, supervision, and retention, review of schools in matrimonial cases, special education program evaluation, and student placement and program disputes.

**Court Qualified Education Expert:**

Qualified by various courts, including federal district courts and state and administrative courts, as a general education expert, education administration expert, school liability expert, special education expert, and special education administration expert. Qualified to review and render opinions on issues of the administration of federal and state laws and regulations in the context of general and special education programs and services from preschool through post secondary public and private education facilities.

## ADDITIONAL EDUCATION AND EDUCATION ADMINISTRATION RELATED EMPLOYMENT

1991-1993     HIGHLAND PARK SCHOOLS, Highland Park, NJ
              **Director – Division of Special Services**

In this central office position, hired, supervised and evaluated the activities of highly trained specialists including psychologists, social workers, learning disabilities teacher-consultants and teachers. Participated as a multi-disciplinary team member to determine identification, evaluation and program and placement decisions for students in preschool through high school. Diagnosed learning disabilities and fashioned programs for students in pre-kindergarten through high school. Designed and implemented evaluations of programs and services, interpreted and implemented federal and state laws and regulations, provided mediation for disputed issues and developed education programs for at risk and pupils with disabilities.

Assisted with the development and implementation of the student assistance program for general education. Developed the proposal that awarded the district the distinction of being one of eighteen "network" districts for inclusive special education programming.

Implemented a preschool program for pupils with disabilities, special services advisory council, resource center programs with in-class pupil support systems, departmental high school programs, in-school education teams, inclusive education programs in the elementary schools and computerized data management systems. Provided staff development in laws and regulations governing the education of students with disabilities as well as other instructional issues.

4

1980-1991    **NEW JERSEY STATE DEPARTMENT OF EDUCATION**, Trenton, NJ
**Manager – Division of Programs and Services – 1983-1991**

Conducted and supervised the review of education programs, policies and procedures in more than three hundred public, private and state facility education programs. Participated in and supervised aspects of the review of programs and services in the Jersey City and Paterson School Districts in preparation for State takeover. Developed comprehensive reports and organized case files for the State Attorney General.

Served as division manager for the statewide system to review complaints regarding the implementation of federal and state laws and regulations. Supervised and conducted complaint investigations in more than forty-five schools.

Developed and interpreted state regulations governing the education of pupils with disabilities. Key areas included transition planning, vocational education, secondary education, child study team services, and special education program design.

Supervised and conducted monitoring of programs for compliance with federal and state laws and regulations for the entire state and developed programs of improvement and technical assistance. Supervised and conducted monitoring reviews for private schools for the handicapped, state institutions and public schools across New Jersey.

**County School Program Coordinator – 1980-1983**

In the Hunterdon County Office of Education, provided leadership for boards of education and school administrators in the areas of needs assessment, planning, program implementation and evaluation in twenty-nine school districts. Participated with local school district teams in the identification, evaluation, program development and placement of pupils with disabilities. Interpreted federal and state laws and regulations governing the education of pupils with disabilities. Reviewed and evaluated education programs to assure compliance with federal and state regulations.

1977-1980    **KINGWOOD TOWNSHIP SCHOOL**, Frenchtown, NJ
**Superintendent of Schools**

Developed and implemented a major school district renewal project focused on conducting reviews and needs assessments with staff, parents and the community. Designed and implemented education improvement programs. Reviewed, evaluated and developed all aspects of teacher supervision of students. Developed policies and procedures in order to legally and adequately implement staff hiring, supervision and dismissal as well as student supervision and school safety. Revised all major curriculum areas and implemented eight new innovative programs within three years.

1974-1977    **BONNIE BRAE SCHOOL**, Millington, NJ
**Curriculum Coordinator/Teacher – grades nine to twelve.**

In this residential treatment center for students with severe disabilities, established staff training programs, provided individual consultation and supervision and taught a class. Organized, developed and evaluated curricula and instructional programs. Supervised and

5

evaluated teachers and participated in the development of student individualized education programs.

1971-1974    **ANSELMO COMMUNITY SCHOOL**, Frenchtown, NJ
            **Founder and Principal/Director**

In this private school for grades kindergarten through twelve developed and administered all policies, procedures and staff guidelines. Hired and supervised all staff. Developed, supervised and evaluated programs and services for students. Made decisions regarding student suspension and expulsion. Taught the lower elementary section general and special education classes.

1967-1971    **FLEMINGTON-RARITAN SCHOOLS**, Flemington, NJ
            **Teacher**

Taught self-contained special education classes and resource center for a wide range of students with disabilities. Provided consultation to general education staff regarding the implementation of instructional strategies and student supervision.

1966-1967    **STATE OF OHIO DEPARTMENT OF CORRECTIONS**
            **Social Worker**

In this juvenile correction facility, served on a multidisciplinary pupil planning team, made program and placement decisions, developed individual and group counseling programs, supervised a caseload of high school age inmates and provided counseling on an individual and group basis.

**Related Employment.**

1997        **THE COLLEGE OF NEW JERSEY**, Trenton, NJ
            **Adjunct Professor, Department of Special Education**

Taught a seminar class for student teachers who were placed for practice teaching in various schools throughout New Jersey and Pennsylvania. The class covered student supervision, mediation, discipline, evaluation of outcomes, and general teaching strategies. Conducted on-site observation, evaluation, and supervision of student teachers at their school assignments.

1996 – Present  **THE COLLEGE OF NEW JERSEY**, Trenton, NJ
            **Adjunct Professor of Education, International and Overseas Program**

Develop and teach graduate level courses in international schools around the world. Courses include Special Education, School Law, Administration, and Staff and Student Supervision. Taught the graduate course "Learning and Behavior Problems of Children and Youth with Disabilities" in the International School of Aleppo, Syria, spring 1996 and in Tel Aviv, Israel, spring 1997.

1996 – Present  **THE COLLEGE OF NEW JERSEY**, Trenton, NJ
            **Adjunct Professor, Department of Special Education**

6

Instruct graduate and undergraduate level courses in the teaching and supervision of students with behavioral and learning problems. Courses include: Exceptional Populations in Society and Learning and Behavior Problems of the Handicapped.

2003 – Present  **THE COLLEGE OF NEW JERSEY**, Trenton, NJ
**Adjunct Professor, Department of Educational Administration**

Instruct graduate level courses in the field of educational administration and supervision.

1991  **SETON HALL UNIVERSITY**, South Orange, NJ
**Adjunct Professor, Department of Public Administration**
Developed and taught a graduate level course entitled "Organizational Theory and Behavior in the Public Sector."

1969-1975  **NORTHWEST NEW JERSEY COMMUNTIY ACTION PROGRAM**, Philipsburg, NJ
**Director of Head Start Programs**

Developed, directed, and evaluated 21 summer head start centers in three counties. Hired and supervised center administrators, teachers, bus drivers, and other support staff. Developed pupil identification and evaluation procedures and transition programs with public schools for pupils. Designed and supervised instruction.

1967  **NEUROPSYCHIATRIC INSTITUTE**, Princeton, NJ
**Teacher**

In this residential facility for autistic children, designed and implemented an instructional program for the summer and taught a group of eight pupils. Developed and implemented student programs.

1996-1997  **OHIO UNIVERSITY**, Athens, Ohio
**Assistant Resident Director**

Provided student supervision in a 600-bed undergraduate and graduate residence hall on campus. Responsible for the review, development, and enforcement of school and dormitory policies and rules.

1965-1966  **THE COLLEGE OF NEW JERSEY**, Trenton, NJ
**Resident Assistant**

Provided student supervision in a 150-bed undergraduate residence hall on campus. Responsible for the review, development, and enforcement of school and dormitory policies and rules.

## EDUCATION

- **Franklin Pierce Law Center – Masters Degree in Education Law**
  Major areas of study: torts and special education. Other areas of study included student and school staff rights, legal research and analysis and mediation. – Graduated May 2001.

- **Harvard University – Programs in Professional Education**
  Major area of study: Education Law – Summer 1997.

- **Rutgers University – Doctor of Education – Educational Administration and Supervision**

7

Major area of study: General school organization and supervision, policy and procedure development, organizational analysis and development, facilities, and staff and student supervision. Graduated October 1982.

- **Institute of Management Consultants – Certified Management Consultant**
  Major area of study: Ethical issues in consulting, managing client relationships in education and public agencies and legal consulting. Certified 1997.

- **Rutgers University and the State of New Jersey Department of Personnel – Certified Public Manager**
  Major area of study: Organizational analysis and development, staff supervision, and program evaluation in public agencies. Certified 1995.

- **The College of New Jersey – Master of Arts – Special Education.**
  Major area of study: Special education including identification, evaluation, program development and placement of students with disabilities, curriculum development, child study team functions, diagnosing learning disabilities, including reading and math, and fashioning appropriate accommodations, programs and services, development and review of student evaluation and education plans, and teacher training and supervision. Graduated 1969.

- **The College of New Jersey – Bachelor of Arts**
  Major area of study: Industrial Arts Education and Psychology. Graduated 1966.

- **Other Graduate Study:**

  University of Maine – Human Relations.
  Ohio University – Pupil Personnel Services.
  Ohio State University – Special Education: Pupil Identification, Program Development and Supervision.
  New York University – School Administration: Team Member Functioning and Supervision.

### RECENT SPECIALIZED TRAINING and STUDY

Developing Inclusive Schools and Communities
McGill University, Montreal, Canada – July 1993
Improving Communication Between Experts and Attorneys – September 1994
Complying with IDEA and Section 504 – December 1994
National Institute on Legal Issues of Education
Individuals with Disabilities – May 1995
Special Education Law and Practice – June 1995
Witness Preparation – July 1995
The Deposition Process – September 1995
Management Consulting: A Workshop for Professionals – December 1995
Hot Topics in Special Education Law – June 1996
Courtroom Communications – September 1996
Education Law Association Conference – September 1996
Expert Witnesses: The Art and the Law – December 1996
Current Issues in School Law – Harvard University – July 1997
Education Law Association Conference – November 1997
Special Education Law and Practice – June 1998

8

The Law of Higher Education – August 1998
Education Law Institute – Franklin Pierce Law Center – August 1998
Legal Research and Analysis – August 1998
Legal Research and Analysis II – October 1998
Education Issues in the Supreme Court – Spring 1999
Liability, Torts, Contracts, Section 1983, and Constitutional Issues – July 1999
Basic Education Law – Fall 1999
Education Supreme Court Seminar – Spring 2000
Free Appropriate Public Education and the Least Restrictive Environment
for Students with Disabilities – Spring 2000
Law School for Experts Seminar – June 2000
National Expert Witness & Litigation Seminar – June 2000
Education Law – Franklin Pierce Law Center, Concord, NH – Spring 2000
Education Law Institute – Franklin Pierce Law Center, Concord, NH – July 2000
Special Education Law – Franklin Pierce Law Center, Concord, NH – Fall 2000
Administrative Law – Franklin Pierce Law Center, Concord, NH – Spring 2001
The Mediation Process – CDR Associates, Boulder, CO – February 2001
School Law for the Non-school Lawyer, New Jersey Institute for Continuing Legal Education – April 2001
National Institute on Legal Issues of Educating Individuals with Disabilities, Las Vegas, NV – May 2001
Hot Topics in Special Education – New Jersey Institute for Continuing Legal Education – September 28,
2002
Education Law Association Annual Conference, New Orleans, LA – November 14-16, 2002

## CERTIFICATIONS

Teacher of Industrial Arts
Teacher of the Handicapped
Principal
School Administrator
Assistant Superintendent for Business
Certified Public Manager
Certified Management Consultant
Diplomate – American Academy of Certified Consultants and Experts

## MEMBERSHIPS

International Association of School Safety Professionals
American Association of School Administrators
Association for Supervision and Curriculum Development
New Jersey Association for supervision and Curriculum Development
Society of Professionals in Dispute Resolution
Education Law Association
National Forensic Center
American College of Forensic Examiners
Council for Exceptional Children
Phi Delta Kappa International
National Down Syndrome Conference
Lambertville Education Foundation

## HONORS AND LEADERSHIP ACTIVITIES

Past Chairperson, Law Special Interest Group, National Institute of Management Consultants
Past Vice President, Institute of Management Consultants, Princeton Chapter

9

Past President, Certified Public Managers Society of New Jersey, Central Chapter
Past Member, New Jersey Governor's Task Force on Children's Services Planning
Past Member, Board of Directors, Hunterdon County YMCA
Past Allocations Committee Member, Hunterdon County United Way
Hunterdon County Juvenile Justice Committee
Hunterdon County Children's Services Council
Recipient, Graduate Fellowship in Pupil Personnel Services, Ohio University
President, Senior Class, The College of New Jersey
Vice President, Student Government, The College of New Jersey
Editorial Advisory Board – *Common Ground*
Co-editor – *Expert's Quarterly*

*Who's Who in American Education*
*Who's Who in New Jersey*
*Who's Who in American Business*
*Who's Who in Executives and Businesses*

Invited participant for the Oxford Round Table on Education Policy –
Sir William Blackstone Colloquium on Public School Law, Oxford, England.

Recognized by the National Forensic Center as a Distinguished Education Expert.
Awarded Diplomat status by the American Academy of Certified Consultants and Experts.

Invited to participate as a delegate to the Republic of South Africa as part of the Helen A. Kellar Institute for Human disAbilities, Graduate School of Education, George Mason University.

Institute of Management Consultants, Princeton Chapter – Past Vice President.

Rotary International, Hopewell Valley Chapter – Co-chairperson, International Committee.

Recognition Award – Radio America for "Commitment to Community Service Radio."

Research Fellow – Institute on Education Law and Policy, Center for Law and Justice, Rutgers University School of Law.

Advisor – National Invitational Conference on School Choice & Urban Education Reform, Center for Law and Justice, Rutgers University School of Law – January 2001.

Presenter at the Institute on Legal Issues of Educating Individuals with Disabilities – May 2001

Lambertville Education Foundation – Vice President

Moderator – Special Education Presentation – Education Law Association Annual Conference – November 2002

## PUBLICATIONS

*The Administrative Principal in New Jersey – Role and Function,* Rutgers University, 1987.

*Breakthrough – Successful Special Education Programs in the High School,*
New Jersey State Department of Education, 1990.

Bridging the Gap, *Channels – A Journal for Special Educators,* Fall 1992.

Transition Planning – What Schools Need to Know, *CEC Today,* November 1994.

10

Accountability and Special Education: Planning for Results,
*National Association of Secondary School Principals Journal,* January 1995.

Accountability and Special Education: An Impossible Dream?,
*The Journal of School Business Management,* January 1995.

Role of the Education Expert in Litigation Support, *New Jersey Lawyer,* January 1995.

The Myth of Separate Education, *School Leader,* March/April 1995.
A Case Against Inclusion, *Nolpe Notes,* April 1995.

The Inclusion Confusion, *Education,* Winter 1995.

What Can You Do With Classified Pupils with Behavior Problems?, *Nolpe Notes,* May 1995.

What to do About Classified Pupils with Behavior Problems,
*Pennsylvania Schoolmaster,* June 1995.

Creating & Maintaining Effective Schools for All Children, *Common Ground,* September 1995.

Controlling That Special WorkLoad, *Management in Education,* England, September 1995.

The Educator as a Consulting and Testifying Expert, *The Virginia Bar Association Journal,* Winter 1996.

After a Due Process Decision, Then What?, *The School Administrator,* March 1996.

How to Develop an Attorney – Consultant Team, *Pennsylvania Bar News,* August 12, 1996.

Litigation Support: The Educator Expert, *Bar Bulletin, Maryland State Bar,* September 1997.

Regular Assessment of School Procedures Can Reduce Risks, *School Safety,* Spring 1998.

Experts, Lawyers Should Work As a Team for the Best Results, *The Testifying Expert,* March 1998.

Schools: What Are Our Priorities,? *School Planning and Management,* August 1999.

Is it Reasonable? Accommodations for Students with Disabilities at Colleges and Universities,
*Administrator,* September 1999.

Litigation in Schools: How an Education Expert Can Benefit Your Case, *American Journal of Trial Advocacy,* November 1999.

Disability Harassment, *Enabled On Line,* November 2000

Education Choice: The Legal Issues and Meeting the Challenges of Students with Disabilities, *Institute on Education Law & Policy,* January 26, 2001.

Litigation in Schools: How an Education Expert Can Benefit Your Case, *Nebraska Law Journal,* March 2001.

Litigation in Schools: How an Education Expert can Benefit Your Case, *Wisconsin Law Journal,* August 2001.

Recommendations for Addressing Violence in Schools, *Voices from the Field: The Journal of the National High School Association,* Spring 2002.

11

How an Education Expert Can Assist with Child Custody Solutions, *Michigan Lawyers Weekly*, July 29, 2002.

Sexual Harassment in Schools: Protecting Students from School Staff and Protecting School Staff from Students, Manuscript submitted for publication, May 2003.

Experts and Lawyers: Team for Results, *North Carolina Lawyers Weekly*, September 8, 2003.

Experts and Lawyers: Team for Results, *South Carolina Lawyers Weekly*, September 8, 2003.

**RECENT SPEAKING ENGAGEMENTS, SEMINAR AND WORKSHOP PRESENTATIONS, AND RADIO AND TELEVISION SHOWS**

Presented as a keynote speaker, workshop coordinator, and guest lecturer at over 80 locations on an international basis. A sample of topics include:

Giftedness, Transition Planning for Schools
Administrative Collaboration
Elements of Change
Inclusive Education Planning and Structure
How to Avoid Litigation in Special Education
Programs That Work in Secondary Education
Strategic Planning and the Mission of Special Education
Complaint Investigation
Due Process and Mediation
Special Education Program Design
Special Education Regulations and Their Implementation

*Initial Steps for Developing a Caring School.* Featured presentation at Highland Park School District, 1992.

*Providing Effective Leadership and Administrative Collaboration.* Presented at the Rowen and Kean College Education Conference, October 1992.

*New Way of Looking at Special Education.* Featured presentation at the New Jersey Education Association Convention, Atlantic City, November 1992.

*The Future of Special Education.* Feature presenter at Rutgers University, November 1992.

*The Inclusion Confusion: How to Stay in Control and Out of Litigation.* Presented at the New Jersey Association of School Administrator's Spring Conference, 1996.

*Disciplining Pupils with Disabilities: What Can You Do? How to Stay Out of Litigation.* Presented at the New Jersey Federation Council for Exceptional Children Spring Conference, 1996.

*The National Charter School Movement: How to Organize and Evaluate.* Featured guest on WOGL-FM Radio, Philadelphia talk show with host Mr. Barry Segal, August 1996.

*The Inclusion Confusion: How to Stay in Control and Out of Litigation.* Seminar presented at the New Jersey Association of School Administrator's continuing education program, September 1996.

*Accountability and Special Education: Is it Possible?* Presented at the New Jersey School Boards Association Conference, Atlantic City, October 1996.

12

*Accountability and Special Education: Is it Possible?*  Presented at the New Jersey School Boards Association Conference, Atlantic City, October 1997.

*Reducing Costs, Improving Quality of Instruction, and Minimizing Risk of Litigation.* Guest on WSNJ-FM Radio talk show with host Mr. Paul Hunsberger, November 1996.

*Assistive Technology – Gateway to Appropriate Instruction.*  Keynote address presented at the Ocean County Special Education Conference, December 1996.

*Serving the Needs of Students with Disabilities in Charter Schools: Law and Practice.*  Presented at the annual conference of the Education Law Association, Seattle, November 1997.

*Money Damages in School and Education Cases.* Featured presenter at the Education Law Committee of the Connecticut Bar Association, January 1998.

*Risk Management in Schools.*  Featured guest interviewed by Lynn Doyle on Comcast Newsmakers, The Comcast Television Network covering the New Jersey and Pennsylvania region. January 1998.  Aired on CNN Headline News.

*Response to President Clinton's Education Spending Proposal.*  Featured guest interviewed by Donna DePetro on News 12 New Jersey, January 1998.

*Including Students with Disabilities in Classrooms with Students who are Not Disabled.*  Featured guest on Family Talk, a one-hour live broadcast presented on CN8, Comcast Television Network, April 1998.

*Serious Injuries – The Duty to Supervise.*  Presented at the Franklin Pierce Law Center Summer Education Law Institute, August 1998.

*The United States Focus on Civil Education.*  Presented at The Prague Post Foundation's International Roundtable on Education for Civil Society, Prague, Czech Republic, November 1998.

*Education Law Issues in the United States – Focus on Civil Rights.*  Interviewed by Ms. Marketa Kastankova, Radio Praha, Prague, Czech Republic, November 1998.

*Serious Injuries: The Duty of Schools to Supervise Students.*  Presented at the Connecticut Bar Association Annual Conference, January 1999.

*Sexual Orientation Minorities: Harassment, Hostile Environment Issues and Planning School Supports.* West Windsor-Plainsboro School District, March 1999.

*Time Management for Teachers and Making Accommodations for Students with Disabilities.*  Presented via direct long distance conferencing to the Lincoln School, San Jose, Costa Rica, April 1999.

*Education Experts: Key to Effective Discovery in School Cases,* Interviewed by Eric Berkman, Lawyers Weekly USA, published August 23, 1999.

*Legal Issues of Educating Students with Disabilities.* Featured guest on Family Talk, a one-hour live broadcast presented on CN8, Comcast Television Network, September 28, 1999.

*Inclusive Education: The Second Generation – What it Really Takes to Make it Work,* Featured Group Session Speaker, New Jersey School Boards Association, New Jersey Association of School Administrators Conference, October 27, 1999.

*Managing for Successful Educational Programs – What the Research Says About Schools That Include All Students.* Presentation to the staff of Lincoln School, San Jose, Costa Rica, November 1999.

13

*Individuals With Disabilities Education Act In New Jersey.* Presentation as a faculty member of Lorman Education Services, New Brunswick, NJ, April 24, 2000.

*Hot topics In School Law.* Presentation as a faculty member of Lorman Education Services, Cherry Hill, NJ, May 24, 2000.

*School Safety Issues: How to Cut Down on Litigation and Protect Students.* Exclusive guest expert on WCTC Radio, Central New Jersey. Interview and audience call-ins with host Bernard Spigner, August 8, 2000.

*School Safety: What Administrators and Teachers Need to Do,* WWOR Television, New York. Public service announcement airing for one week during the week of August 14, 2000.

*Disability Harassment: What Parents and Schools Should Know.* CN8, The Comcast Network. Guest expert on Family Talk with Mary Amaroso, September 6, 2000.

*Including Students With Disabilities in Typical Classrooms: All Students Can Benefit,* WWOR Television, New York. Public service announcement airing during the week of September 10, 2000.

*Appropriate Education for All Students: Issues of Inclusion.* CN8, The Comcast Network. Exclusive guest expert on the one-hour talk and call-in show Family Talk with Mary Amaroso, September 12, 2000.

*Pennsylvania Individuals with Disabilities Education Act: Appropriate Placement of Students with Disabilities and the Least Restrictive Environment,* Harrisburg, PA, October 27, 2000.

*Connecticut Individuals with Disabilities Education Act: Appropriate Placement of Students with Disabilities and the Least Restrictive Environment,* Shelton, CT, November 28, 2000.

*Hot Topics in Pennsylvania School Law: Sexual Harassment of Students: Recent Case Law,* Philadelphia, PA, December 6, 2000.

*Writing and Revising Student Handbooks and Other Related School Issues in Massachusetts: Student Harassment – Recent Case Law,* Boston, MA, December 15, 2000.

*Writing and Revising Student Handbooks and Other Related School Issues in Delaware: Student Harassment – Recent Case Law,* Wilmington, DE, February 9, 2001.

*What is an Education Expert?* Hopewell Valley Rotary Club, Hopewell, NJ, February 21, 2001.

*Writing and Revising Student Handbooks and Other Related School Issues in New Jersey: Student Harassment – Recent Case Law,* Cherry Hill, NJ, March 20, 2001.

*Writing and Revising Student Handbooks and Other Related School Issues in Pennsylvania: Student Harassment – Recent Case Law,* Philadelphia, PA, April 5, 2001.

*New Jersey Individuals with Disabilities Education Act: Appropriate Placement of Students with Disabilities and the Least Restrictive Environment,* New Brunswick, NJ, April 24, 2001.

*The Six Principles of the Individuals with Disabilities Education Act,* Development Disabilities conference, Clinton, NJ, April 28, 2001

*Disability Harassment Is No Laughing Matter: Liability of Schools and Recent Case Law,* 22nd National Institute on Legal Issues of Educating Individuals with Disabilities, Las Vegas, NV, May 7-10, 2001.

14

*School Liability: School Liability for Administrators, Sexual Harassment of Students,* New Brunswick, NJ, May 11, 2001.

*Sexual Harassment of Students,* Mount Laurel, NJ, June 7, 2001.

*Teacher Appraisals and Dismissals,* Mount Laurel, NJ, October 11, 2001.

*School Violence Issues: Protecting Our Schools, Issues of student-to-student and staff-to-student sexual harassment,* Parsippany, NJ, May 24, 2002.

*The IDEA, Section 504 and the ADA: Impact Upon Decisions Regarding Students and Staff in New Jersey,* Parsippany, NJ, July 29, 2003.

*Section 504 vs. The Idea: The Impact of Disability Laws on Students and Staff in New Jersey,* Mount Laurel, NJ, October 17, 2003

*Sexual Harassment in Schools: Protecting Students from School Staff and Protecting School Staff from Students,* Education Law Association Conference, Savannah, GA, November 15, 2003.

October 2003.

# EDWARD F. DRAGAN, Ed.D

## Supplement to Resume

### Deposition and trial testimony.

1.  C.T. v. Ocean City Board of Education – Trial testimony.  New Jersey Administrative Court, New Jersey Superior Court, Atlantic County, NJ, August 20, 1993.

2.  G.K. v. Roselle Board of Education – Trial testimony.  New Jersey Administrative Court, Newark, NJ, November 1, 1994.

3.  B.M. v. Abington Board of Education – Trial testimony.  Pennsylvania Administrative Court, Bucks County, PA, June 6, 1994.

4.  C.F. v. Summit Board of Education – Trial testimony.  New Jersey Administrative Court, Newark, NJ, June 29, 1995.

5.  B.M. v. Union County Regional High School Board of Education – Trial testimony.  New Jersey Administrative Court, Newark, NJ, January 23, 1995.

6.  S.M. v. Bergenfield Board of Education – Trial testimony.  Judge Marie Simonelli, New Jersey Administrative Court, Newark, NJ, November 19 and 20, 1996.

7.  J.T. v. Barnegat Township Board of Education - Deposition, March 14, 1997.

8.  B.K. v. Brick Board of Education – Trial testimony.  Judge Martone, New Jersey Administrative Court, Quakerbridge, NJ, November 4, 1997.

9.  Doe v. Jody's, Inc. - Deposition, December 1, 1997.

10. M.B. v. Diocese of Rockville Center – Trial testimony.  Judge Ralph P. Franco, Supreme Court, State of NY, Nassau County, NY, January 20, 1998.

11. Doe v. Jody's, Inc. – Hearing, Magistrate Judge Wolfson, US District Court, District of NJ, Trenton, NJ, March 18, 1998.

12. The City of Cedar Falls v. Cedar Falls School District – Trial testimony.  Judge Stephen Clarke, Iowa District Court, Black Hawk County, Waterloo, Iowa, July 2, 1998.

13.    J.T. v. Barnegat Township Board of Education – Trial testimony.  Judge Martone, New Jersey Administrative Court, Quakerbridge, NJ, September 22, 1998.

14.    R.M. v. Jefferson Township Board of Education – Deposition, December 22 and 23, 1998.

15.    P.A., et al v. Clover Park School District, Washington – Deposition, March 2, 1999.

16.    P.A., et al v. Clover Park School District, Trial Testimony.  Superior Court of Washington, Tacoma, Washington, May 10, 1999.

17.    S.G. v. New Brunswick Board of Education – Deposition, August 17, 1999.

18.    N.L. for L.L. v. Montville Township Board of Education – Trial testimony.  Judge Richard McGill, New Jersey Administrative Court, Newark, NJ, October 5, and 7 1999.

19.    J.E. v. Ridgewood Board of Education – Trial testimony.  Judge Richard McGill, New Jersey Administrative Court, Newark, NJ, January 11, February 8, and March 16, 2000.

20.    T.H. v. Stanwood Board of Education, Seattle, Washington – Deposition, March 10, 2000.

21.    E.C. v. Clearview Regional Board of Education – Deposition, June 1, 2000.

22.    D.G. v. Association for Help of Retarded Children – Hearing, Justice Alan D. Oshrin, Superior Court, State of New York, May 15, 2001.

23.    Ramirez v. Ramirez – Court Testimony – Judge Warren Donohue, Montgomery County Circuit Court, Gathersberg, MD, October 15, 2001.

24.    R.M. v. West Windsor-Plainsboro Regional Board of Education – Deposition, December 4, 2001.

25.    A.R. and A.A. v. Houston Independent School District – Deposition, January 15, 2002.

26.    A.M.M. and M.E.M. v. Las Lomitas School District, et als. – Deposition, June 3, 2002.

27.    J.R. v. Paterson Board of Education, et als. – Deposition, July 23, 2002.

28.    White v. Okeechobee County School Board.  In the Circuit Court of the Nineteenth Judicial Circuit in and for Okeechobee County, State of Florida –

2

Deposition, July 25, 2002.

29.    J.R. v. Paterson Board of Education, et als. – Judge Thomas F. Brogan, In the Superior Court of New Jersey – Trial testimony, September 12, 2002.

30.    Roberson v. Newark Board of Education – Judge Mary C. Jacobson, In the Superior Court of New Jersey – Trial testimony, October 24, 28, 2002.

31.    Kolash v. Vermont Center for the Deaf and Hard of Hearing, Inc., et al. In the United States District Court, District of Massachusetts – Deposition, December 17, 2002.

32.    Kolash v. Vermont Center for the Deaf and Hard of Hearing, Inc., et al. In the United States District Court, District of Massachusetts, Boston, Massachusetts, Civil Action No.: 01CV12351RGS – Trial testimony, April 16, 2003.

33.    Witcher v. Division of Youth & Family Services, et als. In the Superior Court of New Jersey Law Division Essex County. Docket No.: Esx-L-000429-01 – Deposition, May 22, 2003.

34.    Doe v. Cicero School District #99. In the Circuit Court of Cook County, Illinois, County Department, Law Division. Docket No.: 01 L 3617 – Deposition, October 10, 2003.

35.    Howard v. Pearl River Community College. In the Circuit Court of Pearl County, Mississippi. Cause No.: 2002-0498 – Trial testimony, October 15, 2003.

Revised November 1, 2003.

3

> # In the Matter of
> # Shuman and Shertzer
> # v.
> # Penn Manor School District, et al.

In the United States District Court
For the Eastern District of
Pennsylvania

Civil Action No. 02-CV-3594

Supplemental
Case Review
and
Consultant Report

Submitted to:
Deirdre A. Agnew, Esq.
Law Offices of Deirdre A. Agnew
1450 East Boot Rd.
West Chester, PA 19380

Completed by:
Edward F. Dragan, Ed.D.
Education Management Consulting, LLC
24 Arnett Ave., Suite 102
Lambertville, NJ 08530

November 12, 2003

---

**Shertzer and Shuman**
**v.**
**Penn Manor School District, et al.**

---

## INTRODUCTION

In accordance with the notice in my expert report on this matter dated October 30, 2003, as a consulting expert on this case, I reserved the right to modify or supplement reports as additional information is made available or as additional tasks are assigned. Such tasks may include, but are not limited to, review of additional records and/or transcripts of depositions, interviews, and research.

On November 6, 2003, I received additional documents not previously provided for review and analysis. Upon my review and analysis of the documents, I have determined that they are significant to my opinions in this case. Therefore, I am submitting this supplemental report.

## GOAL OF THE ASSIGNMENT

The goal of the assignment is to render an opinion as to whether the documents listed in the Consultant's Methodology section below affect the opinions that I made in my report dated October 30, 2003. Another goal of the assignment is to render an opinion as to whether, based upon my background, training, and experience, the documents constitute sufficient investigative documentation concerning the alleged sexual harassment incident between Joshua Shuman and Olivia Becker.

## CONSULTANT'S METHODOLOGY

Before preparing this supplemental report, I reviewed the following additional documents:

2

1.    Handwritten document identified as Mr. Gale's notes with the heading "Olivia Becker 10th" at the top; and

2.    Handwritten document identified as Mr. Gale's notes with the heading "Jeremy Fritsch" at the top.

## SUMMARY OF OPINIONS

It is my opinion, based upon a reasonable degree of probability in the fields of education and education administration and supervision and student supervision that the District, through its employees, failed to meet the standard of professional care when it responded to the allegations of sexual harassment presented by Olivia. The handwritten document identified as Mr. Gale's notes with the heading "Olivia Becker 10th" at the top only lists information provided by Olivia. There are also names of four students listed on the document. A review of all the documents in this case failed to produce any evidence that any of the four listed student names were interviewed.

The handwritten document identified as Mr. Gale's notes with the heading "Jeremy Fritsch" at the top indicates that Jeremy Fritsch observed behavior contrary to Olivia's verbal allegation. A review of all the documents in this case failed to produce any evidence that this information, known by Mr. Gale, was further investigated.

The documents fail to constitute sufficient investigative documentation. Therefore, my review and analysis of these documents reinforce my opinion that the District, through its employees, breached the standard to investigate Olivia Becker's allegation. Further, my review and analysis of these documents reinforce my opinion that the District, through its employees, breached the standard to continue the investigation once Mr. Gale had notice that a witness contradicted Olivia's allegation.

3

The District, through its employee, breached the standard in the field of education administration and supervision, and its own standard, by failing to conduct a thorough investigation into the allegations of Olivia on December 10, 2001. The District, through its employee, breached the standard in the field of education administration and supervision, and its own standard, by failing to conduct a thorough investigation following the statements made by Jeremy Fritsch, who indicated that he was an eyewitness to the activities that occurred between Joshua and Olivia.

I base this opinion on the following:

1. My review and analysis of the notes taken by Mr. Gale on December 10, 2001 indicates that the District breached its own standard requiring that the principal "shall" conduct a thorough investigation and "shall" prepare a written report summarizing the investigation and recommending disposition of the complaint. Although the note lists four friends who Olivia talked to, there is no evidence in the record that Mr. Gale, or any other administrator from the school, spoke with any of those students about the allegations. In fact, three of the four individuals whose names appear on Mr. Gale's note could not recall ever being called to the office and interviewed by Mr. Gale or any other administrator. (The fourth student is now deceased.)

2. My review and analysis of the notes taken by Mr. Gale when he interviewed Jeremy Fritsch in late January 2002 indicates that the District, through its employees, breached its own standard to conduct a thorough investigation into the allegation by Olivia, in light of Jeremy Fritsch's observation. Jeremy Fritsch's observation, as recorded by Mr. Gale, raised potential problems regarding the discipline of Joshua. Specifically, this information raised the issue of whether the conduct between Olivia and Joshua was

4

consensual. This information should have caused Mr. Gale to continue the investigation into the allegation of Olivia. Although the note indicates that Jeremy Fritsch stated he saw Olivia pull Joshua's hand to her crotch, there is no indication in the record that Mr. Gale ever continued the investigation in order to substantiate the observation and reach an appropriate decision. Although the note indicates that Jeremy Fritsch said something to Ms. Fay (about his observation) on Monday (following the allegation on Friday), there is no indication in the record that Mr. Gale ever continued the investigation or interviewed Ms. Fay regarding Jeremy Fritsch's statement in order to verify Olivia's allegation and to reach a fair decision.

## DISCUSSION

The standard in the field of education and education administration and supervision prohibits sexual harassment. Whether it is a student or employee complaining, the school is responsible for responding effectively. Once a school has notice of possible sexual harassment of a student, it should take immediate and appropriate steps to resolve the situation. This requires a thorough inquiry or investigation and documentation of the investigation.

The standard in the field regarding witnesses to alleged sexual harassment indicates that the individual who conducts the investigation is to ask the alleged harasser if any witnesses can rebut the allegations. In this situation, neither Mr. Gale nor any other administrator in the District ever asked Joshua to present any witnesses. In fact, Mr. Gale indicated that it was not his role or responsibility to ask Joshua if he had any witnesses.

The standard also indicates that the individual conducting the investigation is to interview any witnesses or others with knowledge of the incident. A review of the new documents verifies that, although Olivia provided the names of four of

5

her friends to whom she described the allegation, neither Mr. Gale nor any other administrator interviewed these students because there are no notes of any witness interviews.

With regard to witnesses, the standard is to ask the witness if he or she knows of the behavior that is the subject of the complaint. The investigator should solicit specific details, including: *"What do you know?"* *"What incidents did you see?"* *"Where?"* *"When?"* *"Have you seen [the alleged offender] behave this way before?"* The investigator should ask if the witness knows of any other potential witnesses and repeat the process of questioning with those individuals. The investigator should not limit interviews to the individuals identified by the parties. With regard to this case, it appears that neither Mr. Gale, nor any other administrator interviewed anyone other than Olivia and Joshua on December 10, 2001 and Jeremy Fritsch in late January after Joshua was already suspended. When reaching conclusions, the individual should ensure that they are based on careful consideration of the facts. The District, through its employees, created an unfair context wherein a decision to take disciplinary action against Joshua was made before obtaining all the information.

When investigating complaints, the individual investigating should document everything. Detailed notes, including quotes, should be part of the documentation. A review of the documents failed to produce evidence that the District, through its employees, developed detailed notes, including quotes, or that any documentation existed except for the two new documents reviewed for the completion of this supplemental report.

Once an investigation is complete, it is best to document what happened and why. At a minimum, the school should document:
1.    the conclusions reached;
2.    how the complaint was resolved; and
3.    what evidence the conclusions were based upon.

6

Jeremy Fritsch reported to Mr. Gale, as evidenced by Mr. Gale's handwritten note, that he saw Olivia pull Joshua's hand to her crotch and that he reported this to Ms. Fay.  Although Mr. Gale made a note of Jeremy Fritsch's report to him indicating that Jeremy Fritsch saw Olivia pull Josh's hand to her crotch, Mr. Gale provided inconsistent testimony regarding this fact.  He indicated that Jeremy Fritsch did not see anything while he was in the class. (Gale 133) This is contrary to his own report of what Jeremy Fritsch reported.   With this knowledge, Mr. Gale had the responsibility to continue the investigation by seeking additional witnesses.  This should have been accomplished by asking Jeremy Fritsch if he knew of any other students in the class who may have observed the behavior.  In addition, Mr. Gale should have approached Joshua and asked him to provide a list of witnesses who may have observed the behavior.  He also should have interviewed the substitute teacher.  The interviews of named witnesses should have been supplemented by interviews of, at least, a sample of the rest of the students in the class.  Detailed notes should have been kept of the questions asked of the witnesses and potential witnesses, and their responses.

It is likely that, had Mr. Gale continued the investigation based upon the information shared by Jeremy Fritsch, it would have been determined that the actions between Joshua and Olivia were consensual.  In response to this conclusion any reasonable administrator under the same or similar circumstances would apply equitable and fair treatment to both students by assigning some form of discipline to both, not just Joshua.  Some discipline was warranted to both Joshua and Olivia because of their behavior.  That discipline would more appropriately have been detention for both of them rather than suspension for only Joshua for four days.  In addition, had the determination been made that the conduct was mutual and consensual any reasonable

7

administrator under the same or similar circumstances would have expunged the record of the sexual harassment and resulting discipline involving Joshua.

## SUMMARY

My review and analysis of the additional documents strengthens my original opinion that the District, through its employees, failed to take appropriate and reasonable steps to adequately investigate the initial allegation of Olivia and to follow up on additional information from an eyewitness.  It is likely that, had the appropriate and reasonable steps been taken initially, Joshua would not have been suspended for four days.  Further, it is likely that, had the appropriate and reasonable steps been taken when a witness presented new evidence, Joshua's discipline record would have been expunged.

## ATTORNEY INFORMATION

Deirdre A. Agnew, Esq.
Law Offices of Deirdre A. Agnew
1450 East Boot Rd.
West Chester, PA 19380
610-738-4800

## NOTICE

As a consulting expert on this case, I reserve the right to modify or supplement this report, and the opinions herein contained, as additional information is made available or as additional tasks are assigned.  Such tasks may include, but are not limited to, review of additional records and/or transcripts of depositions, interviews, and research.

EDWARD F. DRAGAN, ED.D., MEL, CMC

8