---

# In the Matter of
# Shuman and Shertzer
# v.
# Penn Manor School District, et al.

---

In the United States District Court
For the Eastern District of
Pennsylvania

Civil Action No. 02-CV-3594

Case Review
and
Consultant Report

Submitted to:
Deirdre A. Agnew, Esq.
Law Offices of Deirdre A. Agnew
1450 East Boot Rd.
West Chester, PA 19380

Completed by:
Edward F. Dragan, Ed.D.
Education Management Consulting, LLC
24 Arnett Ave., Suite 102
Lambertville, NJ  08530

October 30, 2003

| Shertzer and Shuman |
| v. |
| Penn Manor School District, et al. |

## GOAL OF THE ASSIGNMENT

The goal of the assignment is to render an opinion as to whether the Penn Manor School District (District), through its employees, acted within the standard of professional care in the field of education and education administration and supervision regarding Joshua Shuman, a student enrolled in the Penn Manor High School, during the 2001-2002 school year.

The opinions expressed in this report are within a reasonable degree of probability in the fields of education and education administration and supervision. The opinions are based upon standards articulated by the State of Pennsylvania and the District as well as common and accepted practices in these disciplines and my experience and training as a teacher, school administrator, and adjunct professor of educational administration.

## QUALIFICATIONS OF CONSULTING EXPERT

My education includes a master's degree in special education, with a focus on administration, a doctoral degree in education administration and supervision, with a focus on staff supervision and policy development and implementation, and a master's degree in education law. I also have an extended background in the education field. My experience includes school board superintendent, where I was responsible for the development of policies governing student discipline, student supervision, and harassment. It also includes principal, where I was responsible for the development of procedures governing student discipline, student supervision, harassment, and staff supervision. In this position, I trained teachers and other staff members on topics that included the supervision and discipline of students, what constitutes harassment, and what steps to take upon a report of harassment. In this

position, I also had the responsibility to investigate issues of student behavior and make determinations regarding appropriate discipline, including suspension. My opinions are based upon my years of experience as a state education administrator where I supervised and evaluated public and private school programs, services, and policies and procedures. The responsibilities of this position included, but were not limited to, providing consultation to schools regarding the supervision and discipline of students, including policies and procedures governing student harassment and discipline.   As an adjunct professor of Educational Administration, I provide information and instruction to school district personnel enrolled in graduate level classes on issues concerning student discipline, student supervision, sexual harassment, and staff supervision.

I am court-qualified as an education, education administration and supervision, special education, special education administration and supervision, student supervision and liability expert in numerous federal, state, and administrative courts around the country.

## CONSULTANT'S METHODOLOGY

Before preparing this report, I reviewed the following documents:

1. Complaint;
2. Plaintiff's Response to Motion to Dismiss Portions of Complaint;
3. Hearing transcript and ruling by Court on Motion to Dismiss Portions of Complaint;
4. Penn Manor High School Policy Manual;
5. Penn Manor High School Administrative Handbook;
6. Student File on Joshua Shuman;
7. Student File on Olivia Becker;
8. Personnel file and discovery responses of Janice Mindish;
9. Personnel file and discovery responses of Philip Gale;
10. Personnel file and discovery responses of Brian Baddick;
11. Personnel file of Carole Fay;

12.     Joshua's school re-enrollment forms for this year (now in 12th Grade);

13.     Summary of incident written by Joshua Shuman;

14.     Diagram of classroom drawn by Joshua Shuman;

15.     Joshua Shuman's discipline record for 10th grade;

16.     Olivia Becker's discipline record for 11th grade;

17.     Letter from High School to Teresa Shertzer dated December 10, 2001;

18.     Joshua Shuman's reinstatement of suspended student form;

19.     List of students in classroom provided by high school, including disciplinary actions taken that resulted in at least 4-day suspension of student for school years 2000-2001 and 2001-2002;

20.     Letter providing address of another student in class left off above list;

21.     Statement written by student witness Jeremy Fritsch;

22.     Complaint Joshua Shuman submitted to school claiming Olivia Becker made false accusations against him;

23.     Letter and memo from Attorney Henderson summarizing events at and leading up to Reinstatement Conference on December 14, 2001;

24.     Letter Attorney Deirdre Agnew sent to Superintendent dated January 24, 2002;

25.     Response from School Solicitor dated February 12, 2002;

26.     Defendant's Summary of Events;

27.     Rule 26 Disclosures from both sides;

28.     Interrogatories directed to Defendants;

29.     Defendants' Initial Responses to Discovery;

30.     Defendants' Three (3) Supplemental Responses to Interrogatories;

31.     Trial Orders in the case;

32.     Orders ruling on Motion to Dismiss Portions of Complaint;

33.     Joshua Shuman's psychotherapy records and report;

34.    Copies of School Code:

    a. 22 Pa. Code § 12.1 through §12.14

    b. 22 Pa. Code § 161.3

35.    Confidential communications statute – 42 Pa. C.S.A. § 5945;

36.    Copies of Local Agency Law;

37.    Penn Manor High School Student Handbook for the 2001/2002 school year;

38.    Penn Manor High School Student Handbook for the 2003/2004 school year;

39.    US Supreme Court Decision: Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975);

40.    Deposition transcript of Philip B. Gale and exhibits;

41.    Deposition transcript of Janice Mindish and exhibits;

42.    Deposition transcript of Brian D. Baddick and exhibits;

43.    Deposition transcript of Donald Stewart and exhibits;

44.    Deposition transcript of Joshua Shuman and exhibits;

45.    Deposition transcript of Teresa Shertzer and exhibits;

46.    Deposition transcript of Carole Fay and exhibits;

47.    Deposition transcript of Jeremy Fritsch and exhibits;

48.    Deposition transcript of Olivia Becker and exhibits;

49.    Deposition transcript of Jay Shaiebly and exhibits;

50.    Deposition transcript of Jennifer Nickle and exhibits; and

51.    Deposition transcript of Shawn Bachman.

## SUMMARY OF OPINIONS

It is my opinion, based upon a reasonable degree of probability in the fields of education and education administration and supervision and student supervision that the District failed to act within the standard of professional care.

It is my opinion that the District, through its employees, breached the standard in the field of education and that breach subjected Joshua to unfair and

mistaken exclusion from the educational process.  My review and analysis of the data indicates that the District's decision, through its employees, to suspend Joshua in this circumstance was not supported by the evidence.  The substantial rights of Joshua may have been prejudiced because the District's findings, inferences, and conclusions were unsupported by substantial evidence in view of the entire record that I reviewed.   A reasonable administrator faced with the same or similar circumstance would not consider the collected evidence to support a decision to suspend Joshua for four (4) days.  The District, through its employees, breached its duty to thoroughly investigate the complaint against Joshua and to provide an opportunity for a factual hearing before excluding him from the educational process for four (4) days.  This process would not have cost the District anything and it would not have interfered with the total educational process of the District.

I base this opinion on the following:

1.    There is a lack of substantial evidence which a reasonable administrator in the same or similar situation would regard as adequately supporting the conclusion that Joshua sexually harassed Olivia Becker;

2.    The decision to suspend Joshua for four (4) days was not supported by the evidence, was arbitrary and capricious, and an abuse of discretion on the part of the staff;

3.    District policy specifically provided for a factual hearing at which Joshua could contest the suspension, confront, and cross-examine witnesses who supported the charge, or call witnesses to verify his version of the incident.   The District, through its employees breached this standard when they suspended Joshua for four (4) days and failed to appropriately provide such a hearing;

4.    According to the Penn Manor Policy Manual, Section 248, when a student brings a complaint against another student for unlawful harassment, the Principal shall conduct a thorough investigation

and shall prepare a written report summarizing the investigation and recommending disposition of the complaint. Copies of the report "shall" be given to the complainant, the accused, the Superintendent, and others directly involved. The District, through its employees, breached this standard by failing to conduct a thorough investigation of the allegations. The District, through its employees, breached this standard by failing to prepare a written report summarizing the investigation and recommending disposition of the complaint. The District, through its employees, breached this standard by failing to provide copies of the report to the complainant, the accused, the Superintendent and others directly involved;

5.      The District, through its employees, breached its standard of investigating allegations of harassment by failing to notify the Superintendent of the allegations, failing to conduct an impartial investigation, failing to conduct a thorough investigation, and failing to prepare a written report in a timely manner that summarized the investigation and recommended disposition of the complaint. The investigation that the Board conducted through its employees was not able to substantiate the charge of harassment. Even so, disciplinary action was arbitrarily taken against Joshua and he was denied access to his education as a result of being suspended;

6.      The District, through its employees, and in particular Mr. Gale and Mr. Baddick, acted unreasonably when Joshua was detained and interrogated for a period of three to four hours and threatened with police action;

7.      Mr. Philip B. Gale, Assistant Principal, failed to conduct an adequate investigation of the charges against Joshua before making a determination to suspend him for four (4) days. In the course of this failure he did not interview students in the class that

Joshua and Olivia were attending nor did he interview the teacher and;

8. The District, through its employees, breached the standard in the field of education and education administration and student supervision when Mr. Gale failed to inform Joshua that since a suspension for more than three (3) days was being considered, Joshua had the right to talk with and question Olivia;

9. The District policy, articulated by Mr. Gale, is that inappropriate conduct, in the context of student discipline, is the same as sexual misconduct and that sexual misconduct is consensual. The eyewitnesses to the activity between Joshua and Olivia state, except for Olivia, that the conduct was consensual. Therefore, in this case, the District, through its employees, failed to afford Joshua equal treatment by not disciplining Olivia under the same standard;

10. The District, through its employees, did not reasonably consider the fact that Mr. Gale may have accepted fact statements from three students who did not witness the activities in the class. Olivia told these students, according to Mr. Gale, her version of the occurrences of the day. However, two of the three students testified that they do not recall talking with anyone in the administration or ever talking with Olivia about the incident. The third student has died. Mr. Gale failed to conduct an adequate investigation into these statements and used this alleged student information to help make the decision to discipline Joshua by suspending him for four (4) days, denying him access to his education;

11. The District, through its employees, breached the standard articulated by the Pennsylvania Department of Education Code regarding the exclusion of students from school. Even though Joshua's suspension exceeded three school days, the District, through its employees, failed to provide Joshua and his parent the

opportunity for an informal hearing consistent with state requirements;

12. The District, through its employees, breached the standard articulated by the Pennsylvania Department of Education Code and its own standard regarding hearings and the proper elements of due process. There was no informal hearing provided for Joshua, although the suspension exceeded three school days. The District, through its employees, failed to provide Joshua's parents notice of the time and place of an informal hearing. The District, through its employees, failed to provide Joshua with the right to question any witnesses at a hearing. The District, through its employees, failed to provide for Joshua to exercise his right to speak and produce witnesses on his behalf. The District failed to offer to hold the informal hearing within the first five days of the suspension;

13. The District, through its employees, breached the standard pursuant to the United States Supreme Court decision in Goss v. Lopez when it failed to provide Joshua, who was facing temporary suspension, with an explanation of the evidence that the school administrators claimed that they had;

14. The District, through its employees, breached the standard when it failed to provide Joshua and his mother with access to the details of the claim that Olivia was making and failed to supply Ms. Shertzer with even Olivia's name;

15. The District, through its employees, breached its standard regarding unlawful harassment. There is no indication in the record that the building principal immediately, upon the allegation of Olivia, notified the superintendent or other designated administrator. The record indicates that Mr. Gale failed to conduct an impartial and thorough investigation of the alleged harassment since no potential witnesses were interviewed, including students who were in the class with Joshua and Olivia, as well as the teacher who was in

charge of the class.  There is no evidence in the record that the building principal prepared a written report summarizing the investigation and recommending disposition of the complaint, and that copies of the report were provided to the complainant, the accused, the superintendent and others directly involved;

16.    The District, through its employees, breached their standard when the Superintendent/Acting Superintendent was presented with evidence of potential problems regarding the discipline of Joshua and failed to appropriately act.

## DISCUSSION

The discussion section of this report presents in detail the information upon which the above opinion is based.  The discussion begins with a review of the pertinent section of Goss v. Lopez as it relates to the standard of care in the field of education administration and student supervision.  Next it will address the education code of the State of Pennsylvania.  It continues with a review of the policies of the Board of Education of the District.  Next, the discussion section will present a description of the incident that occurred on December 7, 2001.  Finally, the section will present a description of the response to the incident by the school and district officials, and whether the response was within the standard of professional care in the field of education and education administration and supervision.

**Goss v. Lopez.**

Due process requires that every individual have an opportunity to know the evidence against him or her.  The general rule requiring evidence be released to the accused is directly in keeping with the due process standard of Goss v. Lopez.  Administratively, the standard of Goss v. Lopez requires that for students facing temporary suspension that the student be given oral or written

notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.

**Pennsylvania Education Code.**

The State of Pennsylvania specifies administrative code, which sets the standard of professional care in the field of education and education administration and supervision in the public schools in the state. Pennsylvania Code Chapter 22 Section 12.6 is entitled "Exclusions from School." This standard indicates that the board of school directors shall define and publish the types of offenses that would lead to exclusion from school. Exclusion from school may take the form of suspension or expulsion. Suspension is exclusion from school for a period of from one to 10 consecutive school days. According to the standard, no student shall be suspended until the student has been informed of the reasons for the suspension and given an opportunity to respond. Prior notice of the intended suspension need not be given when it is clear that the health, safety, or welfare of the school community is threatened. The standard requires that the parents and the superintendent of the district shall be notified immediately in writing when the student is suspended. When the suspension exceeds three school days, the student and parent shall be given the opportunity for an informal hearing consistent with the requirements set forth in Section 12.8 (relating to hearings).

Pennsylvania Code Chapter 22 Section 12.8 is entitled "Hearings." This section of the education code specifies that education is a statutory right, and students must be afforded all appropriate elements of due process if they are to be excluded from school. The code provides for an informal hearing. The purpose of the informal hearing is to enable the student to meet with the appropriate school official to explain the circumstances surrounding the event for which the student is subject to suspension or to show why the student should not be suspended. The informal hearing is meant to encourage the student's parents or guardian to meet with the principal to discuss ways by which future

offenses can be avoided.  The following due process requirements are to be observed concerning the informal hearing:

1. Notification of the reasons for the suspension shall be given in writing to the parents or guardian and to the student;

2. Sufficient notice of the time and place of the informal hearing shall be given;

3. A student has the right to question any witnesses present at the hearing;

4. A student has the right to speak and produce witnesses on his own behalf; and

5. The district shall offer to hold the informal hearing within the first five days of the suspension.

**Penn Manor School District Policies.**

The Penn Manor School District has the authority to adopt policies for the guidance of the Superintendent in the operation of the school district.  The policies shall be consistent with law, have a rational and substantial relationship to a legitimate purpose of the Board, and be directed towards the maintenance and support of a thorough and efficient system of public education in the district. (Board Policy Number 002.)

Mr. Philip B. Gale, Assistant Principal in August of 2000 (Gale 12:5) indicated that there are specific policies that he has to follow during the discipline process. (Gale 19:18)  The school district policy manual (Gale 19:21) contains them and there is information in the student handbook (Gale 19:24) and the high school administrative handbook. (Gale 20:2)  In explaining the District policy concerning discipline of students, Mr. Gale indicated that if there is a student-to-student complaint he interviews the accused. (Gale 21:1)  He also indicated that he interviews witnesses. (Gale 22:25)  According to Mr. Gale, if something happened in a classroom he would interview the students in that classroom (Gale 23:12) and he would talk to the teacher if the teacher were in the room. (Gale

23:23)  According to Mr. Gale, there is an informal hearing for suspensions longer than three (3) days. (Gale 25:14)  Ms. Mindish is not normally directly involved in routine discipline matters but is involved through discussions with administrators. Mr. Gale stated that the student accused of something can request to talk with the accuser (Gale 26:7) but he does not tell them that. (Gale 26:10)  Additionally, Mr. Gale indicated that if there are witnesses the accused student is given the opportunity to come back at a later time after doing his own investigation (Gale 30:4) but he does not tell the student that. (Gale 30:6)  Ms. Mindish indicated that parents are to be notified once there is a decision to suspend a student. (Mindish 46)  Mr. Gale indicated that the District detains a student only once there has been a decision to discipline, which is likely to result in exclusion from school such as a suspension. (Gale 34, 35)

There is much conflict in the record regarding the District's policy concerning informal hearings when a student is considered for suspension for more than three days.  Mr. Gale indicates that an informal hearing is held during the time of the investigation.  Mr. Baddick also indicates that the informal hearing is held during the investigation.  However Ms. Mindish indicates that the informal hearing is held when the parent picks up a child who has been suspended which is after the investigation.   The District solicitor, Mr. Robert M. Frankhouser, indicates that the informal hearing is held during a student reinstatement conference, which is after the suspension is served.

The Board developed a policy entitled "Student Discipline."  That policy indicates that the Board shall require each student to adhere to the rules and regulations promulgated by the administration and to submit to disciplinary measures appropriately assigned for infraction of those rules.  The policy states that any student disciplined by a district employee shall have the right to notice of the infraction and a hearing before the building principal prior to being disciplined, and may appeal the discipline determination to the superintendent. (Board Policy Number 218.)

The Board developed a policy entitled "Suspension and Expulsion."  That policy indicates that the Board recognizes that exclusion from the educational program of the schools, whether by suspension or expulsion, is the most severe sanction that can be imposed on a student in the district and one that cannot be imposed without due process.  The Board may suspend, after a proper hearing, a student for such time, as it deems necessary or may permanently expel him or her.  The policy states that no student may be suspended without notice of the reasons for which he is suspended and an opportunity to be heard in his own behalf before the school official who holds the authority to reinstate him.  The parents shall be notified immediately in writing when a student is suspended.  When the suspension exceeds three (3) school days, the student and parent or guardian will be given the opportunity for an informal hearing with the designated school official.   The hearing shall take place as soon as possible after the suspension, except when extraordinary circumstances involving the health and safety of the student or others in the school require immediate exclusion, the hearing may be delayed to such time as circumstances permit. (Board Policy Number 233.)

The Board developed a policy entitled "Student Rights."   The policy indicates that no student shall be deprived of equal treatment and equal access to the educational program, due process, a presumption of innocence, and free expression and association, in accordance with Board policy. (Board Policy Number 235.)

The Board developed a policy entitled "Unlawful Harassment."  The policy indicates that the Board prohibits all forms of unlawful harassment of students and encourages students who have been harassed to promptly report such incidents to the designated employees.  The policy further states that the Board directs that complaints of harassment shall be investigated promptly and corrective action shall be taken when allegations are verified.  The policy defines

the term harassment, in part, as unwelcome and offensive physical conduct relating to sex, which creates an intimidating hostile or offensive educational environment. When a student believes that he or she is being harassed, the student should immediately inform the harasser that his or her behavior is unwelcome, offensive, or inappropriate. If the unwelcome, offensive, or inappropriate behavior continues, the student shall follow the established complaint procedure. The complaint procedure includes the following:

1.    A student shall report a complaint of harassment, orally or in writing, to the building principal or a designated employee, who shall inform the student of his or her rights and of the complaint process.

2.    The building principal immediately shall notify the Superintendent or other designated administrator and shall conduct an impartial, thorough, and confidential investigation of the alleged harassment. In determining whether alleged conduct constitutes harassment, the totality of the circumstances, nature of the conduct and context in which the alleged conduct occurred shall be investigated.

3.    The building principal shall prepare a written report summarizing the investigation and recommending disposition of the complaint. Copies of the report shall be provided to the complainant, the accused, the Superintendent and others directly involved, as appropriate;

4.    If the investigation results in a substantiated charge of harassment, the district shall take prompt corrective action to ensure the harassment ceases and will not recur. (Board Policy Number 248.)

Mr. Donald Stewart, Superintendent, indicated that he was not notified before the discipline decision was dispensed. (Stewart 74:14)   The District standard requires that a report be prepared for the Superintendent, recommending disposition of the complaint.  Mr. Gale indicated that he was not aware that the superintendent is required to be called in a claim of unlawful

harassment. (Gale 126:23)  Mr. Gale was also not aware that he was supposed to circulate the investigation report to the accused and the complainant. (Gale 127:6)  Mr. Gale breached his duty to notify the superintendent, to prepare an investigative report, and circulate that report to the appropriate individuals.  A summary was prepared about January 30, 2002 (Gale 131:7), which was approximately seven weeks after the suspension.

**Penn Manor High School Administrative Handbook.**

The Penn Manor High School publishes an administrative handbook that contains policies and procedures concerning the effective operation of the school.  The handbook includes a section entitled "Sexual Harassment."  This section describes examples of sexual harassment and the procedure for registering a sexual harassment complaint.  The section is specifically written for employee misconduct and not student misconduct.

**Penn Manor High School Student Handbook.**

The Penn Manor High School publishes a student handbook, which is distributed to each student.  According to the principal's message, the handbook is designed to inform the student body of policies and procedures established at Penn Manor High School.  The policies are designed to ensure a productive educational environment.  Students, according to the principal's message, are required to have a student handbook with them through the school day.

One section of the student handbook describes the peer mediation program.  The program helps students resolve their conflicts peacefully. Students trained as peer mediators conduct mediation sessions.  Students in conflict are given the chance to explain their side of the story without interruption. Then they are given the chance to respond and clarify what the other person has reported.

Consequences for inappropriate behavior are defined in the student handbook. One section describes the consequence of inappropriate public display of affection, indicating that the first offense is addressed with a written warning. The second offense will require a one-hour detention and the third offense a two-hour detention.

Consequences for harassment of students are defined in the student handbook. The first step is to conduct a conference with both sides. Detention or immediate suspension, peer mediation, or a letter sent to parents may result. The second step includes detention or suspension, a parental conference and required additional counseling, and possibly police involvement.

The student handbook for the 2003/2004 school year contains a section entitled "Out of School Suspension." This section indicates that out of school suspension is reserved for severe discipline, failure to serve detentions or repetitive disciplinary problems. A parent conference is required for reinstatement. It states in this handbook "an informal hearing with the administrator will occur for student suspensions beyond the third day." This did not exist during the 2001/2002 school year.

**School Records Pertaining to Joshua Shuman.**

Joshua was born on September 17, 1986 and was attending grade ten during the 2001-2002 school year at Penn Manor High School. Penn Manor High School is a school in the Penn Manor School District, Millersville, Pennsylvania. A review of Joshua's school records indicates that he achieved grades of mostly B's during the ninth grade and mostly C's during tenth grade. Standardized test scores revealed a student of average to above average achievement in most academic subject matter. Mr. Gale indicated that Joshua was not a problem student (Gale 46:16) and he was not aware of any discipline issues. (Gale 46:21) Ms. Janice Mindish, Principal of Penn Manor High School,

indicated that Joshua was not a problem student (Mindish 90:25) and had no discipline to speak of, of which she was aware. (Mindish 98:3)

When Joshua was attending the first grade, he was referred for a consultation due to below academic performance compared with his peers. The team recommended a check on his reading progress mid-year. There is no other information in the record indicating that special education was provided for Joshua. His progress report for third grade indicates that he demonstrated capable progress, met expectations with guidance and support, and worked satisfactorily and appropriately in most areas. Joshua's report card for grade six indicates that he demonstrated significant progress, met expectations successfully with minimal support and worked confidently and competently in most academic areas. Indications of character development were rated by his teacher as progressing successfully in most areas.

Overall, a review of the record indicates that Joshua was a typical student with average ability who progressed through the school system without academic or behavior concerns.

**School Records Pertaining to Olivia Becker.**

Olivia was born on February 24, 1986. She attended parochial school through her elementary grades. A review of her record indicates that she performed academically and behaviorally within the average range. She attended the Lamperter-Strasburg School District before transferring to Penn Manor School District where she started grade ten in the 2001-2002 school year.

During the latter half of the eleventh grade, her father, who expressed concern that she may have a learning disability, referred Olivia for a multidisciplinary evaluation. Achievement testing found Olivia's reading skills to be significantly below grade and age expectations. Her math skills were found to be another area of learning deficiency. School Psychologist, Dr. Robert Hoeppel,

in his May 13, 2003 report indicated that Olivia described school as being a highly stressful environment and she has experienced what she described as panic attacks since eighth grade. She reported being symptom-free during tenth grade. Dr. Hoeppel concluded that Olivia could be described as having low average, to average cognitive ability. Olivia also exhibited a history of emotional distress that further interfered with her availability to learn. As part of the evaluation process Olivia's father, Mr. Thomas T. Becker, completed a form describing current or past problems in behavior areas. Mr. Becker indicated, among other issues, that Olivia blames others for her own mistakes, engages in physically dangerous activities, lies, and has rapid mood swings. Dr. Hoeppel recommended that the school consider Olivia eligible for specially designed instruction as a student with a learning disability and emotional concerns. The multidisciplinary evaluation team concluded that Olivia is a student with a disability and classified her as emotionally disturbed with a secondary disability category of specific learning disability. The determination of the District was that she was in need of specially designed instruction including social skills and support in the content areas of reading and math.

**Description of the Incident and Follow-up by School Personnel.**

On December 7, 2001, Joshua was attending school at the Penn Manor High School. He and other students, including Olivia Becker, Jeremy Fritsch, Jennifer Nickle, and Jay Shaiebly were attending class in the agriculture room of the school during the second and third block of the day. A substitute teacher, Ms. Myers, was in charge of the class on that day since the regular teacher, Ms. Carole Fay, was not present.

On December 10, 2001, Mr. Gale indicated, he first learned of Olivia's claim, after she went to one of the guidance counselors, Mr. Wildasin. (Gale 48:10) Mr. Wildasin brought Olivia to him (Gale 49:7) and she said that she needed to talk about some things that had occurred on the Friday before. (Gale 49:10) Olivia told Mr. Gale that prior to the class in question she and Joshua

were flirting back and forth which entailed talking and joking around. (Gale 50:11, 50:19)  Olivia told Mr. Gale that during the agriculture class, while they were watching a video, Joshua had his hand on top of her hand and she went along with it because he had a hold of her hand. (Gale 51:14)  Mr. Gale indicated that Olivia alleged Joshua forced himself on her sexually.  Mr. Gale told Olivia that he would investigate (Gale 54:10) and he sent her back to class. (Gale 54:12)  Olivia identified three students, according to Mr. Gale, and he wrote their names down. There were no notes of Mr. Gale's alleged investigation provided by the District.

At approximately 10:15 AM on December 10, 2001, Joshua was called to the school office to meet with Mr. Gale.  Mr. Gale stated that he informed Joshua that he was being accused of inappropriately touching a young lady in his classroom. (Gale 55:23)  According to Joshua, Mr. Gale told him that Olivia was claiming that he physically forced his hand upon her and that she was very upset about it. (Shuman 81:8)  According to Joshua there was no force involved and the two of them were touching each other over their clothing and that that Olivia physically held his hand.  Mr. Gale informed Joshua that the stories did not match and immediately put Joshua in another room in the school.  According to Mr. Gale while Joshua was in the room Olivia was called down a second time and denied that the actions were consensual and became angry. (Gale 63:6; 64:3)

Joshua was in a separate room for three to four hours.  During the time that Joshua was interrogated by Mr. Gale and Mr. Baddick it was mentioned that the police could become involved. (Shuman108:8)  According to Joshua, he took this as a threat. (Shuman 108:13)  If the administrators said this during the time that they were questioning Joshua it was and inappropriate comment and the type of behavior that is not acceptable for administrators in a school setting.  Also during the questioning Mr. Baddick asked Joshua "did you feel her to get a rise." (Shuman 93:11)  If Mr. Baddick said this during the questioning of Joshua it was an inappropriate comment and the type of statement that is not acceptable for an

administrator in a school setting.  The administrators claimed that another investigation was taking place on another matter, which distracted them from only dealing with Joshua in a timely manner.  Even if this other investigation was taking place, the time of Joshua's detention was unreasonable.

According to Joshua, after the administrators talked him with, Mr. Gale indicated that there were no witnesses and that he was suspended for four (4) days because of inappropriate conduct.  During these meeting Joshua was never told that he was disciplined for sexual harassment. (Shuman 112:6)  After Joshua found out his punishment, Mr. Gale called his mother.  Neither Joshua nor his mother was ever told that he was being disciplined for sexual harassment.

In a handwritten letter, Joshua indicated that Olivia and he were flirting with each other in class on Friday.  In the third block, Ms. Myers said it was okay for him to move to the back of the room to talk to Jeremy Appel.  Then he and Olivia started to flirt again; she nudged his leg and he touched her leg.  Then he touched her crouch and she proceeded to rub his penis.  He stated that there was no resistance or force involved and she was laughing about it.  On the following Monday, Joshua wrote, Mr. Gale told him that Olivia said he had sexually forced himself on her.

Jeremy Fritsch, a student in the class, indicated that he saw Joshua and Olivia touching each other and he saw Olivia pull Joshua's hand down to her crotch.  He did not hear either of them say no or anything. (Fritsch 12:6)  He indicated that he saw Olivia pulling Joshua's hand down to her crotch and that she was not trying to push him away. (Fritsch 17:4)  Jeremy reported that he heard laughing between both Joshua and Olivia. (Fritsch 16:15)  He indicated that he thought he was sitting right in front of Joshua and Olivia. (Fritsch 13:24)  In a handwritten report, Jeremy indicated that Mr. Gale called him to the office and interviewed him about what he saw between Joshua and Olivia.  Jeremy

stated that he told Mr. Gale what he saw and Mr. Gale wrote it down.  Copies of notes were never provided.

In Answers to Interrogatories prepared by Mr. Baddick, Ms. Mindish and Mr. Gale, they indicated that Mr. Gale interviewed students Dusty Lewis, Shawn Bachman, and Jennifer Nickle on December 10, 2001.  Ms. Mindish also indicated that these were the three students interviewed and they were friends of Olivia. (Mindish 119:8, 119:15)  However, Ms. Nickle indicated that she did not think that Mr. Gale called her down on December 10, 2001 to talk with her. (Nickle 23:12)  She stated that she would remember because it was a "pretty big deal." (Nickle 23:17)  Ms. Nickle indicated that Olivia did not talk with her about any contact between her and Joshua. (Nickle 21:10)  Shawn Bachman indicated that he did not remember anything that went on in the class and did not remember talking to any administrator or to Olivia about the incident. (Bachman 11:10; 16:14; 18:7)  Mr. Bachman indicated that he did not witness any contact between Joshua and Olivia in the class. (Bachman 18:4)  Ms. Mindish indicated that these three witnesses did not see anything. (Mindish 140:21)  These students were not witnesses to the activities that occurred in the class.  If they represented what Olivia told them from her perspective, the administrators were relying on incomplete information at best.  As set forth above, the testimony from two of the three students indicates that neither remembers being called to the office, speaking with an administrator or ever speaking with Olivia about the incident.  (It is my understanding that Dusty Lewis is deceased.)

The assumption that Olivia accurately told students what had happened is not reliable evidence from which a reasonable school administrator should make a determination about circumstances that could deny a student of educational opportunity by virtue of a long-term suspension of four (4) days.  Ms. Mindish indicated that discipline actions that involve suspensions of four (4) days or more are not routine. (Mindish 180:14)  Mr. Gale indicated that none of the students he interviewed saw anything. (Gale 67:21)  The students he interviewed were, he

thought, friends of Olivia, who she claimed to have told of the incident, after the fact, and who in fact did not witness anything.  Ms. Mindish indicated that the administrator would often say to a student, "who saw what happened…? And then we will call those students in and talk to them." (Mindish 46:23)  Ms. Mindish indicated that she believed she was told that, even Olivia's witnesses did not see anything, and that no one on either side saw anything one way or the other. (Mindish 117:15)

Ms. Mindish indicated that the District policy regarding unlawful harassment requires that the administrator must conduct an impartial, thorough, and confidential investigation of the alleged harassment. (Mindish 73:24)  There is no information in the record, and no report, that indicates that the District, through its employees, conducted an investigation in a meaningful way.  Mr. Baddick, Mr. Gale and Ms. Mindish all indicated that the only documentation of the interviews of students is a document entitled "Summary of Events in Josh Shuman Case."  Mr. Gale indicated in his answers to interrogatories that there were no known witnesses to the situation other than Joshua and Olivia. However, he failed to investigate to the point of reasonably determining whether in fact there were any witnesses.  Ms. Mindish stated that normally (in a situation like this) one would interview the classroom teacher. (Mindish 118:24)  Even though Ms. Mindish indicated that attempting to contact the substitute teacher was certainly something that could be done (Mindish 118:16), Mr. Gale did not attempt to contact her for information.   Even though the substitute teacher was in charge of the class that day, Mr. Gale claims to have listened to the accounts of three students.  They did not witness anything in the class.  Mr. Gale indicated that he did not think that he asked Joshua if he knew of any witnesses. (Gale 71:21)  He indicated that he did not think it was important to know if Joshua had any witnesses because if they had been that important he felt that Joshua would have offered them to tell his side. (Gale 72:8)  Since he was the administrator investigating the allegation against Joshua, Mr. Gale had an obligation to conduct a fair and thorough investigation of the charges.  As such, Mr. Gale should have

indicated to Joshua that he could have named witnesses to verify his description of what occurred, but he failed to do so.  Mr. Gale indicated that he was trying to do a fair investigation (Gale 72:14) and he agreed that he was trying to find every person who had knowledge or could assist with the determination of who was telling the truth. (Gale 72:21)   However, he only claims to have interviewed students identified by Olivia. (Gale 73:2)  In this situation, Mr. Gale failed in his duty since he only listened to Joshua, to Olivia, and, he claims, to the three students Olivia identified.  He failed to interview any independent witnesses from the class.  Mr. Gale stated that he made no attempt to contact the substitute teacher (Gale 74:17) and made no effort at that point to find other witnesses. (Gale 74:21)   Mr. Gale breached the District standard as articulated by Ms. Mindish.  Even with the lack of information from all potential eyewitnesses, i.e., all the students in the class and the teacher, Mr. Gale stated that he formed a judgment after talking to Olivia a second time, and talking to the three students to whom she allegedly relayed her story. (Gale 71:14)  Two of the three witnesses did not remember talking with Mr. Gale or even Olivia.  This calls into question whether Mr. Gale ever spoke with any of these witnesses.

Mr. Gale informed Joshua that he was suspended for four (4) days.  A review of the record indicates that Joshua was suspended for inappropriate conduct.  Mr. Gale indicated that inappropriate conduct is the same as sexual misconduct. (Gale 37:9) and that sexual misconduct is consensual. (Gale 36:18, 37:1, 37:3)  Ms. Mindish indicated that if the touching were consensual they would both have a suspension for inappropriate conduct. (Mindish 133:12)  Ms. Mindish indicated that it does make a difference if the touching is consensual, because that means they both behaved inappropriately. (Mindish 134:4)  Mr. Gale indicated that sexual harassment is not consensual. (Gale 37:3)  Ms. Mindish indicated that in a different situation, where two students were both acting inappropriately, these students both were suspended for three days. (Mindish 134:25)  Ms. Mindish stated that she is not aware of any situation that was classified as consensual conduct, that was inappropriate, and only one

student was disciplined. (Mindish 137:2)  Therefore, if Joshua was charged with inappropriate conduct, i.e., sexual misconduct, which is consensual by District standard, then the District, through its employees breached his right to equal treatment by failing to discipline Olivia under the same standard.

Ms. Teresa Shertzer, Joshua's mother, was contacted approximately three to four hours after Joshua was originally detained and questioned by school staff, and was told to come to the school to pick up her son.  According to Ms. Shertzer there was a short telephone conversation with Mr. Gale. Ms. Shertzer indicated that Mr. Gale told her that Joshua was being suspended for inappropriate touching but would not tell her Olivia's name or what Joshua was being accused of.  He told her it was confidential. (Shertzer 43:9)  Ms. Shertzer should have been called right away, as soon as Joshua was called to the office.  It was inappropriate for Mr. Gale to wait for three to four hours to call Ms. Shertzer.

Mr. Gale indicated that whether a student is detained in a separate room or office after initial questioning depends on whether the administrator decided that disciplinary action is warranted (Gale 33:10); otherwise the student returns to class. (Gale 33:14)  Mr. Gale indicated that Joshua was in the conference room about two and one-half to three hours. (Gale 116:14)  Since Joshua was being detained, Mr. Gale had exercised the District policy following a determination that Joshua would be disciplined and likely suspended.  Joshua was suspended from December 11 through December 14, 2001.  Because of the disciplinary action taken against Joshua, he was prohibited from attending the Pennsylvania Farm Show.

Ms. Mindish stated that whenever there is a suspension of more than three (3) days, an informal hearing is required. (Mindish 72:12)  There is no indication in the record that the District, through its employees, provided for an informal hearing to take place, either when Joshua's mother came to the school to pick him up, or at any time at all.  Ms. Mindish indicated that Ms. Shertzer was

probably not advised that when she picked Joshua up from school, that was the informal hearing, (Mindish 147:20), a time, according to Ms. Mindish, during which Joshua and Ms. Shertzer could seek and obtain additional information that could potentially clarify and resolve some or all outstanding issues.   Donald Stewart, the acting superintendent at the time, indicated that an informal hearing is "…an opportunity for the youngster and his parents to have an opportunity to discuss the circumstances and understand the circumstances of the suspension." (46-5) He further indicated that the parent and student needs to be informed of what the accuser said and what the accused did. (55:5)  Upon questioning, the school administrator should provide detail to the parents the reasons for suspension (55:11).   Mr. Stewart stated that the informal hearing frequently occurs when the parent comes to pick up the child. (46:24)  He further indicated that, while he is familiar with the education code which specifies that a parent is to be notified about a time and place for the informal hearing (47-24), he doesn't know what words the parents are to be told to inform them it is the informal hearing. (48-5) From Ms. Mindish's conversations with Mr. Gale or Mr. Baddick, she does not know if Ms. Shertzer, at minimum, was given the complainant's name (Mindish 149:2) and/or whether she was told what Olivia claimed Joshua did to her. (Mindish 149:6)  Ms. Shertzer indicated that she was never told these things from the administration.   Even if school officials considered this an informal hearing, it breached the applicable administrative standard for this context.   As stated previously, the administrators do not seem to agree on the timing of an informal hearing.  No matter when they claim they say it is supposed to occur, Joshua and his mother were never informed that any meeting or conversation was an informal hearing.

When Jeremy learned of Joshua's suspension, he approached his teacher, Ms. Fay, and told her what he witnessed in the classroom on December 7, 2001.  He stated that he saw Olivia and Joshua touching each other.  He also saw that Olivia was a willing participant, that she engaged in touching Joshua and encouraging him to touch her, and at no time did she tell Joshua to stop.  In

response to Jeremy's statements, Ms. Fay told him that there was nothing she could do and to forget it. (Fritsch 22:14)  Jeremy indicated that because Ms. Fay told him to forget about it he did not go to see Mr. Gale or any other administrators about what he had observed. (Fritsch 42:1)  A handwritten report developed by Jeremy indicates that he saw Joshua and Olivia touching each other.  He saw Olivia grab Joshua's hand and pull it to her crotch.  He also indicated that he saw Olivia touching Joshua and did not hear Olivia or Joshua tell each other to stop.  Jeremy went to Ms. Fay during the time that Joshua was on suspension.  It was inappropriate action on Ms. Fay's part that she failed to go to the administration with this information.

Ms. Mindish stated that she asked Mr. Gale why he did not give her Jeremy's name before and he said he did not realize this student saw anything, and the student came to him after Joshua returned from suspension.  Thus, he was not aware of the student at the time he investigated. (Mindish 143:24)  Ms. Mindish indicated that if Jeremy had been interviewed at the beginning about what he saw it could have changed the discipline. (Mindish 205:3)  If Mr. Gale appropriately followed the standard, he would have conducted a thorough investigation prior to the determination of the suspension.   This investigation would have included interviewing the students and teacher who were in the class during the incident.  If he had completed such an investigation, then it is likely that Jeremy's information, concerning his witnessing of the events, would have been uncovered and considered, and likely could have modified the decision to suspend Joshua and prevent the issue pertaining to his equal treatment.

Ms. Shertzer received a letter from the district on or about December 13, 2001, stating that the reason for Joshua's suspension was "Sexual Harassment. More specifically: Inappropriate conduct."  This is the first time that these terms were used and Joshua and Ms. Shertzer saw them.  The letter advised Ms. Shertzer to call the school office to schedule a reinstatement conference.  The letter did not mention an informal hearing.

A reinstatement conference was conducted at the school on December 14, 2001. Ms. Janice M. Mindish, Principal, and Mr. Gale, indicated to Ms. Shertzer and others present that they were not at the conference to discuss the incident; that the conference was a reinstatement conference not an informal hearing. No other conferences or hearings were held or scheduled. According to Answers to Interrogatories prepared by school officials, Joshua did not deny the inappropriate contact with Olivia. At the meeting, questions were asked about the incident (Gale 119:24), but the family and Joshua's attorney at the time, were told by Ms. Mindish (Gale 120:8) that it was not an informal hearing but rather, a reinstatement conference. (Gale 120:4) Mr. Stewart indicated that he thought a reinstatement conference might not have to be "exclusively" for that purpose (99-13) and that, "it could be, yes," if a parent with a disciplined student started to ask questions during the reinstatement conference, and wanted there to be a hearing, there could be. (100-1) When Joshua returned to school on or about December 17, 2001, he was provided a document that stated that he was reinstated to school as of December 17, after a successful parent conference was held. Mr. Stewart indicated that a suspended student returns to school the day of the reinstatement conference but Joshua returned, not on Friday December 14, 2001, the day of his reinstatement conference, but on Monday December 17, 2001. (137-16). Record documents, as well as Mr. Stewart's deposition testimony (137-20), indicate that Mr. Bob Frankenhouser, District attorney, wrote a letter explaining that the December 14, 2001 meeting was Joshua's informal hearing. This indicates that a contradiction concerning the understanding of the administrators as to when an informal hearing is to take place. Clearly from the record the reinstatement conference was not an informal hearing.

On or about January 23, 2002, Joshua made a written complaint against Ms. Becker, in accordance with Penn Manor District Policy 218, Section 248. That policy states that, if it is concluded that a student has made false

accusations against another, that student shall be subject to disciplinary action. There is no documentation in the record that indicates that the District, through its employees, followed its own standard and conducted an investigation of the complaint.   Joshua and his mother were not advised that any investigation occurred at this time.   However, in interrogatories prepared by school officials and the depositions of Ms. Mindish and Mr. Gale it is indicated that an investigation was made relating to a follow-up on January 25, 2002.   In that apparent second investigation, according to the summary of events prepared by Mr. Mindish, Olivia identified a fourth witness, Jay Shaiebly.   He apparently was an actual witness.   However, he indicated that he never spoke with Olivia or an administrator about the incident.

On or about January 24, 2002, Joshua, through his counsel, in accordance with Penn Manor District Policy 218, Section 248, sent a written appeal letter to the Superintendent. The letter pointed out the failure to hold an informal hearing, the failure to properly investigate the allegations and prepare a written report, and the improper detention and questioning/interrogation of Joshua for approximately 4 hours on December 10, 2001.   The District responded that the appeal was untimely and that no further action was warranted or necessary.   Donald Stewart, serving as Superintendent at the time of this incident indicated that there is no time limit of which he is aware in which to bring an appeal of a disciplinary matter that involves unlawful harassment (78-24) and that he has the authority to reopen an investigation. (128-11).

**Conclusion.**

The District, through its employees, breached the standard in the field of education and education administration and supervision, which resulted in Joshua's unfair and mistaken exclusion from the educational process.   The District's decision, through its employees, to suspend Joshua for four (4) days was not supported by substantial evidence.   The District, through its employees, breached its standard regarding unlawful harassment.

The District, through its employees, breached its duty to thoroughly investigate the complaint against Joshua, to inform him that he had the right to speak to, and question his accuser, and to provide an opportunity for an informal hearing, before excluding him for four (4) days from the educational process, or within five (5) days of his suspension.  District policy specifically provided for a factual hearing at which Joshua could contest the suspension, confront the accuser's witnesses and cross-examine them, or call witnesses to verify his version of the incident. The reviewed record fails to indicate that such process took place.  Even under the standard of Goss v. Lopez Joshua was never provided an explanation of the evidence the authorities had.  The District, through its employees breached its standard by failing to prepare a written report summarizing the investigation and recommending disposition of the complaint, and as a result, it failed to uphold District policy to provide copies to the complainant, the accused, the Superintendent and others directly involved. The District, through its employees, breached its standard of investigating allegations of harassment by failing to conduct an impartial investigation. In the course of his investigation, Mr. Gale did not interview students in Joshua and Olivia's class and did not interview the teacher. He dispensed Joshua's discipline based on inferences made because of information provided by witnesses named only by Olivia Becker.

The District policy specifies that inappropriate conduct, in the context of student discipline, is the same as sexual misconduct, which is considered consensual.  Evidence was presented to the District that the conduct was consensual and they should have disciplined both students.  Failing to do so is where they breached their own standard.

The District, through its employees, improperly and unreasonably detained and interrogated Joshua.

The District failed to provide Joshua and his mother with the information regarding Olivia's name and what she claimed he did to her.

Some discipline was warranted to both Joshua and Olivia because of their behavior. That discipline would more appropriately have been detention for both of them rather than suspension for only Joshua for four days. The District, through its employees, failed to uphold its standard and denied Joshua equal treatment under this standard by suspending him for inappropriate conduct but not assigning any disciplinary consequences to Olivia for participation in the same conduct.

As a result of the arbitrary manner in which discipline was assigned to Joshua, he was denied access to his education and sustained prejudice to his substantial rights.

## STATEMENT OF CONFIDENTIALITY.

I have read the statement of confidentiality in this matter and agree to abide by its provisions.

## ATTORNEY INFORMATION

Deirdre A. Agnew, Esq.
Law Offices of Deirdre A. Agnew
1450 East Boot Rd.
West Chester, PA 19380
610-738-4800

## NOTICE

As a consulting expert on this case, I reserve the right to modify or supplement this report, and the opinions herein contained, as additional information is made available or as additional tasks are assigned. Such tasks may include, but are not limited to, review of additional records and/or transcripts of depositions, interviews, and research.

_____

EDWARD F. DRAGAN, ED.D., MEL, CMC

**Appendix**

    A.      Consultant Resume

    B.      Consultant Testimony Record