Page 1

```
01       UNITED STATES DISTRICT COURT
02         FOR THE EASTERN DISTRICT
03            OF PENNSYLVANIA
04            * * * * * * * *
05  JOSHUA SHUMAN, a      *
06  minor by and          *
07  through his mother    *
08  and natural           *
09  guardian, TERESA      *
10  SHERTZER, and         *
11  TERESA SHERTZER,      *   CIVIL ACTION
12       Plaintiff        *   Case No.
13       vs.              *   02-CV-3594
14  PENN MANOR SCHOOL     *   (Tucker)
15  DISTRICT; PENN        *
16  MANOR SCHOOL          *   DEPOSITION OF
17  BOARD; C. WILLIS      *   JOSHUA SHUMAN
18  HERR; RICHARD L.      *   September
19  FRERICHS; JEFFREY     *   5, 2003
20  E. LYON;              *
21
22
23        Paragon Court Reporting
24        335 North Front Street
25        Philadelphia, PA 19106
```

Page 2

```
01  PATRICK T. KLINE;     *
02  DONALD H.             *
03  ANDERSON; H.          *
04  THOMAS HERR; KELLY    *
05  K. WITHUM; DONNA      *
06  WERT; JEFFREY G.      *
07  KREIDER; DOLORES      *
08  WARFEL and STEVE      *
09  SKROCKI, each         *
10  individually and      *
11  as                    *
12  members/officers      *
13  of the Penn manor     *
14  School Board; GARY    *
15  B. CAMPBELL,          *
16  individually and      *
17  as Superintendent     *
18  of the Penn Manor     *
19  School District;      *
20  DONALD STEWART,       *
21  individually and      *
22  as Acting             *
23  Superintendent of     *
24  the Penn Manor        *
25  School District;      *
```

Page 3

```
01  individually and      *
02  as Principal of       *
03  Penn Manor high       *
04  School of the Penn    *
05  Manor School          *
06  District; BRIAN D.    *
07  BADDICK,              *
08  individually and      *
09  as Assistant          *
10  Principal of Penn     *
11  Manor High School     *
12  of Penn Manor         *
13  School District;      *
14  PHILLIP B. GALE,      *
15  individually and      *
16  as Dean of            *
17  Students of Penn      *
18  Manor High School     *
19  of Penn Manor         *
20  School District;      *
21  and CAROLE FAY,       *
22  individually and      *
23  as a teacher and      *
24  Agriculture           *
25  Coordinator at        *
```

Page 4

```
01  Penn Manor            *
02  School                *
03  District,             *
04       Defendant        *
05            * * * * * * * *
06           DEPOSITION OF
07           JOSHUA SHUMAN
08          September 5, 2003
```

EXHIBIT B

**Paragon Court Reporting, LLC**                    Page 1 - Page 4

Page 169

01  information, and the stories don't
02  match, and you don't figure out whose
03  story doesn't match, either nobody
04  gets in trouble or both of them get
05  in trouble for the act. There's no
06  question when it comes to flirting.
07  It don't matter if you're fighting
08  yourself or not in the hallway. Both
09  of you should get kicked out of
10  school.
11  Q. Are you surprised that
12  immediately following the class,
13  Olivia Becker was in the hallway
14  saying you touched her and it was
15  unwanted? Did that surprise you?
16  A. Yes.
17  Q. But you didn't tell anybody at
18  that time that she was lying? You
19  didn't make yourself heard that time,
20  speak to any of those kids, stop her
21  and say what are you're saying,
22  you're lying? That's not true. Why
23  didn't you do that?
24  A. Because I didn't have a need
25  to. Nobody believes her anyway.

Page 170

01  Q. So nobody believes her anyway?
02  A. Exactly.
03  Q. Who'd ever believe her?
04  A. Any kid in that classroom, I
05  guarantee you does not believe her.
06  When she talks in class everybody
07  makes a face about her talking.
08  Q. Why?
09  A. Because she's annoying and she
10  doesn't tell the truth. She does not
11  tell the truth and she is an
12  attention seeker. And I'm not the
13  only person that says that.
14  Q. Why haven't you sued her in
15  this case?
16  A. Because she's not the one that
17  made the decision on the discipline.
18  Q. She's the one lying, according
19  to you.
20  A. It's one thing for her to lie,
21  but someone that's supposed to be
22  handling something and going through
23  the process in trying find something
24  out, it comes to a conclusion that
25  had no evidence behind it. Then I

Page 171

01  find a problem with it, because I got
02  kicked school for four days and my
03  whole reputation ruined.
04  Q. Okay. So you think that it's
05  a greater wrong to believe somebody
06  who's lying than to actually lie in
07  the first place, and that's why you
08  decided to sue the school and the
09  administrators instead of Olivia
10  Becker; is that accurate?
11  A. Well, how do you know if I get
12  done suing the school district, I'm
13  not going to sue her?
14  Q. Okay. That's what I'm asking.
15  Why haven't you sued her, why
16  haven't ---?
17  A. I haven't got there yet.
18  Q. Okay. Fair enough.
19  A. She keeps bragging that way,
20  she's ---.
21  Q. Would you describe yourself as
22  a stable person?
23  A. Yes.
24  Q. Have you had problems with
25  your emotions in the past?

Page 172

01  A. No.
02  Q. Do you have problems
03  expressing your emotions?
04  A. No. I wouldn't say that.
05  Q. Do you have a good
06  relationship with your family?
07  A. Yes.
08  Q. Describe for me the
09  relationship you have with your
10  sister.
11  A. I'd say it's a good
12  relationship.
13  Q. Does your sister have a heroin
14  addiction?
15  A. She did.
16  Q. Can you tell me about that?
17  A. She was a heroin addict for
18  two years.
19  Q. Did she go to jail?
20  A. Yes.
21  Q. For what?
22  A. Possession and stealing.
23  Q. Give me the time period for
24  the heroin addiction and the time she
25  went to jail.

## Page 173

01 A. Don't know the time periods.
02 Q. Prior to December 7th of 2001?
03 A. Yeah, it's prior.
04 Q. A year prior, more than a year
05 prior?
06 A. About a year prior.
07 Q. Did your sister attend Penn
08 Manor School District?
09 A. Yes, she did.
10 Q. Did she have trouble in
11 school?
12 A. Yes.
13 Q. What kind of trouble?
14 A. Cutting class, she had
15 problems with school officials, had
16 problems with the counselors.
17 Q. Did she ever run away from
18 home?
19 A. Not that I'm aware of.
20 Q. She's over the heroin
21 addiction now?
22 A. That's correct. She has a
23 child and a fianc .
24 Q. I'm sorry, did you tell me
25 that you couldn't recall if it was a

## Page 174

01 year --- from a year prior to
02 December 7th, 2001, when your sister
03 ---?
04 A. It was prior I believe, I'm
05 not 100 percent sure on that.
06 Q. How did you react personally
07 to the fact that your sister had this
08 drug addiction and these
09 run-ins with the law?
10 A. That was her own doing.
11 Q. How did it affect you?
12 A. I was upset about it, but
13 there was nothing I could do about
14 it.
15 Q. Was your relationship with her
16 during this time period good or bad?
17 A. I didn't talk to her.
18 Q. Why didn't you talk to her?
19 A. Because I didn't want to be
20 associated with her while she was
21 doing that.
22 Q. It's fair to say that you were
23 upset with what she was doing?
24 A. That's correct.
25 Q. Were you getting psychological

## Page 175

01 treatment as a result of the way you
02 felt about your sister and her drug
03 addiction and her run-ins with the
04 law?
05 A. I was talking to my
06 psychologist at that time. But that
07 was not my doing, talking to the
08 counselor.
09 Q. Whose doing was it?
10 A. My mom wanted to make sure.
11 She called and asked to set up an
12 appointment to see if I was all right
13 with handling that.
14 Q. Did your mom have some
15 concern?
16 A. She had some concern that
17 maybe I was like hiding how I felt
18 about it. But it was determined that
19 I had normal feelings, like anybody
20 else.
21 Q. During that time of treatment,
22 do you recall whether or not you were
23 diagnosed with any type of
24 psychiatric or psychological
25 disorder?

## Page 176

01 A. No. I was not.
02 Q. Do you recall being diagnosed
03 with adjustment disorder, with
04 depression on or around December of
05 2000?
06 A. No.
07 Q. Tell me about your
08 relationship with your natural
09 father?
10 A. There is none.
11 Q. What's your natural father in
12 jail for, do you know?
13 A. Intent to kill. Two counts.
14 Q. Assault with intent to kill,
15 do you know anything more specific
16 about the charges?
17 A. I don't know anymore specific,
18 except to an attempt to kill.
19 Q. He didn't kill somebody?
20 A. I don't believe he did. It's
21 intent, I don't know.
22 Q. Your natural father writes
23 letters to you?
24 A. He does occasionally.
25 Q. Do you respond to the letters?

Page 177

01  A. No, I do not.
02  Q. Does he try to call you?
03  A. No.
04  Q. Have you ever called him?
05  A. No.
06  Q. Have you ever visited him?
07  A. No.
08  Q. Have you ever experimented
09  with drugs?
10  A. No.
11  Q. Alcohol?
12  A. No.
13     ATTORNEY WILEY:
14   I have one extra copy
15  of the complete set of records
16  from Life Span Psychological
17  Services.
18     ATTORNEY AGNEW:
19   One more?
20     ATTORNEY WILEY.
21   Yes, that were
22  subpoenaed from my office. I
23  wanted to show him at least
24  one page of it and I'll have
25  it marked. But I only have

Page 178

01  one extra copy.
02     ATTORNEY AGNEW:
03   Do you want to make a
04  copy?
05     ATTORNEY WILEY:
06   Do you mind?
07     ATTORNEY AGNEW:
08   No. I don't, I don't.
09  I guess I'm going to need to -
10  -- whatever you marked, I'm
11  going to need to get a copy
12  of.
13     ATTORNEY WILEY:
14   We'll attach it to the
15  transcripts.
16     ATTORNEY AGNEW:
17   Mark the entire
18  exhibit?
19     ATTORNEY WILEY:
20   Yes. These all ---.
21     ATTORNEY AGNEW:
22   Okay.
23     BY ATTORNEY WILEY:
24  Q. These were all of the records
25  that were sent to me on May 19th, of

Page 179

01  2003, from Life Span Psychological
02  Services pursuant to my subpoena.
03  Eleven (11) pages including the cover
04  page. I understand that you treated
05  more recently, so it's possible that
06  there are additional treatment
07  records, I suspect.
08  A. Correct.
09  Q. One the fourth page back,
10  there's an initial evaluation, do you
11  see that?
12  A. Yes.
13     ATTORNEY AGNEW:
14   Initial interview.
15     ATTORNEY WILEY:
16   Initial interview is
17  what it's titled.
18     ATTORNEY AGNEW:
19   Do you want him to
20  read it?
21     ATTORNEY WILEY:
22   Not yet.
23     BY ATTORNEY WILEY:
24  Q. Do you recall having an
25  initial interview with Hubert Wood?

Page 180

01  A. Yes.
02  Q. Okay. And when you were
03  testifying you said that your mom had
04  sent you in because she was concerned
05  about your expressions of emotions in
06  relation to what was going on with
07  your sister and I guess with your
08  father. Is this what you were
09  talking about, the time you went in
10  to see ---
11  A. Yes.
12  Q. --- Hubert Wood? Okay. Do
13  you recall this initial interview?
14  A. Yes.
15  Q. And at the top it names you as
16  the patient, provides your date of
17  birth and I think that DOE stands for
18  date of evaluation, December 19th,
19  of 2000. Do you recall that being
20  the date of your initial interview?
21  A. My first interview there?
22  Q. Yes.
23  A. Correct.
24  Q. Do you recall that?
25  A. Yes.